**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES,

       v.

EDDY ALEXANDRE,

           Defendant.

No. 22 Cr. 326 (JPC)

**SENTENCING SUBMISSION ON BEHALF OF EDDY ALEXANDRE**

Emil Bove
Brittany Manna
Chiesa Shahinian & Giantomasi PC
11 Times Square, 34th Floor
New York, NY 10036
(212) 324 7265
ebove@csglaw.com

*Attorneys for Eddy Alexandre*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 3

    I.       PERSONAL HISTORY ......................................................................................... 3

          A.     Eddy's Life in Haiti ............................................................................... 3

          B.     "[A]n exemplary husband" .................................................................. 6

          C.     Eddy's Life in the United States ........................................................... 7

               1.     "[A]n extraordinary father" and Family Man ................................ 8

               2.     A "Great mentor" ......................................................................... 9

               3.     "He takes pleasure in helping people" ......................................... 10

    II.     EMINIFX ......................................................................................................... 12

    III.    EDDY'S COOPERATION WITH THE RECEIVER .......................................... 16

PSR OBJECTIONS ............................................................................................................. 18

    I.       PARAGRAPHS 8 AND 9 .................................................................................. 18

    II.     PARAGRAPHS 12 AND 13 .............................................................................. 19

    III.    PARAGRAPH 15 ............................................................................................... 19

    IV.    PARAGRAPH 19 ............................................................................................... 20

    V.     PARAGRAPH 19(c) ......................................................................................... 20

    VI.    PARAGRAPH 20 ............................................................................................... 20

    VII.   PARAGRAPH 22 ............................................................................................... 21

    VIII.  PARAGRAPH 24 ............................................................................................... 21

    IX.    PARAGRAPH 26 ............................................................................................... 22

DISCUSSION .................................................................................................................... 22

    I.      THE      LOSS-DRIVEN      GUIDELINES      RANGE      IS UNREASONABLE UNDER § 3553(a) ................................................................ 22

    II.     THE    REMAINING    §  3553(a)    FACTORS    WARRANT    A SUBSTANTIAL DOWNWARD VARIANCE ...................................................... 24

        A.     Personal History And Characteristics ....................................................... 25

            1.     Personal History .......................................................................... 25

            2.     Cooperation .................................................................................. 26

        B.     The Nature And Seriousness Of The Offense ........................................... 27

        C.     A Just Punishment Must Account For The Severe Collateral Consequences Eddy Faces .................................................................... 29

            1.     Reputational Consequences ......................................................... 29

            2.     Harsher Conditions of Confinement ............................................. 30

            3.     Immigration Custody ................................................................... 31

            4.     Country Conditions in Haiti .......................................................... 32

            5.     Separation From Family And Community ..................................... 33

        D.     Specific Deterrence Has Been Achieved ................................................. 34

        E.     The   Requested   Sentence   Would   Achieve   General Deterrence ................................................................................................. 36

        F.     Avoiding Sentencing Disparities ............................................................. 37

        G.     Non-Incarcerative Sentencing Options Are Appropriate ......................... 41

    III.    NO FINE SHOULD BE IMPOSED ................................................................. 43

    IV.    EDDY SHOULD BE PERMITTED TO SURRENDER ..................................... 44

CONCLUSION ................................................................................................................. 45

## PRELIMINARY STATEMENT

We respectfully submit this sentencing memorandum and the accompanying letters on behalf of Eddy Alexandre to assist the Court in connection with the July 18, 2023 sentencing hearing.  For the reasons set forth below, we respectfully request that the Court impose a prison term substantially below the applicable Guidelines range, supplemented by a three-year statutory maximum term of supervised release and a significant term of community service to be completed in Haiti, the $248.8 million in forfeiture to which Eddy already consented, and appropriate restitution.

As reflected in Eddy's letter, the PSR, and over 500 other sentencing letters, Eddy has accepted responsibility for his offense, and he is extremely remorseful.  (*See, e.g.*, Ex. A).[1]  This memorandum provides a clearer picture of Eddy as a person, and places his crime within the context of his life's work.  Eddy grew up in poverty in Haiti, and he was a witness to nearly unspeakable violence that has plagued that country for decades.  Following the example of his parents, he found strength and refuge in faith and service.  Eddy came here in 1998 and continued to establish himself as a good and honorable man and a leader – a loving husband of almost 25 years to his best friend and partner in life; a dedicated father of three talented young men; a devoted son to his 82-year-old mother; a supportive sibling; a trusted adviser and spiritual counselor in his church; and a mentor and father figure in his extended family and to many people in his community.  So many, in fact, that family, loved ones, and supporters have filled Your Honor's courtroom, as well as others, to help Eddy through this difficult time.

Eddy's eight-month offense was in many ways a stark departure from the tremendous

---

[1] Unless otherwise noted, citations to "Dkt." are to entries on the public docket in this case, citations to "CFTC Dkt." are to entries on the public docket in *CFTC v. Alexandre, et ano.*, No. 22 Civ. 3288 (VEC), and citations to "Ex." are to exhibits appended hereto.

qualities he has repeatedly demonstrated throughout his 52 years, and in other ways a product of them.  He was not motivated by greed, but rather a desire to help others through a career in providing financial services to his community through EminiFX.  Eddy entered the industry with confidence based on his prior achievements and success, but without enough experience to understand the requirements of his new field.  He faced challenges, and he also made serious mistakes.  As EminiFX grew rapidly, he felt too embarrassed to tell the EminiFX members that his platform was not operational as advertised, and that he was not making them the money that his "ROI" disclosures suggested.  Eddy recognizes how wrong this was.  By at least January 2022, Eddy worked hard behind the scenes to try to remedy the situation by, for example, hiring more experienced staff who he believed could help him recoup the market losses and deliver the investment returns he had promised.  Those efforts continued until Eddy's arrest and the shutdown of EminiFX in May 2022.  Eddy understands that he did too little, too late to correct the problem. He offers no excuses, but his actions in this regard are indicative of his motive and intent as the offense progressed.

Following Eddy's arrest, he helped the Receiver identify and recover EminiFX's assets so that they could be distributed to the former members.  The Receiver has described Eddy's efforts as "substantial cooperation," and these efforts are another significant mitigating feature at sentencing.  The Receiver has also explained that he "has recovered the bulk of the EminiFX assets," approximately $173.5 million.  The extent of this recovery, supported in part by Eddy's cooperation, is also mitigating.  In addition, it is one of the indications that the "loss" amount driving the Guidelines range in this case is unreasonable and worthy of a substantial downward variance.  Nevertheless, Eddy understands that the penalties for his offense will be severe and that they will be borne to a large extent by his family too.  These penalties will in all likelihood include

removal to Haiti, which is at least as dangerous today as when Eddy lived there previously, as well as other harsher conditions of incarceration not experienced by similarly situated U.S.-citizen defendants in the federal system.  These collateral consequences also deserve careful consideration during the crafting of an appropriate sentence consistent with the Parsimony Clause.  For all of these reasons, Eddy respectfully requests leniency so that he can move forward in his life, remorsefully, with recognition of the serious errors that led to his offense, making restitution to address the harm that he caused to victims, and working ptoward rehabilitation through continued service to his community and love of his family and friends.

## BACKGROUND

I. **Personal History**

A. **Eddy's Life in Haiti**

Eddy was born in Haiti in 1972.  (PSR ¶ 57).  During his early years, his family lived in Bassin Bleu, which is a small village about 50 miles southwest of Port-au-Prince.  The Dyaspora Coordinating Committee describes some of the challenges faced by residents of Bassin Bleu:

> While rich in natural resources, this community is lacking in many basic amenities such as roads, schools, health care, and clean drinking water.  In fact, to go to school the children of Bassin Bleu have to walk more than five miles downhill on an unpaved road and cross a bridge-less river into the town of Jacmel.  When the river crests passage is nearly impossible, which means that the students of Bassin Bleu are also cut off from accessing an education.  This fact poses a challenge not only to accessing education but also to conducting any business related to taking goods to market or purchasing basic provisions for the households of Bassin Bleu.[2]

Consistent with that account, poverty was widespread in Bassin-Bleu when Eddy was a child.  Healthcare was limited, there was little infrastructure to speak of, drinkable water was hard to find, and food was scarce.  (PSR ¶¶ 57, 59).  Cream of wheat was a staple of the family's diet.  Rice

---

[2] *See* DCC, *Bassin Bleu, Jacmel*, https://www.dyaspora.org/bassin-blue (last accessed July 5, 2023).

was a luxury and a rare treat.  (*Id.* ¶ 59).  Eddy's family did not have a car when he was young.

He walked several miles to school, even when his parents gave him bus fare, to save money for

food.  During those walks, Eddy learned about the violence that was ravaging his country.  As a

child, Eddy witnessed several murders, and he became all too familiar with the sight of dead bodies

cast aside on the dirt roads in his area.  (*Id.* ¶ 59).

Despite these challenges, Eddy's parents raised him and his siblings in a home "full of

love."  (PSR ¶ 59).  Eddy's father Matthieu was a respected pastor in the 7th Day Adventist Church

(the "Church").  Eddy grew up watching his dad preach, study theology, and perform mission work

throughout Haiti.  (*See* Emmelyne Alexandre, Ex. B at 75 ("It was customary for my father to take

Eddy with him on mission trips to the rural areas of the country as his right-hand little man.")).

Matthieu's example instilled commitment to faith, generosity, and service in all of his children.

(*Id.*).

Hurricane David struck Haiti and the Dominican Republic in August 1979.  As a seven-

year-old boy, Eddy huddled low with his family and loved ones while winds exceeding 100 miles

per hour battered his home and other structures that would be considered anything but safe under

today's construction standards.  (*See* PSR ¶ 60).  Eddy survived and worked through that trauma,

which ultimately served as a vivid memory of the bond that he shared with his family through their

service to supporting and rebuilding the community in the aftermath of the storm.

In 1985, the Church called on Eddy's father to preach in the United States.  Eddy's mother

traveled with him.  Eddy and his younger siblings stayed in Haiti with family and friends in Cap-

Haïtien and Port-au-Prince, including at a single house with 15 other people.  (PSR ¶ 62).  Thus,

at 13, Eddy assumed the role of father figure and mentor.  (*See, e.g.*, Lydie Bastien, Ex. B at 754

("Eddy was always there for his younger siblings . . . ."); Emmelyne Alexandre, Ex. B at 72

(describing Eddy in Haiti as "very kind and a responsible big brother to the younger siblings")). Childhood friends who grew up with Eddy in Haiti recall that he was a "born [l]eader" and "always a model Citizen for our community." (Joel Gustave, Ex. B at 17; Rearden-Rose Lamour, Ex. B at 76). Eddy's sister, Lydie, describes the example Eddy set: "[A]s the oldest boy, Eddy had always set the example of a life lived with high standards of love, integrity, loyalty, good humor, duty and service." (Ex. B at 753).

But times were still tough, to say the least. Prior to that point, Eddy saving money for food was an act of discipline and solidarity with his parents. In 1985, it became an imperative for the survival of himself and his younger siblings. (*See* PSR ¶ 62). And while life in Haiti's capital offered more amenities than villages such as Bassin Bleu, the violence was much worse. There were violent clashes between Jean-Claude Duvalier's government and protestors throughout the country that involved flagrant human rights abuses. (*See* Ex. C). Eddy recalls police officials, militia groups, and other criminals using tactics that included kidnapping and murder. In Port-au-Prince, Eddy saw these militias slash innocent people with knives, and much worse.

Eddy dealt with the horrific violence and other challenging conditions like his father, by committing to the Church. Already an important foundation for his own family, Eddy worked hard to lead and mentor others in the Church's youth ministry. Childhood friend Emmanuelle Franck recalls that "Eddy was my defender and a protective brother a younger sister could rely on" who "would make sure that I ate and was safe." (Ex. B at 92). Eddy taught people to play instruments like the clarinet and saxophone, he visited rural hospitals with his youth group, and he helped rebuild and renovate churches and other places of worship. (*See* PSR ¶ 60). Ms. Franck remembers that "Eddy would regularly hold classes on survival skills on sheltering, signaling, food

& water, [and] First Aid," and he "would visit the elderly and Shut-in from church."  (Ex. B at 93).

Joel Gustave, another childhood friend, described his observations of Eddy beginning in Haiti:

> He likes to volunteer for difficult and non-rewarding missions. . . . Nothing stopped him [from] being useful to others.  If you ask Eddy, even at the last moment, to accompany you to go do some ministry work in prisons and/or in hospitals, to the best of my recollection, he never refused.

(Ex. B at 17).

Between 1992 and 1994, Eddy earned a bachelor's degree in computer programming and accounting from the University Adventist of Haiti.  (*See* PSR ¶ 74).  Following his graduation, Eddy started economics coursework at Quisqueya University.  (*Id.* ¶ 75).  Traveling to Quisqueya was dangerous, and Ms. Franck used understated language to describe the risk of militia violence: "I could count on Eddy to accompany me [to Quisqueya] during inclement weather conditions or when there was political turmoil."  (Ex. B at 92).

Eddy also ran computer training and literacy programs in Carrefour and Bainet during this period.  Eddy hoped that this training would empower people in his community to obtain economic stability and build each other up.  Eddy's friend, Alain Geffrard, observed this aspect of Eddy's commitment to his community:

> I remember when he was in Port-au-Prince, he was already a computer scientist and he set up a computer school giving many young people who had no means the possibility to come and train, and thanks to that, these young people after their training found work and met their needs and those of their families.

(Ex. B at 24).

### B.    "[A]n exemplary husband"[3]

---

[3] (Pastor Smith Olivier, Ex. B at 3).

Around the time that Eddy was studying at Quisqueya and working in Carrefour and Bainet, he met his wife, Clarelle.  They married in 1998.  (PSR ¶ 64).

Clarelle remembers this important time in their life:  "I first met Eddy in Haiti in the late 90s, where he was a director for a computer school.  He was dedicated to expanding the program and helping young people learn basic computer skills.  His passion for teaching and his selflessness in serving others inspired me."  (Ex. B at 1).  Clarelle's letter also speaks to the strength of the bond that has greatly enriched Eddy's life:

> Eddy has been a pillar of support for me through thick and thin.  His unwavering love has helped me overcome many challenges and encouraged me to further my education.
>
> [. . .]
>
> Eddy is a dedicated provider who works long hours to ensure that his family has everything they need.  His love, support, and dedication have made him an exceptional husband and father.

(*Id*).

Clarelle's father, Ernst, described the stability of the marriage: "As a father, as a man you can tell when your daughter is in good hand[s].  Not once after more than 24 years of marriage that my daughter come to me to solve any issues in their relationship."  (Ex. B at 5).  According to Pastor Smith Olivier: "[Eddy] treats his wife with respect, kindness, dignity, and love, lauding her whenever possible, both publicly and privately.  This respect is mirrored by her profound admiration for him."  (Ex. B at 2).

### C.      Eddy's Life in the United States

In 1998, the same year as his marriage to Clarelle, Eddy made the difficult decision to move to the United States to support his mother, who was living in Long Island, and establish a foundation for Clarelle and the rest of his family.  (*See* PSR ¶ 61).  In this way, Eddy continued to

serve as the "back[]bone" of his family.  (Lydie Bastien, Ex. B at 753).  Clarelle joined Eddy in the United States the following year.  (*See* PSR ¶ 64).

Eddy initially found work as a computer technician.  (*See* PSR ¶ 82).  He built a family and raised his sons, he acted as a father figure and mentor to many others, and he established himself as a leader in the Church around Queens and Long Island through acts of service and charity to many.

### 1.      "[A]n extraordinary father" and Family Man[4]

Eddy's three sons – Eddy Clarke (22), M. (15), and E. (13) – are remarkably talented young men with promising futures and too many accomplishments to set forth here.  (*See* PSR ¶ 64).  Eddy Clarke is a Division I student-athlete.  M. is a high school student earning excellent grades while also playing soccer, violin, and piano.  E. is also exceling in his studies, plays the violin, and enjoys sports.

Eddy is a critical source of strength to each of his sons and has committed himself to their development throughout his life.  Lydie described her "front row seat" to

> watching [Eddy] develop from a respectful and loving son, a playful and caring big brother into an honest, God fearing Christian man.  He is a loving and devoted husband to his wife of soon 25 years, in December 2023 and a watchful, loving, fun, responsible and dedicated father to his sons.  He rarely ever misses a play or a game or a parent teacher conference, he never misses a graduation, a birthday or any award ceremony or illness or uncomfortable time of the boys' lives.

 (Ex. B at 753).  Pastor Olivier made similar observations:

> Mr. Alexandre is not only a devoted husband but also a proud father.  He has established an impressive support system for his children, always present at their activities, whether at church or school.  His public celebration of his children's achievements has fostered a deep sense of respect and admiration within them.  He is their role model, their hero, and an integral part of their lives.

---

[4] (John Maisonneuve, Ex. B at 22).

(Ex. B at 3).

Eddy has also continued to be extremely supportive of his siblings.  (Emmelyne Alexandre (Eddy's sister), Ex. B at 752 ("He checks on my emotional and mental health and brings his family over to pray with me.  During a very difficult transitional time in my life, my brother drove twice to Boston to be present, exactly what I needed at the time.")).  When Eddy's father died, he led the funeral preparations and supported his siblings.  (*See id.*).  After that, in addition to taking care of Clarelle and his immediate family, Eddy served as one of the primary caretakers for his mother, who is 82 and faces significant health challenges.  (*See* Philomise Alexandre, Ex. B at 756; Lydie Bastien, Ex. B at 753 ("[Eddy] is our elderly mother's support in NY since I live in Atlanta, GA.")).

## 2.    A "Great mentor"[5]

Eddy has devoted a tremendous amount of time and energy to mentoring and supporting relatives and loved ones outside his immediate family.  "He is always checking in on his nieces and nephews, making sure they are well, that their education plan is solid, and sharing this wonderful bright, warm smile of Uncle Eddy and rewards for all straight A's and met goals." (Lydie Bastien, Ex. B at 753).  Eddy "serves as a mentor to many young men, investing in their lives and education, and inspiring them to pursue greatness and excellence."  (Pastor Smith Olivier, Ex. B at 3).  There are numerous examples of Eddy's commitment to these types of relationships:

- "As someone growing up without a father [I] was always looking at the male figures around me and eddy was one just stood out to me. . . .  I've personally watched eddy show compassion towards people that he just met feeling deeply for another person as they experience ups and downs in life."  (Markenson Tissus, Ex. B at 31).

- "Eddy . . . played an instrumental role in inspiring me to pursue my ambitions. . . .  Eddy has been a shining example of the barriers that can be broken by minorities in the field of Tech.  He actively encouraged me to pursue my passions without fear of limitations.  He

---

[5] (Eveline Mompremier-Louis, Ex. B at 10).

cheered me on, motivated me, and helped me see my potential.  His unwavering support and encouragement inspired me to dive headfirst into the world of programming and technology." (Aisha Thermidor, Ex. B at 12).

- "[Eddy] has been in my life since I was born. . . .  He has always put his best foot forward to be a role model and has advised many people to stay in school, follow their dreams, and stay out of trouble, including myself."  (Edwina Jean-Louis, Ex. B at 34).

- "Uncle Eddy has always been a father figure in my life, the support that I have received from him is unmatched."  (Korally Cepero, Ex. B at 33).

- Eddy is a "role model to me and many others," and "his actions have demonstrated a deep commitment to making a positive impact on the world."  (Jean Loiseau, Ex. B at 38).

- "He is a great mentor to my own daughter.  For example, for my daughter's Prom last year, he stayed in contact with her to ensure that she ha[d] the proper attire to attend the event." (Eveline Mompremier-Louis, Ex. B at 10).

- "During my entire career . . ., Eddy has been an integral part of it.  He has given sound advice.  He has encouraged me when I wanted to give up."  (Charlucie Jaboin, Ex. B at 743).

### 3.    "He takes pleasure in helping people"[6]

Following his father's example and a path he began in Haiti, Eddy has devoted himself to the Church and his community in the United States.  Eddy's pastor describes him as "one of the most committed, dedicated, devoted, and upright gentlemen I have encountered in my ministry." (Pastor Smith Olivier, Ex. B at 2).  Pastor Olivier has watched Eddy lead the Church's Men's Ministry and, for example, "visit the sick in hospitals," "spend time with senior citizens in nursing homes," and "provide comfort and consolation to those grieving, assisting them through the funeral preparation process and offering his support in the aftermath of their loss." (*Id.*; *see also* Wilner Byas, Ex. B at 15-16 (describing Eddy visiting him in the hospital and praying with him in 2018); *see also* PSR ¶ 69).

---

[6] (Joel Gustave, Ex. B at 17).

Eddy has also "dedicated countless hours to various charitable organizations and has always gone above and beyond to help those in need." (Marie Jean, Ex. B at 54). By 2000, Eddy had created a "program in the Flatbush community to encourage young people to stay in school and decrease the number of high school dropouts." (James Dieuvel, Ex. B at 30). Also around 2000, Eddy began volunteer work with an auxiliary police unit associated with the 113th Precinct in Queens, which inspired similar service by friends such as Wilner Byas. (Ex. B at 16). In addition, Eddy "serve[d] as a chaperone for the young men in . . . conference retreats," and he "would also provide support to the Pathfinder & Adventurer Ministries in chaperoning, instructing, and supporting the youth of tomorrow." (Tatiana Etienne, Ex. B at 29). He has also spent "countless hours" helping to develop and administer the Church's bible study program. (Pauline Colas, Ex. B at 41).

In approximately 2012, Eddy started to work with others to try to improve Haitians' access to healthcare. In connection with that work, Eddy visited Haiti with medical supplies that he and other members of the community distributed to the Haitian community. In 2014, Eddy started a youth mentorship program with his children in Queens, which motivated his peers to help "preparing the next generation starting with our kids." (Charles Jolly, Ex. B at 19). In 2017, Eddy began volunteer work with a group called EMO-Haiti, which runs a robotics competition designed to foster students' interest and development in science. (*See* PSR ¶ 69).

Several letters describe how Eddy served as an important leader in his Church and the surrounding community during the COVID-19 pandemic. Eddy contracted the virus early, and he "used his experience [with the virus] to create awareness and educate others." (James Dieuvel, Ex. B at 30). After Eddy recovered, he "made himself available to drive his church community service truck to deliver food to everyone who was in need in his area during the quarantine period."

(John Maisonneuve, Ex. B at 22; *see also* Eveline Mompremier-Louis, Ex. B at 10 (describing how Eddy "did fundraise[ing] through family and friends to do weekly food distribution due to a great demand as many people were losing their jobs"); Wilner Byas, Ex. B at 15 ("Eddy served the community by driving twice a week to pick up food from the location and drop and unload the truck at three different locations.")).  Eddy also "offered free chaplaincy services to the community and worked with the city and local churches to provide food assistance to those in need."  (James Dieuvel, Ex. B at 30; *see also* Clifford Jean, Ex. B at 45 ("On Sundays when we would donate food to those struggling during covid, [Eddy] brought out multiple bags of jackets to . . . also give out to anyone in need.")).  Eddy "was willing to put himself in danger to be a person that could help those who couldn't help themselves."  (Sherly Prival, Ex. B at 58).

Marc Toureau describes how Eddy "graciously volunteered to lead the final prayers for my mother" when she died in 2020.  (Ex. B at 90).

> When everyone declined or shied away because of fears of the pandemic, Eddy stepped in for a complete stranger and provided assistance without any fee in return.  For his selfless act I will forever be grateful as he allowed me to close the final chapter of my mother's life according to the faith.

(*Id.* at 90). Lydie also recalls Eddy's service to the Toureau family:

> [Eddy] was the only chaplain who agreed to lead the burial ceremony of my friend's cousin's mother in the heart of COVID in NY, although he never met the family before that day, just because we asked and he has a heart of flesh committed to serve. He drove from the ceremony in NY to NJ for a grave to provide my friend's family with a decent burial when funeral homes and cemeteries were rare and full.

(Lydie Bastien, Ex. B at 754).

## II.       EminiFX

Eddy founded EminiFX in September 2021 based on a personal interest in investing, confidence in his leadership abilities, and a desire to help fellow Haitians in America and elsewhere.  As is clear from his work history, however, Eddy had no significant experience in the

financial industry at the time.  (*See* PSR ¶¶ 79-82).  He had provided computer training and technical services in Haiti and the United States, worked on failed ventures involving real estate and information technology services, filed bankruptcy petitions in 2017 and 2019, worked as a senior computer network engineer, and eventually found his way in cybersecurity.  (*Id.* ¶¶ 79-82, 89).

Consistent with Eddy's lack of experience, the Receiver has noted that EminiFX lacked, for example, the type of structure, general ledger, and accounting controls that are typically required of a large investment platform.  (*E.g.*, Ex. J, Receiver's Financial Condition Report Of EminiFX ("Financial Condition Report") at 2).  As Eddy has acknowledged, EminiFX did not have some of the trading functions that he advertised on the EminiFX website and discussed in meetings with investors.  (*See* PSR ¶ 34).  Eddy also acknowledges that the weekly "ROI" figures he described to investors were not based on investment returns.  (*See* Ex. A at 4).  He was wrong, he accepts responsibility for it, and he is extremely sorry.  (*See id.*; *see also, e.g.*, PSR ¶¶ 33-34).

Eddy's initial optimism about EminiFX's ability to generate returns for members was buoyed by a generally positive trend in the price of Bitcoin between September and November 2021, which is reflected in the chart below:



But that trend reversed in late 2021, during a period referred to as "crypto winter."   During that time, the price of Bitcoin was "generally trending downward, declining over 57% from its high of $68,790 on November 10, 2021, to a closing price of $28,936 on May 11, 2022." (Financial Condition Report at 20).   The steeply declining Bitcoin price coincided with increasing user contributions to EminiFX:



(Financial Condition Report at 15).

Some financial institutions placed restraints on certain of the accounts that Eddy was using to operate EminiFX.  (*See, e.g.*, Financial Condition Report at 12 (noting that one of the "primary" accounts "used for User contributions" was "frozen" in March 2022)).   In response to the restraints,

Eddy tried to transfer funds between accounts to maintain control over the funds for EminiFX. (*See* PSR ¶ 25).  Eddy transferred approximately $9 million of those funds to his personal account at Interactive Brokers because he had been trying without success to open an EminiFX account at Interactive Brokers since approximately October 2021.  In March 2022, in response to a request from the CFTC's Division of Data, Eddy registered with the "CFTC Portal" and submitted a CFTC Form 40.  (Ex. D at 1-2).  Eddy disclosed the name of EminiFX when he submitted the Form, and also informed the CFTC that the Interactive Brokers account was his "personal account."  (*See id.* at 2).  Eddy also apprised Interactive Brokers of the CFTC registration.  (*Id.* at 3-5).

As EminiFX's users and assets steadily increased, Eddy found it more and more difficult to acknowledge that he was not helping his community in the way he had promised.  With a mix of overconfidence and lack of experience, and as Eddy explained during his plea allocution, Eddy believed he could recoup the market losses and deliver the investment returns he had promised. (*See* PSR ¶ 34).  He started to work even harder.  He left his cybersecurity job to focus on EminiFX in February 2022.  (PSR ¶ 79).  He started to invest in real estate in an effort to find another way to improve the performance of EminiFX, which he discussed with investors during EminiFX's weekly zoom meetings.  (PSR ¶ 19(e) n.2).  The Receiver has described these transactions as "Real Estate Investments" that were part of EminiFX's "Long Island Real Estate Portfolio."  (Financial Condition Report at 23; *see also* Ex. L, 2022 Annual Status Report Of Receiver David A. Castleman ("Annual Report") at 4).

In 2022, Eddy also brought in almost 60 employees to help build EminiFX, including approximately 25 accounting employees beginning in March 2022.  (*See* Ex. M (listing of staff provided to EminiFX by Robert Half); *see also* PSR at 36).  There were "traders, an accounting department, and a human resources department."  (Ex. F at 5; *see also* Ex. G at 1 (former employee

estimating that Eddy hired "multiple traders"); *id.* at 2 (former employee describing accounting and customer service departments)).

Two examples in particular provide important context for Eddy's actions and intent. Eddy hired Robert Xiong, an employee who worked on "coding models for stock valuations and forecasting stock prices." (Ex. F at 6 (referring to "Employee-5")). Xiong's experience included: (1) "extensive financial modeling experience and solid quantitative skills on Credit/Equity Derivatives/Structured Product[s]"; and (2) "[d]evelop[ing] proprietary equity trading models to systematically calculate intrinsic values using historic financial statements to identify investment opportunities." (Ex. E at 2).

Eddy also hired Robert Perelman as Vice President of FX Development and Member Education to help with "creating the new Forex division" and providing investment training. (Ex. G at 2 (referring to "Employee-7")). With Eddy's authorization, Perelman hired a "seasoned Forex trader from BBVA bank," and a commodities trader who was scheduled to start on May 16, 2022. (Ex. E at 8). Beginning in approximately January 2022, and with Perelman's assistance beginning in approximately April 2022, Eddy tried to set up an account at a financial services company called StoneX, where Eddy hoped to establish the type of trading functionality that he had failed to achieve with Interactive Brokers. (*See* Ex. E at 8; *see also* Ex. K). The account was approved on May 12, 2022, the day of Eddy's arrest. (Ex. K at 19).

### III.       Eddy's Cooperation With The Receiver

The Receiver assumed control of EminiFX on the day Eddy was arrested. Since that time, the Receiver has identified $262.5 million in investor contributions and $34 million in investor withdrawals, leaving an investor balance of approximately $228.5 million. (Financial Condition Report at 6). With respect to that balance, the Receiver has recovered approximately $173.5

million, and he identified $49.1 million in investment losses and $5.9 million in operational expenses.  (*Id.*).

Eddy has made extensive efforts to assist the Receiver in those recovery efforts.  In an October 12, 2022 status report submitted to Judge Caproni, the Receiver described Eddy's efforts as having involved "substantial cooperation and assistance with [the] process."   (Ex. N, Second Status Report of Receiver David Castleman at 14).  In the same report, the Receiver explained that Eddy

> has cooperated with the Receiver's efforts to secure assets, including stipulating to the turnover of the purchase money deposits from the Long Island Real Estate Portfolio, consenting to the turnover of records from the cryptocurrency exchanges overseas, facilitating the turnover of vehicles to the Receiver, and providing a comprehensive list of EminiFX and Alexandre accounts to assist in the Receiver's efforts to locate and recover receivership assets.

(*Id.* at 4).  The Receiver also believes that Eddy's cooperation has been "an important validation tool" and that it "reduced recovery costs" so that more money is available to be redistributed to EminiFX's members.  (*Id.* at 9, 14).

At the request of the Receiver, on June 8, 2022, June 10, 2022, and June 21, 2022, Eddy executed real estate contract terminations relating to three properties that were part of EminiFX's real estate investment strategy so that the Receiver could collect the deposits associated with those transactions.  (*See* Annual Report at 4 ("The Receiver also recovered, often with the cooperation of Alexandre, over $3.3 million from other sources including the resolution of the Long Island Real Estate Portfolio and other recoveries.")).  Eddy also facilitated the turnover to the Receiver of seven vehicles, six of which were not in the possession of Eddy and his family at the time.  (*See* PSR ¶¶ 86-87).

In August 2022, Eddy successfully moved to preclude an arbitration demand relating to one of the investment properties – in an effort to conserve resources and funds that could later be

distributed to EminiFX's members.  (*See* CFTC Dkt. Nos. 148, 159).  On the same day, Eddy also consented to and executed a "Stipulation Confirming Receiver's Authority to Terminate, Assign or Otherwise Dispose of Various Real Estate Sale Agreements," which allowed the Receiver to terminate additional contracts and recover more assets.

Finally, Eddy's assistance to the Receiver was particularly important with respect to two offshore cryptocurrency exchanges: CoinPayments and KOT4X. Because CoinPayments and KOT4X were located outside U.S. jurisdiction, the Receiver and the government had limited authority to recover assets from them.  On June 13, 2022, in an effort to assist the Receiver in collecting documents and information from CoinPayments, Eddy provided written consent for CoinPayments to share information and transfer assets to the Receiver.  On July 28, 2022, as part of a similar effort with respect to KOT4X, Eddy consented to the Receiver's "Request for Account Information."  KOT4X later turned over approximately $700,000 worth of cryptocurrency.  (*See* Financial Condition Report at 7).  On November 15, 2022, Eddy joined a letter request by the Receiver to CoinPayments, which ultimately resulted in CoinPayments turning over approximately $107.8 million worth of Bitcoin.  (*See id.*; *see also* Annual Report at 7).

## PSR OBJECTIONS

Set forth below are our objections to the PSR.  Although the PSR describes additional objections to other aspects of the draft report, we are not pursuing those objections in connection with the sentencing hearing.

### I.        Paragraphs 8 and 9

Paragraphs 8 and 9 of the PSR include vague references to purported noncompliance with release conditions, despite the fact that – to Eddy's knowledge – E.D.N.Y. Pretrial Services never found any of these issues to be significant enough to report to the Court so that Eddy would have an opportunity to challenge them.  Our response to these unadjudicated claims is set forth at pages

29 and 30 of the PSR.  We ask that paragraphs 8 and 9 be stricken from the PSR because they could adversely, and improperly, impact BOP's assessment of Eddy.

## II.        Paragraphs 12 and 13

We object to paragraphs 12 and 13 of the PSR for the reasons set forth at pages 30-33 of the PSR.  The argumentative language in these paragraphs was taken, nearly verbatim, from the criminal complaint charging Eddy.  (*Compare* PSR ¶¶ 12-13, *with* Dkt. No. 1 ¶¶ 5-6).  The Probation Office appears to have adopted this language without reviewing much, if any, of the underlying evidence.

For example, contrary to the language at issue in the PSR, we respectfully submit that EminiFX holding long-term positions in Bitcoin for investors in a CoinPayments account in the name of EminiFX was an investment on behalf of those investors.  (*See* PSR at 32).  The distinction between maintaining custody of this type of asset on behalf of a customer, as opposed to keeping fiat currency in a retail deposit account, is illustrated by the fact that the prosecutors and the Receiver are seeking to hold Eddy accountable for the decreased value of the investment that occurred due to the falling price of Bitcoin.  The language in paragraphs 12 and 13 of the PSR also fails to account for the fact that, during the 32-week period at issue, there were 13 weeks in which the value of the Bitcoin in EminiFX's CoinPayments account appreciated (including eight weeks where the value rose by 5% or more).  (*See* PSR at 31).

## III.       Paragraph 15

We object to the last sentence of paragraph 15, which states: "As noted above, RA3 did not exist."  As we explained in the objection set forth at page 34 of the PSR, this sentence reflects argumentative language from the prosecutors that is an oversimplification of the record.  We respectfully submit that the sentence should be stricken and replaced with the following language:

"Some of the trading functions advertised on the EminiFX website related to cryptocurrency and foreign currency (FOREX) were not fully functional."

## IV.        Paragraph 19

We renew our request that paragraph 19 be supplemented with the language set forth at page 36 of the PSR.  Rather than including objective facts in the PSR, the Probation Office instead elected to incorporate a summary sentence from the prosecutors that sets forth their argumentative spin on these facts.  (*See* PSR at 37 ("Although EminiFX hired some trading staff . . .")).  Documentation supporting the first three paragraphs that we request be added to paragraph 19 is included as Exhibits E and M.  With respect to the fourth proposed paragraph, the Court should reject the government's opposition to incorporating language from its own disclosure letters in the PSR.  (*See* Exs. F, G).

## V.        Paragraph 19(c)

As noted on pages 37 and 38 of the PSR, we do not see or hear Eddy using language like "our trade secret" and "we keep it to ourselves" during the recordings of the April 28, 2022 meeting.  We ask that these alleged quotes be stricken from the PSR.

## VI.        Paragraph 20

We object to the inclusion of the purported summaries of witness statements in this paragraph.  The summaries were not disclosed during discovery, and we have not had a fair opportunity to investigate or challenge them.  (*See* PSR at 38-39).  We further request that the three bullets quoting witness statements from the prosecutors' disclosure letters be added to the PSR.  (*See id.*; *see also* Exs. F, G).  The prosecutors challenged the inclusion of this language based on the assertion that these statements "do not bear on the offense conduct."  (PSR at 39).  That contention is frivolous.  *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense

which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

**VII.        Paragraph 22**

For substantially the same reasons that we object to similar language in paragraph 13, we object to the following language from paragraph 22: "EminiFX had not earned its investors any profit, but rather: 1) ALEXANDRE failed to invest a substantial amount of the investor funds he received." (*See* PSR at 31-32, 39).

**VIII.        Paragraph 24**

We object to the suggestion in paragraph 24 that these transactions constituted some sort of misappropriation by Eddy. (*See* PSR at 40). The Probation Office added the last sentence of this paragraph, at the prosecutors' request, in another instance of favoring argumentative language that presents the prosecutors' spin over an objective description of the evidence. (*See id.*).

The prosecutors' defense of this paragraph appears to rest on the fact that Eddy did not list these transactions on the EminiFX website. But he disclosed them to the EminiFX members in other ways. As confirmed by the prosecutors' own disclosure letter and the very same recording that the prosecutors relied upon for cherry-picked quotes, Eddy told the members of EminiFX about the real estate investments discussed in paragraph 24. (*See* PSR at 40). The prosecutors have argued that a Manhasset home for which a $535,000 deposit was made was for Eddy's personal use, but the Receiver has not found enough evidence to reach a conclusion regarding that issue. (*See* Financial Condition Report at 24 & n.28). With the exception of the BMW Aplina, which Eddy leased and used himself, Eddy disclosed the purchase of the vehicles described in this paragraph on social media and during the April 2022 meeting. (PSR at 40; *see also id.* ¶ 86). Eddy also told the EminiFX members about the office space, he invited them to visit it on April 24, 2022, and a large number of them accepted that invitation. (*Id.*). Finally, the legal fees described

in this paragraph were legitimate expenses incurred as a result of seeking real legal advice regarding some aspects of EminiFX's operations. (*Id.*).

IX.        **Paragraph 26**

For the reasons stated in the PSR, Eddy objects to the following language from paragraph 26: "Additionally, ALEXANDRE failed to invest a substantial portion of EminiFX investor funds at all. Because a large percentage of investor funds were deposited in Bitcoin, at the direction of ALEXANDRE, those deposits were held in the form of a highly volatile cryptocurrency." (*See* PSR at 31-32, 42).

**DISCUSSION**

I.        **The Loss-Driven Guidelines Range Is Unreasonable Under § 3553(a)**

Although we are not contesting any aspect of the Stipulated Guidelines Range in Eddy's plea agreement, we respectfully submit that the Guidelines' recommendation of a 120-month sentence is untethered from reality and unjust under the circumstances presented. *See, e.g.*, *United States v. Johnson*, No. 16 Cr. 457, 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) ("[T]he Guidelines would have this court place Johnson in jail for almost a decade without batting an eyelash simply because of the sizeable profit from the frontrunning trades. The Guidelines do not ask the court to consider the duration of the criminal activity, [defendant's] *mens rea*, the character of the loss, or any other factors that might allow the court to impose a sentence based on [defendant's] worth."). Notwithstanding that the Receiver has recovered and will distribute approximately $173.5 million that investors transferred to EminiFX, the Guidelines characterize the "loss" associated with Mr. Alexandre's crime as approaching $250 million. *Cf. United States v. Banks*, 55 4th 246, 258 (3d Cir. 2022) ("Because the [Guidelines] commentary expands the definition of 'loss' by explaining that generally 'loss is the greater of actual loss or intended loss,' we accord the commentary no weight." (cleaned up)); *United States v. McKinney*, No. 22 Cr.

20249, 2022 WL 17547467, at *7 (E.D. Mich. Dec. 9, 2022) ("Nothing in § 2B1.1(b)(1)'s table or in the plain language of the guideline indicates that individuals should be penalized for potential harm that has not occurred.").

As a result, U.S.S.G. § 2B1.1(b)(1) calls for a 26-level enhancement, which accounts for more than 70% of Eddy's offense level of 37.  (*See* PSR ¶ 37).  In the absence of that loss enhancement, and because of Eddy's lack of criminal history, an offense level of 11 would yield a Guidelines recommendation of 8-14 months.  Thus, the Guidelines "loss" in this case increased the Guidelines range by at least 106 months, almost nine years.  Without the 120-month statutory cap that operates as the applicable Guidelines range, *see* U.S.S.G. § 5G1.1(a), the "loss" would increase the range by at least 196 months, more than 16 years, to 210-262 months.  In other words, the "loss" enhancement leads to a Guidelines recommendation that exceeds by more than six years the maximum penalty Congress authorized for Eddy's crime.

There is a "widespread perception that the loss guideline is broken." *United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013) (Underhill, J., concurring).[7]  The Guidelines under

---

[7] *See, e.g.*, Dkt. No. 457 at 87, *United States v. Connolly and Black*, No. 16 Cr. 370 (S.D.N.Y. Oct. 24, 2019) (McMahon, J.) ("The flaws in the fraud guideline, as articulated by Judge Rakoff in the *Rabobank* sentencings, and by many other judges of this and other courts – including me on other occasions – make a guideline sentence way out of line with respect to these two men . . . ."); Dkt. No. 230 at 21-22, 24, *United States v. Ho*, No. 17 Cr. 779 (S.D.N.Y. Mar. 25, 2019) (Preska, J.) (imposing 36-month bribery sentence, despite 262-327 month Guidelines range, because fraud provisions "dramatically overstate the seriousness of the offense and the appropriate guideline range"); Dkt. No. 58 at 11, 34-35, *United States v. Kent*, No. 16 Cr. 385 (S.D.N.Y. Oct. 6, 2017) (Cote, J.) (imposing 366-day sentence despite 46-57 month Guidelines range because Guidelines were "not representative of what would be a reasonable sentence"); Dkt. No. 611 at 75, 170, *United States v. Litvak*, No. 13 Cr. 19 (D. Conn. Apr. 26, 2017) (imposing 24-month sentence despite 108-135 month Guidelines range); Dkt. No. 18 at 16, 20-21, *United States v. Li*, No. 15 Cr. 870 (S.D.N.Y. June 13, 2016) (Sweet, J.) (imposing probation despite 78-97 month Guidelines range based on $57 million loss amount); Dkt. No. 371 at 25, *United States v. Levy*, No. 11 Cr. 62 (S.D.N.Y. Feb. 19, 2014) (Crotty, J.) (imposing 24-month sentence despite 188-235 month Guidelines range based on "concerns about the guidelines for high loss economic crimes"); *Gupta*, 904 F. Supp. 2d at 341, 355 (Rakoff, J.) (imposing 24-month sentence despite 78-97 month

§ 2B1.1 are "just mindlessly accelerated once you have numbers of any size added in the loss or gain table," to the point of being "almost useless."  Dkt. No. 271 at 23, *United States v. Faibish*, No. 12 Cr. 265 (E.D.N.Y. Mar. 10, 2016).  "By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face." *United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012).  "Where, as here, the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences."  *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006).

## II.        The Remaining § 3553(a) Factors Warrant A Substantial Downward Variance

As the Court is well aware, Section 3553(a) requires consideration of a number of factors to "tailor" a sentence to Eddy and his offense.  *United States v. Booker*, 543 U.S. 220, 245 (2005). A fair balancing of these factors—including Eddy's childhood in Haiti, his service and charity, his support of his family and community, his acceptance of responsibility and remorse, and his impending removal and related collateral consequences—weighs in favor of a term of imprisonment that is substantially below the applicable Guidelines range, a maximum term of supervised release and community service in Haiti, forfeiture, and restitution.

---

Guidelines range because Guidelines were "irrational on their face"); *Adelson*, 441 F. Supp. 2d at 507 (Rakoff, J.) (imposing 42-month sentence despite 85-year Guidelines range).

### A.    Personal History And Characteristics

#### 1.    Personal History

As illustrated by the large number of people who have come to support Eddy during court proceedings, and as described above in the Background section and the more than 500 letters submitted by Eddy's family and friends, Eddy is a good man who has helped many people. He started to accomplish this as a child in Haiti under challenging circumstances, facing poverty, significant violence, and at least one natural disaster. Following his father's example, he committed himself to faith and service. He continued on this path when he came to the United States in 1998 through active leadership roles in the Church and significant volunteer work in the community.

During the COVID pandemic, Eddy worked as a chaplain for people who were isolated and in need, educated others based on his experience with the virus, and collected food and clothing that he distributed during the frequent lockdowns and quarantines. In one vivid example of those efforts, Eddy led final prayers for the mother of Marc Toureau – someone he had not met – and helped make arrangements for the burial of Mr. Toureau's mother with the same attention and care that he displayed when his father died. (Ex. B at 90, 752).

Even during one of the darkest times in his life, since this case has been pending, Eddy remained devoted to his ministry and committed to the Church by continuing to preach at services and support others. And throughout all of these challenges, Eddy has been a supportive husband to Clarelle; a loving father to his three children; a helpful son to his parents; a caring sibling; and a friend, mentor, and support line to countless others. The strength of these relationships speaks not only to Eddy's character but also to his tremendous capacity to make a positive impact after this case is behind him.

### 2.      Cooperation

Eddy's assistance to the Receiver demonstrates that his remorse is genuine and is another factor that strongly supports his downward-variance request.  The Receiver has described Eddy's assistance in a way that would merit relief pursuant to U.S.S.G. § 5K1.1 if the prosecutors used the same words.  According to the Receiver, Eddy has provided "*substantial cooperation* and assistance with [the Receivership] process."  (CFTC Dkt. No. 163 at 14 (emphasis added)).  And, to be clear, Eddy's assistance to the Receiver, who was put in place by the CFTC after coordination with the prosecutors, was very much assistance to the government's efforts to address this crime and provide recourse to victims.

Eddy is not seeking a downward departure under § 5K1.1, but similar considerations are relevant under § 3553(a).  His assistance was timely.  After being released on May 31, 2022 from the MDC, where it was nearly impossible for him to communicate with counsel, Eddy began assisting the Receiver almost immediately beginning on June 8.  (*See* Annual Report at 4).  Eddy waived his Fifth Amendment privilege with respect to certain issues by providing information to the Receiver and taking actions that confirmed his control over otherwise-disputed assets.

In addition to terminating real estate contracts at the Receiver's request, Eddy turned over vehicles to the Receiver that were not identified as forfeitable assets in the Indictment.  (*Compare* PSR ¶ 4, *with id.* ¶ 88).  Other prominent examples relate to EminiFX's cryptocurrency holdings at CoinPayments and KOT4X, which were located abroad and not identified as forfeitable assets in the Indictment.  The prosecutors do not appear to have been aware of those accounts at the time of Eddy's arrest, and they argued at the time that offshore cryptocurrency assets would be "more complicated" for "Government actors to locate, trace and freeze."  (Dkt. No. 13 at 24; *see also id.* ("At this point in the investigation, we do not have visibility into that section of these extra

funds.")).[8]  Eddy helped identify and recover these assets without requiring the Receiver or the government to resort to uncertain and resource-intensive treaty requests.

Through counsel, Eddy communicated directly with CoinPayments and KOT4X to facilitate the recovery of those assets.  Beginning on June 13, 2022, he signed consents urging CoinPayments to return the funds.  His efforts were productive, and resulted in the Receiver recovering $107.8 million from CoinPayments and $700,000 from KOT4X.  (*See* Financial Condition Report at 7).  Based in part on Eddy's assistance, "the Receiver has recovered the bulk of the EminiFX assets."  (*Id.* at 6; *see also* PSR at 17 ("[A] great portion of the lost funds are being regained in an effort to repay the victims.")).  Eddy's cooperation with the Receiver supports his request for leniency.

### B.      The Nature And Seriousness Of The Offense

We recognize that the most significant aggravating factor under § 3553(a) is the seriousness of Eddy's offense.  Eddy acknowledges this and accepts responsibility for it.  He is "extremely remorseful."  (PSR at 17; *see also id.* ¶¶ 33-34; Ex. A).  Eddy offers no excuses for his mistakes, but there are some mitigating considerations.

First, in September 2021, Eddy jumped into the investment business with his common sense, computer-related technical abilities, and enthusiasm driving him, but without much of the formal education and experience that comes from working at established companies in the field. He did not have enough experience in some of the areas that are necessary to run the type of

---

[8]  (*See also, e.g.*, Dkt. No. 13 at 22 (prosecutors arguing that "there are a sizeable amount of unaccounted for funds" and an "enormous amount of unaccounted for money"); Dkt. No. 10 at 3 (prosecutors arguing that "[a]t present, only approximately $61 million in investor funds have been located and frozen by the Receiver, leaving as much as $53 million in unaccounted for investor funds that Alexandre could access and use to flee from prosecution")).

operation that he hoped EminiFX would become.  This led to some practical challenges, such as account restraints at Bank of America and Interactive Brokers.  The steeply declining price of Bitcoin did not help matters.  But the real problem was that Eddy had spent so many years successfully leading in his community that in dealing with the practical challenges and the "crypto winter" he felt too embarrassed to tell the EminiFX members that his platform was not operational as advertised, and that he was not making them the money that his "ROI" disclosures suggested.  His lack of training and desire to fulfill others' expectations contributed to serious lapses in judgment – mistakes that he acknowledges and for which he has apologized.

Second, Eddy's offense lasted only about eight months.  (*See* PSR at 17 ("It appears that the offense did not occur for a long period of time . . . .")).

Third, although Eddy did not self-report, he was working to fix his errors at EminiFX at the time of his arrest.  Eddy believed that he could rectify the situation by working harder.  In January 2022, he started to establish a relationship with StoneX.  He left his cybersecurity job in February 2022.  He hired more people, including people like Xiong and Perelman who appeared to have the experience necessary to build out EminiFX's trading operations.  Eddy communicated with the CFTC, and he tried to set up the type of automated trading and FOREX functions that he had advertised at Interactive Brokers and StoneX.  We are not suggesting that Eddy's personnel decisions and communications with the CFTC and Interactive Brokers are exonerating, but they are mitigating insofar as they reflect Eddy trying to communicate with regulators and set up proper accounts for EminiFX.  Eddy should have done more of these things, done them faster, and been more transparent about their status and the corresponding results.  His efforts between January and May 2022, however, reflect favorably on his true intent during the course of the crime.

Finally, this was not an offense that was motivated by greed. Although Eddy drew a salary, he was not living lavishly relative to the volume of investor contributions. For example, in May 2022, the FBI arrested him at the modest rental house where he had lived since 2010. (PSR ¶ 67). Eddy believed he could make a career out of providing financial services to his community at EminiFX. He acknowledges that he should gone about it differently, but the record of Eddy's efforts near the end of the enterprise supports the conclusion that he was working toward the goals he had described and not simply to enrich himself.

### C.   A Just Punishment Must Account For The Severe Collateral Consequences Eddy Faces

In formulating a "just punishment," 18 U.S.C. § 3553(A)(2)(a), consistent with the Parsimony Clause, the Court should consider the severe collateral consequences that Eddy faces as a result of his conviction. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."). Even for an American citizen, "the collateral consequences of a felony conviction form a new civil death," as "[c]onvicted felons now suffer restrictions in broad ranging aspects of life that touch upon economic, political, and social rights." *United States v. Nesbeth*, 188 F. Supp. 3d 179, 187 (E.D.N.Y. 2016). But Eddy also faces what Judge McMahon has described as "the unusual 'all other things are not equal' collateral consequence of his not being a United States citizen." Dkt. No. 457 at 93, *United States v. Connolly and Black*, No. 16 Cr. 370 (S.D.N.Y. Oct. 24, 2019).

### 1.   Reputational Consequences

The government has promoted its efforts in this case in multiple press releases and on social media. Eddy's prosecution and the CFTC action have been covered in national news outlets such as the *Washington Post* and major publications in Haiti such as *The Haitian Times*. While we do

not criticize the government for issuing the releases and recognize that these are among the consequences of Eddy's serious errors in judgment, his widely publicized arrest and conviction has damaged his reputation in a way that will be difficult, if not impossible, to repair. *See United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (imposing downward variance based on "incalculable damage to [defendant's] personal and professional reputation"). These reputational consequences will likely impact Eddy's family for generations. *See* Dkt. No. 26 at 11, *United States v. Garbarino*, No. 87 Cr. 860 (S.D.N.Y. Jan. 7, 2013) ("[F]or the rest of [defendant's] life he will have to face up to the fact that if he ever has grandchildren they will be the ones who say, oh, yes, my grandfather, the felon.").

## 2.    Harsher Conditions of Confinement

Despite being a non-violent, first-time offender, BOP is unlikely to designate Eddy to the type of minimum-security Federal Prison Camp where many defendants convicted of similar crimes serve their terms of imprisonment. Rather, under BOP policy, non-citizen inmates such as Eddy are designated as "Deportable Alien[s]" and required to be "housed in at least a Lower security level institution."[9] *See* Dkt. No. 457 at 91, *Connolly and Black*, No. 16 Cr. 370 ("[H]e will not be eligible to serve his sentence in the same way that any American citizen who stood convicted of this crime would serve. And that's not right."). Moreover, although defendants with similar convictions and histories are eligible to serve the final six months of their sentences in a halfway house or on home confinement, Eddy is ineligible for that relief because of his lack of citizenship. *See* 18 U.S.C. § 3624(c).[10] Eddy's conditions of confinement will therefore be

---

[9]   BOP, Inmate Security Designation and Custody Classification at ch. 5, p. 9, https://www.bop.gov/policy/progstat/5100_008cn.pdf (last accessed July 5, 2023).

[10]   BOP, Program Statement: Community Corrections Center (CCC) Utilization and Transfer

significantly harsher than similarly situated U.S.-citizen inmates, which is another factor that supports Eddy's variance request.

### 3.      Immigration Custody

Eddy will be removed to Haiti as a result of his conviction.  (*See* PSR ¶ 61).  Immigration detention is required upon release from BOP custody for any non-citizen convicted of a fraud offense like the one at issue here.  *See* 8 U.S.C. § 1226(c)(1)(A).  Eddy's removal will almost certainly not be immediate.  For fiscal years 2020 through 2022, DHS reported average immigration detention periods of 63.5 days, 43.1 days, and 25.9 days, respectively.[11]  In 2019, a DHS-OIG report identified "immediate risks or egregious violations of detention standards" at certain immigration-custody facilities,which included "nooses in detainee cells, overly restrictive segregation, inadequate medical care, unreported security incidents, and significant food safety issues."[12]  *See* Dkt. No. 457 at 91-92, *Connolly and Black*, No. 16 Cr. 370 ("[F]or reasons I cannot comprehend, at the end of that term he could not walk out the door and be picked up by [his lawyer] and taken to the airport.  He would be treated like an illegal alien, and he would be released into the custody of ICE, and at some point long after my intended sentence had expired he would be deported.  And that's not right.").  Thus, in addition to the higher security classification that Eddy will face in BOP custody, the deplorable conditions associated with the removal process will exacerbate the severity of Eddy's sentence compared to similarly situated U.S.-citizen defendants.

---

Procedure at 10, https://www.bop.gov/policy/progstat/7310_004.pdf (last accessed July 5, 2023).

[11]  ICE  Annual  Report,  Fiscal  Year  2022  at  15  (Figure  16), https://www.ice.gov/doclib/eoy/iceAnnualReportFY2022.pdf (last accessed July 5, 2023).

[12]  DHS-OIG, Concerns about ICE Detainee Treatment and Care at Four Detention Facilities, https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf  (last  accessed July 5, 2023).

### 4.        Country Conditions in Haiti

Eddy has every intention of making a positive impact in Haiti when he returns, as he did prior to leaving in 1998.  But the dangerous conditions in Haiti also support his variance request because they illustrate the harshness of the removal penalty is in this case.  Eddy has already experienced these conditions firsthand as a child, and the violence continued to have a direct impact on his family even after he immigrated to the United States.  Specifically, in 2010, Eddy's cousin, Wilter Fils-Aime, was murdered in Port-Au-Prince.  Eddy worked with the Haitian government to transport Wilter's remains to the United States, and he led Wilter's burial service in Queens.  (*See* PSR ¶ 69).

Consistent with Eddy's experiences, last year the U.S. Attorney for the District of Columbia described Haiti as a country that "has been ravaged by violent gangs impacting every facet of society."[13]  The State Department currently lists Haiti as a "do not travel" country with the following warnings: "[D]o not travel to Haiti due to kidnapping, crime, and civil unrest," "local police generally lack the resources to respond effectively to serious criminal incidents."[14]

In a 2022 country report regarding Haiti, the State Department found "credible reports of significant human rights violations," including:

> unlawful or arbitrary killings; torture or cruel, inhuman, or degrading treatment or punishment by government agents; harsh and life-threatening prison conditions; arbitrary arrest and detention; serious problems with the independence of the judiciary; serious abuses in a conflict, including widespread civilian deaths or harm, enforced disappearances or abductions, torture, and physical abuse; inability of citizens to change their government peacefully through free and fair elections; [and] serious government corruption . . . .

---

[13]        https://www.justice.gov/opa/pr/criminal-charges-unsealed-against-haitian-gang-leaders-kidnappings-us-citizens (last accessed July 5, 2023).

[14]        https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/haiti-travel-advisory.html (last accessed July 5, 2023).

[. . .]

The government rarely took steps to identify, prosecute, and punish government and law enforcement officials who committed abuses or engaged in corruption, and civil society groups alleged widespread impunity regarding these acts.[15]

After Eddy completes the U.S.-based portion of his sentence, that will be his reality in Haiti.

### 5.   Separation From Family And Community

Of all the significant collateral consequences arising from Eddy's conviction, however, the most severe – for Eddy and those around him – is that Eddy's sentence will permanently separate him from his wife, his boys, his siblings, other family members, his current church, and his community.  "Everyone knows that to be forcibly taken away from home and family and friends and business and property, and sent across the ocean to a distant land, is punishment; and that oftentimes most severe and cruel."  *United States v. Chin Chong*, No. 13 Cr. 570, 2014 WL 4773978, at *5 (E.D.N.Y. Sept. 24, 2014) (cleaned up); *see also United States v. Thavaraja*, 740 F.3d 253, 263 (2d Cir. 2014) ("[A] district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family.").

The very real, very significant pain of this impending separation is evident from the sentencing letters:

- "I cannot imagine [Eddy] not being present for future milestones, such as receiving my DNP or celebrating our first-born's graduation with us next year. . . . The thought of him being incarcerated and away from our family is unbearable. . . . Please consider the impact of your decision on Eddy's family and community."  (Clarelle Dieuveuil (Eddy's wife), Ex. B at 1).

---

[15]    https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/haiti    (last accessed July 5, 2023).

- "[A]s an elderly woman dealing with sickness and chronic diseases at 82 years old, I fear that I may not see him before I die if he goes to prison."  (Philomise Alexandre (Eddy's mother), Ex. B at 756).

- "These young precious boys' paths in life would be forever affected if Eddy should go to prison. Your Honor, nothing in the way they have been brought up or the way we have been living our lives prepared them for such a dire situation, it's been a nightmare from which we all hope to wake up soon. I can say this because I have seen first-hand how much Eddy's sons have been struggling during these past months since the beginning of the proceedings."  (Lydie Bastien, Ex. B at 754).

- "Sending Eddy to jail would be devastating to my family and will definitely shorten my time on this earth.  I have seen firsthand the toll that situation has had on my daughter, my grandkids and me."  (Ernst Dieuveuil (Eddy's father-in-law), Ex. B at 5).

In *United States v. Bikundi*, for example, the court reduced a sentence to time served (47 months) for a defendant who was initially sentenced to an 84-month term based on a Guidelines range of 324 to 405 months, an $80 million loss amount, and a trial conviction.  No. 14 Cr. 30, 2020 WL 3129018, at *4 (D.D.C. June 12, 2020) ("[D]efendant's conviction carries more serious ramifications still, as he is now eligible for removal from the United States, where his young children reside."); *see also United States v. Rodriguez*, No. 05 Cr. 960, 2022 WL 158685, at *5 (S.D.N.Y. Jan. 18, 2022) ("[Defendant] will certainly experience his deportation as a form of punishment itself, as his children and grandchildren reside in the United States.").  Given the strength of these relationships and the love that underlies them, this is a profoundly severe consequence of Eddy's conviction – borne by all involved – and a recognized basis for a variance.

## D.    Specific Deterrence Has Been Achieved

There is no risk that Eddy will commit another crime.  That is evident from his remorse and his assistance to the Receiver.  He has already been subject to significant punishment, which he never wants to repeat.  This includes significant restrictions on Eddy's liberty for more than nine months during pretrial proceedings.  He was incarcerated for 20 days between May 12 and May 31, 2022.  (PSR ¶ 7).  After being released, he was subject to home incarceration for

approximately two months, until July 29, 2022.  (*See* Dkt. No. 30).  For approximately 6.5 months thereafter, between July 29 and February 15, 2023, Eddy was subject to home detention.  (*See* Dkt. No. 76).

Eddy's conviction and the related CFTC proceedings have resulted in Eddy turning over substantially all assets in his name and a dramatic reduction in any future employment prospects. *See United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (reasoning that loss of defendant's business, assets, and income "constitutes a source of both individual and general deterrence"); *see also Stewart*, 590 F.3d at 141 (crediting sentencing court's reasoning that defendant's "conviction made it 'doubtful that the defendant could pursue' his career . . . , and therefore that the need for further deterrence and protection of the public is lessened").

Eddy's age and lack of criminal history also strongly suggest that there is no risk of recidivism.  *See, e.g.*, *United States v. Ruiz*, No. 04 Cr. 1146, 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) ("This Court and others have previously declined to impose Guidelines sentences on defendants who . . . were over the age of forty at the time of sentencing on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants."); *United States v. Cosimi*, 368 F. Supp. 2d 345, 349 (S.D.N.Y. 2005) (reasoning that defendant's "lack of criminal history," among other things, "indicate[d] that he presents a low danger of recidivism"); U.S. Sentencing Comm'n, Amendments to the Sentencing Guidelines (Preliminary) at 2-3 (Apr. 5, 2023) ("Recidivism data analyzed by the Commission suggest that offenders with zero criminal history points ('zero-point' offenders) have considerably lower recidivism rates than other offenders, including lower recidivism rates than the offenders in Criminal History Category I with one criminal history point.").

Finally, if there was any doubt, Eddy's removal will "provide an effective means of protecting the public from future wrongdoing by the Defendant." *United States v. Fanfair*, 379 F. Supp. 3d 138, 141 (E.D.N.Y. 2019).

### E.     The Requested Sentence Would Achieve General Deterrence

The substantial variance Eddy seeks would achieve general deterrence because it includes a significant prison term, punitive asset forfeiture based on the entire Guidelines "loss" amount, restitution, removal, and subsequent restrictions on Eddy's liberty through supervised release in Haiti and community service.  That type of sentence, combined with the efforts of the prosecutors, the CFTC, and the Receiver, would send an adequate and appropriate message to the public about this type of crime.

Adding months or years to Eddy's prison term will not further promote general deterrence. "[E]ven relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *Adelson*, 441 F. Supp. 2d at 514.  "[A] sentence of seven years versus two years versus three years does not make a huge difference in general deterrence."  Dkt. No. 169 at 2, *United States v. Block*, No. 16 Cr. 595 (S.D.N.Y. Nov. 8, 2017); *see also Gupta*, 904 F. Supp. 2d at 355 (reasoning that "business executives fear even a modest prison term to a degree that more hardened types might not" such that "a relatively modest prison term should be sufficient, but not more than necessary" to achieve general deterrence (cleaned up)).  This is because "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."  Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice 1, 28-29 (2006); *see also United States v. Yeaman*, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J., dissenting) ("It is widely recognized that the duration of incarceration provides little or no general deterrence for white collar crimes."); Amy Baron-Evans, Sentencing by the Statute, at 7 (2009) ("Current empirical research on general

deterrence shows that while certainty of punishment has a deterrent effect, increases in severity of punishments do not yield significant (if any) marginal deterrent effects." (cleaned up)).[16]

Indeed, the National Institute of Justice, which is DOJ's "research, development and evaluation agency,"[17] has issued the following guidance:

- "Increasing the severity of punishment does little to deter crime."

- "Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment."

- "[P]rison sentences (particularly long sentences) are unlikely to deter future crime."

- "Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes."

(Ex. H).

## F.    Avoiding Sentencing Disparities

While we recognize the large Guidelines "loss" amount, there are several cases that support the variance requested here – particularly when consideration is given to the actual investment losses of approximately $49.1 million, and the fact that many of the other defendants at issue did

---

[16] Judge Bibas's December 2005 law review article is not to the contrary. *See, e.g.*, Dkt. No. 391 at 44, *United States v. Levin*, No. 20 Cr. 681 (S.D.N.Y. Feb. 1, 2023). In that article, published only approximately 15 months after *Booker*, Judge Bibas cited scholarship from 1974 and 1986 for the propositions that white collar crime is a "prime candidate for general deterrence," and that "[a]n economist would argue" that "raising the expected penalty" would make such crime "unprofitable" and cause it to "cease." Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After *Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005). Declaring that financial crime is a "prime candidate" for general deterrence leaves open the question of how to address that objective in a particular case, and it does not necessarily follow that increased prison time will achieve that aim. Whereas the Eleventh Circuit case that cited Judge Bibas's article involved a seven-day prison sentence, the concept of making financial crime "unprofitable" is consistent with the full package of sentencing penalties and collateral consequences that Eddy faces in this case. *See United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).

[17] NIJ, About NIJ, https://nij.ojp.gov/about-nij (last accessed July 5, 2023).

not face immigration-related collateral consequences or assist in the recovery of funds to the same extent as Eddy.

According to the Sentencing Commission, there were 5,520 defendants sentenced in the "Fraud/Theft/Embezzlement" category during 2022. (Ex. I at 3).  In that category, 499 defendants were sentenced in the Second Circuit. (*Id.*).   At the national level, approximately 58% of fraud defendants received a non-Guidelines sentence. (*Id.* at 16).  In this Circuit, approximately 78% of fraud defendants received a non-Guidelines sentence. (*Id.*).  Most specifically, in this Circuit, approximately 89% of fraud defendants in Criminal History Category I and Zone D of the sentencing table based on U.S.S.G. § 2B1.1 received sentences of less than 59 months' imprisonment.[18]

While the Court is more familiar with its own prior sentences than we could hope to be, it appears that Your Honor has in the past extended the sort of leniency that Eddy seeks where the circumstances warrant it.  In *United States v. Rogas*, the Court sentenced a defendant to 60 months' imprisonment notwithstanding a Guidelines range of 121-151 months.  Dkt. No. 81 at 69, No. 20 Cr. 539 (S.D.N.Y. Nov. 3, 2022).  Unlike here, *Rogas* involved a "year[s'] long fraud," and the government also argued that the defendant had "participated in trafficking illegal drugs." *Id.* at 25, 28.  The loss amount was $123.2 million. *Id.* at 21-22.  In contrast to Eddy's cooperation, Rogas "violated the freeze order issued by Judge Crotty in the civil action brought by the SEC." *Id.* at 76.

---

[18]     U.S. Sentencing Commission, Interactive Data Analyzer, https://ida.ussc.gov/analytics/saw.dll?Dashboard ("The figure includes the 257 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of probation only are included here as zero months.") (last accessed July 5, 2023).

In *United States v. Levin*, the Court sentenced a defendant to 54 months' imprisonment despite a Guidelines range of 87-108 months. Dkt. No. 391 at 10, 34, No. 20 Cr. 681 (S.D.N.Y. Feb. 1, 2023). The government argued that the defendant "took part in a lengthy, wide-ranging scheme to steal more than approximately $100 million from Medicaid and other health care benefit programs," and the Probation Office estimated the loss to be $60 million. Dkt. No. 348 at 1, *id.*; Dkt. No. 391 at 23, *id.* The defendant had also taken steps to "avoid law enforcement detection" following FBI outreach to one of the defendant's employees. Dkt. No. 391 at 39, *id.* Levin's participation in the offense lasted four years, as compared to Eddy's eight months. Dkt. No. 348 at 6, *id.* Levin did not face removal and the associated collateral consequences, there was no record of cooperation with authorities similar to Eddy's, and Eddy did not engage in obstructive conduct.

Finally, in *United States v. Shin*, the Court varied downward to a sentence of 14 months from a Guidelines range of 70-87 months for a defendant who perjured himself at trial regarding a crime that lasted four years. Dkt. 252 at 19, No. 19 Cr. 552 (S.D.N.Y. Oct. 6, 2022).

Consistent with the data from the Sentencing Commission, other judges have issued substantial downward variances in cases involving economic crimes with large loss amounts.[19] In *United States v. Bonventre, et al.*, four defendants faced Guidelines ranges of life following trial convictions relating to the Ponzi scheme at Madoff Investment Securities – the largest, longest-running, and most damaging Ponzi scheme in history. The government estimated that "the actual loss suffered by direct investors in Madoff Securities was approximately $20 billion, with 'paper

---

[19] *See* Jillian Hewitt, Fifty Shades of Gray: Sentencing Trends in Major White-Collar Cases, 125 Yale L.J. 1018, 1052-53 (2016) ("[J]udges in S.D.N.Y. have not shied away from using the discretion afforded by *Booker* to impose sentences significantly shorter than those produced by the Guidelines," and "when a below-range sentence is imposed, it is generally vastly shorter than the sentence recommended by the Guidelines.").

losses' of approximately $66 billion." Dkt. No. 1087 at 41, No. 10 Cr. 228 (S.D.N.Y. July 22, 2014). Trial evidence established decades of complex, fraudulent conduct, and the government argued that one of the defendants, Antoinette Bongiorno, committed perjury at trial. *Id.* at 22-23. Judge Swain found that the loss amount was "many multiples of the $400 million triggering level" for the applicable loss-related enhancement. Dkt. No. 1234 at 13, 48, No. 10 Cr. 228 (S.D.N.Y. Dec. 9, 2014). The court sentenced two defendants to 30 months' imprisonment (Jerome O'Hara, George Perez), and two other defendants to six years' imprisonment (Joann Crupi, Bongiorno). Dkts. 1225, 1232, 1233, 1243, *id.*

In *United States v. Abarbanel*, the government permitted an investment adviser to plead guilty to a violation of 18 U.S.C. § 371 for fraudulently inducing investments in mutual funds over the course of 2.5 years. Dkt. No. 67 at 1, 6, No. 21 Cr. 532 (S.D.N.Y. Mar. 1, 2023). The prosecutors calculated a total loss of $106 million. *Id.* Notwithstanding that amount, and in stark contrast to the government's approach in this case, the prosecutors argued that the Guidelines "loss" was approximately $21 million because "$85 million was returned to the Investor Group as part of the Fund's liquidation process." *Id.* at 1, 6. The Probation Office and the government sought the statutory maximum sentence of 60 months; Judge Kaplan imposed a 48-month term of imprisonment. Dkt. No. 75, *id.*

In *United States v. Petit*, the defendant was convicted at trial of a fraud offense, and the Probation Office as well as the government calculated a Guidelines range of 262-327 months capped by the 240-month statutory maximum. Dkt. No. 157 at 3, No. 19 Cr. 850 (S.D.N.Y. Feb. 24, 2021). The government also argument that Petit and a co-defendant "made repeated efforts to improperly influence the testimony" of a cooperating witness. Dkt. No. 145 at 17, *id.*

Nevertheless, after finding the recommended Guidelines range to be "[b]izarre, barbaric, [and] absurd," Judge Rakoff sentenced Petit to 12 months' imprisonment. *Id.* at 3, 22.

In *United States v. Block*, the defendant was convicted at trial of fraud and false-statements offenses. Dkt. No. 169 at 2, No. 16 Cr. 595 (S.D.N.Y. Nov. 8, 2017). Similar to *Shin*, the court found that the defendant "did testify falsely at trial concerning material matters, with the intent to provide false testimony, and not because of confusion, mistake, or loss of memory." *Id.* at 40-41. The Probation Office estimated a loss amount of $3 billion. Judge Oetken found the government's $300-million loss estimate to be "about right," but declined to impose a loss-related enhancement. *Id.* at 35, 39. Although Judge Oetken calculated a Guidelines range of 18-24 months based on that finding, he noted that the government's estimate would have resulted in an "absurd" Guidelines recommendation of life imprisonment. *Id.* at 71. The Probation Office and the government recommended a seven-year sentence; the court imposed an 18-month term. *Id.* at 71-72.

In *United States v. Graham*, then-District Judge Droney calculated a loss of between $544-597 million resulting from trial convictions based on a fraudulent reinsurance contract. Dkt. No. 1163 at 15, No. 06 Cr. 137 (D. Conn. Oct. 31, 2008). The court varied from a Guidelines recommendation of life imprisonment and imposed a sentence of 366 days' imprisonment.

### G.     Non-Incarcerative Sentencing Options Are Appropriate

The requested variance is also appropriate because there are non-incarcerative options that can further serve the goals of just punishment and rehabilitation. *See* 18 U.S.C. §§ 3553(a)(2)(D), (a)(3); *see also* 18 U.S.C. § 3582(a) ("[I]mprisonment is not an appropriate means of promoting correction and rehabilitation."); *United States v. Manzella*, 475 F.3d 152, 158 (3d Cir. 2007) ("While a court must consider a defendant's need for rehabilitation under § 3553(a)(2)(D), Congress directed in the applicable statute that a court may not carry out that goal by imprisonment" (cleaned up)).

Eddy has already consented to a $248.8 million forfeiture order.  This is a punitive aspect of his sentence that he has accepted without objection.  *See, e.g.*, *United States v. Hameedi*,  No. 17 Cr. 137, 2021 WL 1553999, at *3 (S.D.N.Y. Apr. 20, 2021) ("The Court of Appeals stressed that the purpose of criminal forfeiture is to punish a defendant by removing the defendant's ill-gotten gains." (cleaned up)).  In this regard, Eddy has consented to punishment that is harsher than what the government has imposed on others.  *See, e.g.*, Dkt. No. 391 at 15, *Levin*, No. 20 Cr. 681 (government seeking "forfeiture of about 1.5 million which is approximately 25 percent of the figure that was calculated").[20]  Eddy's restitution will also be a substantial component of his sentence.  *See Adelson*, 441 F. Supp. 2d at 514 (recognizing that "an important kind of retribution may be achieved through the imposition of financial burdens" such as restitution, which "virtually guarantee[d] that [the defendant] will be making substantial restitution payments for the rest of his life").

Eddy's rehabilitation and reentry into the community in Haiti would also be better achieved – in lieu of a lengthy prison term – through a three-year term of supervised release, to be served in Haiti and to include a large community service requirement.  *See United States v. Gardellini*, 545 F.3d 1089, 1091 (D.C. Cir. 2008) (affirming five-year probation term in Belgium).  "Supervised release fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000).  Judges McMahon, Rakoff, and Garaufis have imposed terms of supervised release to be served abroad.[21]  Eddy is a strong candidate for a

---

[20] In *Levin*, the government also pursued a restitution figure that was "an undercount of the loss in this case," *i.e.*, $24 million less than the loss amount calculated by Probation.  Dkt. No. 391 at 23, *Levin*, No. 20 Cr. 681.

[21] Dkt. No. 457 at 94-96, *Connolly and Black*, No. 16 Cr. 370 (imposing two sentences including home confinement and supervised release in U.K.); Dkt. No. 28 at 16-17, *United States v. Curtler*, No. 15 Cr. 670 (S.D.N.Y. Apr. 9, 2019) (McMahon, J.) (imposing two-year term of supervised

sentence that includes a reduced prison term in favor of supervised release because his track record of service to the Church and his community strongly suggests that these endeavors will be a crucial part of his reintegration into society after imprisonment and removal.

- "I know Eddy will strive to make amends and I am sure we will get to see his good works bringing fruitful results to our society again." (Edwina Jean-Louis, Ex. B at 34).

- "I have every confidence that, given the opportunity, Eddy Alexandre will make the most of this situation and will work hard to continue to be a productive and contributing member of his family, community, and society at large." (Valerie David, Ex. B at 8).

- "[G]ive him time to make the necessary corrections, and send him back to his community with ALL the tools he previously developed to continue his mission . . . ." (Jean Renel Belidor, Ex. B at 51).

- "I am confident that Mr. Alexandre will continue to help the community." (Nadege Louis, Ex. B at 95).

- "I humbly request leniency in his sentencing, so he may have a chance to rejoin our community and continue to be the kind-hearted person we all know him to be." (Marleen James, Ex. B at 56).

- "I do believe deeply that Mr. Eddy Alexandre will continue making a significant impact on this community." (Elianne Ulysse, Ex. B at 84).

## III.      No Fine Should Be Imposed

Eddy faces significant and important restitution and forfeiture obligations.  Most of his assets are restrained by the Receiver and will be redistributed to former members of EminiFX. Based on these circumstances, the Probation Office appropriately found that Eddy does not have the ability to pay a fine.  (*See* PSR ¶¶ 83-92).  Therefore, the Court should not impose a fine.

---

release in U.K.); Dkt. No. 282 at 46, *United States v. Yagami*, No. 14 Cr. 272 (S.D.N.Y. Mar. 9, 2017) (Rakoff, J.) (imposing two-year term of supervised release in Hong Kong); Dkt. No. 280 at 3-4, *United States v. Stewart*, No. 14 Cr. 272 (S.D.N.Y. Feb. 4, 2017) (Rakoff, J.) (same); Dkt. No. 163 at 42, *United States v. Saltsman*, No. 07 Cr. 641 (E.D.N.Y. July 28, 2010) (imposing three years' probation in Israel and 2000 hours' community service).

**IV.      Eddy Should Be Permitted To Surrender**

Eddy should be permitted to surrender voluntarily to the institution to which the BOP designates him when that process is complete.  He has faced the prospect of a significant term of incarceration and removal to Haiti since his arrest in May 2022.  Recognizing Eddy's compliant response to these prospects, the Court reduced, rather than increased, the restrictions in his bail conditions after he pleaded guilty and significant prison time became even more likely.  In effect, that modification recognized that the only place on Earth that Eddy wants to be is in Long Island with his family for every last second that the Court will permit him.  There have been no material issues with Eddy's compliance throughout this process, and none whatsoever since the Court's February 2023 modification.  Accordingly, we respectfully request that the Court set a voluntary surrender date at Eddy's sentencing hearing.

**CONCLUSION**

For the foregoing reasons, we respectfully submit that a sentence consistent with the seriousness of the offense and the Parsimony Clause would include a prison term substantially below the applicable Guidelines range, three years' supervised release and a substantial term of community service to be completed in Haiti, $248.8 million in forfeiture, and appropriate restitution.

Dated: New York, New York
       July 5, 2023

                                            Respectfully submitted,

                                            /s/ Emil Bove
                                            Emil Bove
                                            Brittany Manna
                                            Chiesa Shahinian & Giantomasi PC
                                            11 Times Square, 34th Floor
                                            New York, NY 10036
                                            (212) 324 7265
                                            ebove@csglaw.com

                                            *Attorneys for Eddy Alexandre*

Cc:    Counsel of Record
       (Via ECF)