

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 12, 2023

**BY ECF AND EMAIL**
The Honorable John P. Cronan
United States District Judge
Southern District of New York
500 Pearl St.
New York, New York 10007

    Re:    *United States v. Eddy Alexandre*, 22 Cr. 326 (JPC)

Dear Judge Cronan:

    The Government respectfully submits this memorandum and accompanying exhibits in connection with the sentencing of defendant Eddy Alexandre ("Alexandre" or the "defendant"), which is scheduled for July 18, 2023, at 2:00 PM. For the reasons that follow, a Guideline sentence of 120 months' imprisonment is appropriate.

    Between September 2021, and March 2022, when he was arrested, Alexandre defrauded tens of thousands of investors in his company EminiFX, of nearly $250 million, betraying their trust and leaving many of them facing financial ruin. Alexandre exploited his position as a trusted member of his Church and the Haitian community by defrauding the very same people who trusted and supported him the most. To date, the Court has been provided with several victim impact statements, which give voice to the anger, disillusionment, and despair caused by Alexandre's conduct. As the Court can see from these letters, Alexandre's victims were far from wealthy. Each worked hard for the money they invested with Alexandre. And Alexandre worked hard at convincing his victims to turn over this money, preying on the members of his community who placed their trust in him, by luring them to invest with false promises of financial freedom and outsized investment returns. Every week, Alexandre provided false account statements to his investors, told lies, and solicited more and more money to cover up his fraud. Alexandre continued to solicit additional investments and lie to his investors up until the day of his arrest on May 12, 2022. Alexandre also misappropriated investor funds for his own purposes, such as his purchase of a $4.8 million home.

    Alexandre now asks this Court to impose a sentence substantially below the Guidelines, in large part based on his history of service to his community and to his Church. But this cuts both ways. It was these very ties to his community that Alexandre exploited in perpetrating this egregious fraud scheme, and it was because of his deep ties to his community that he was able to lull his victims into giving him their life savings. Further, given the brazen nature of Alexandre's conduct, and the goals of sentencing – particularly just punishment, promotion of respect for the law, and adequate deterrence – a Guidelines sentence of 120 months' imprisonment is warranted.

**Background**

I.      **Offense Conduct**

From September 2021, until his arrest in May 2022, Alexandre raised nearly $250 million from tens of thousands of investors by falsely promising his investors that they would earn between 5% and 9.99% returns on their investment each week; falsely representing to investors that they had in fact earned those returns; and falsely representing to investors that his company, EminiFX, had an automated trading technology that was responsible for generating these outsized profits. Alexandre peddled these lies to his investors from day one of his scheme, through the date of his arrest. In reality, Alexandre, who had no track record as an investment manager, failed to invest the majority of his investors' money, and lost more than $50 million of the funds with which he was entrusted.

Alexandre founded EminiFX in September 2021 and was the company's CEO and sole owner. Alexandre marketed EminiFX as an investment platform through which investors would earn passive income through automated investments in cryptocurrency and foreign exchange ("FOREX") trading. Alexandre offered his investors "guaranteed" high investment returns using new technology that he claimed was secret. Specifically, Alexandre falsely represented to investors that they would double their money within five months of investing by earning at least a 5% weekly return on their investment using a "Robo-Advisor Assisted account" to conduct trading. Alexandre referred to this technology as his "trade secret" and refused to tell investors what the technology was. Each week, Alexandre, through the EminiFX website, falsely represented to investors that they had earned between 5% and 9.99% on their investment, which they could withdraw or re-invest. (PSR ¶ 12).

EminiFX had an office located in New York, New York, and operated a website, eminifx.com (the "Website"). According to representations made on its Website, EminiFX was an investment platform through which investors could purportedly earn passive investment returns through automated investments in cryptocurrency and foreign exchange trading. EminiFX represented that it would provide "an affordable solution offering easy access to cryptocurrency and Forex trading . . . . using the latest technology available, in this case entitled 'Robo-Assisted Advisor Account ('RA3').'" As noted above, RA3 did not exist. (PSR ¶ 14-15).

The Website also offered various "membership levels," depending on how much an investor invested. For example, investors who invested $500 to $2,499 received a Bronze Package, and investors who invested $2,500 to $4,999 received a Silver Package. There were twelve membership levels. Each investor purportedly received a "fully serviced Robo-Advisor Assisted account Trading Account [sic]," and "AI Software" when they invested. (PSR ¶ 16).

According to the Website, EminiFX charged a monthly service fee of $49.99 per month, as well as certain processing fees for new members (15%), and additional fees ranging from .75% to 1.5% for certain transactions, including withdrawals. EminiFX also purportedly charged "performance" fees; which were described in promotional materials as 30% of the trading profits. As noted, there were no trading profits earned, but rather investors suffered sizeable losses that totaled nearly $50 million. (PSR ¶ 17).

Alexandre used a multi-level marketing ("MLM") structure through which EminiFX investors were given a financial incentive to recruit other investors to join EminiFX. Specifically, each EminiFX investor received commissions for recruiting others to join EminiFX. EminiFX explained in marketing materials that EminiFX investors could earn commissions for everyone they personally enrolled and for every new member those members went on to enroll. There was no limit placed on the number of partners that EminiFX investors could enroll. This MLM structure appears to have influenced the rapid growth of EminiFX, which grew to over 30,000 individual investors in an 8-month period. (PSR ¶ 18).

Although investors were required to sign an "earnings disclaimer" when they joined EminiFX, which stated that there were "no guarantees" about earnings, throughout the period Alexandre operated EminiFX (i.e., September 2021 through May 2022), Alexandre frequently guaranteed investors that they would earn outsized returns, ranging from 5% to 9.99% each week. Alexandre made these false representations to investors in different contexts. For example, Alexandre held virtual weekly EminiFX investor meetings ("Weekly Meetings"). During Weekly Meetings, Alexandre induced investors to invest and stay invested in EminiFX by falsely representing to investors that (1) their money would be invested in cryptocurrency and FOREX through an automated investment trading platform; and (2) they would earn at least a 5% weekly return on their investment. (PSR ¶ 19).

Alexandre also falsely represented to investors that they had in fact earned between 5% and 9.99% each week by posting fictitious earning statements to EminiFX investors. Specifically, each week, EminiFX posted earnings statements on each user's account page on the EminiFX Website. Those earnings statements falsely represented to investors that their account balances had increased each Friday by between 5% and 9.99%. Alexandre posted these claimed returns each week throughout the duration of the charged scheme. (PSR ¶ 21).

Alexandre's representations about weekly profits were false. EminiFX had not earned its investors any profit, but rather: 1) Alexandre failed to invest a substantial amount of the investor funds he received; and 2) Alexandre suffered substantial losses with respect to the investor funds that he did invest. (PSR ¶ 22).

Alexandre also used investor funds for purposes that were inconsistent with his representations to investors, including purchasing a $4.8 million home for him and his family, purchasing approximately 46 foreclosure properties in Long Island, and purchasing six luxury vehicles, and leasing a seventh. Additionally, Alexandre used investor funds for other undisclosed purposes, such as over $15,000 in donations to charity organizations of his choosing; tens of thousands of dollars to pay rent and furnish EminiFX office space and host events on behalf of EminiFX; and over $100,000 on legal fees. Alexandre disclosed to investors after-the-fact that he had used their funds for certain real estate and luxury car "investments." (PSR ¶ 24).

Despite representing to investors that he had earned them outsized returns each week, Alexandre failed to disclose substantial trading losses to his investors. For example, between December 2021 and March 2022, Alexandre transferred a total of approximately $9,040,000 to a trading account at Interactive Brokers in Alexandre's name that he had opened in December 2019, before EminiFX existed. These funds were first sent to Alexandre's personal bank account, and then to the Interactive Brokers account. Alexandre primarily traded individual equities and single-

equity options through this account (not FOREX or cryptocurrency as represented to investors on the EminiFX website). As of April 27, 2022, because of significant trading losses sustained by Alexandre, his account balance had declined by approximately $6,270,282, and only $2,769,718 of equity remained in his trading account. Alexandre did not disclose these substantial losses to investors; instead, Alexandre continued to represent to EminiFX investors that they had earned outsized returns on their investments.

Alexandre also failed to invest a substantial portion of EminiFX investor funds at all. Because a large percentage of investor funds were deposited in Bitcoin, at the direction of Alexandre, those deposits were held in the form of a highly volatile cryptocurrency. As the value of Bitcoin dropped, investors suffered tens of millions of dollars in losses.

Due to cases initiated by the Commodity Futures Trading Commission and the Government, the defendant's scheme was disrupted, and a substantial amount of investor funds are in the process of being recovered and will be returned to investors. However, as even the defendant concedes, due to the defendant's fraud scheme, investors will suffer out-of-pocket losses that exceed $50 million. (*See* defendant's sentencing brief ("Br."), Dkt. 86, at 17, noting that the Receiver has identified $49.1 million in investment losses and an additional $5.9 million in operational expenses that investors will not recover due to the defendant's scheme).

**II.     The Charges, Guilty Plea, and the Guidelines Calculation**

In May 2022, in the midst of his scheme, Alexandre was arrested and charged in a criminal Complaint with commodities fraud (Count One), and wire fraud (Count Two). Alexandre was indicted on the same charges in June 2022.

On February 10, 2023, Alexandre pleaded guilty before your Honor to Count One of the Indictment. Alexandre entered his plea pursuant to a plea agreement in which the parties stipulated to an advisory range calculated pursuant to the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") of 210 to 262 months' imprisonment. The parties stipulated to a base offense level of 6; a 26-level enhancement based on an estimated loss between $150,000,000 and $250,000,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(N); a two-level enhancement because the offense involved ten or more victims, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i); a two-level enhancement because the offense involved sophisticated means, pursuant to U.S.S.G. §2B1.1(b)(10)(C); and a four-level enhancement because the offense involved commodities fraud and the defendant was acting as a commodities trading advisor, pursuant to 2B1.1(b)(19)(B). This calculation resulted in a total offense level of 40. With a criminal history Category of I and the three-point reduction for acceptance of responsibility and the defendant's timely notice of his intention to plead yielding an adjusted offense level was 37, the Guidelines range would have been 210 to 262 months' imprisonment. However, because the statutorily authorized maximum sentence for Count One is 10 years' imprisonment, pursuant to U.S.S.G. §§ 5G1.1(a), the Guideline sentence is 10 years' imprisonment.

**III.     Alexandre's Objections to the Offense Conduct Set Forth in the PSR**

Although Alexandre does not challenge the Guidelines range set forth in his plea agreement, he continues to minimize the extent of his criminal conduct, raising several disputes regarding his offense conduct set forth in the PSR. These arguments are meritless and should be rejected.

### Page 7, paragraph 12

First, Alexandre objects to paragraphs 12 and 13 of the PSR on the basis that they "contain argumentative language" that is similar to the charges against Alexandre in the criminal complaint.

Specifically, Alexandre objects to the language in paragraph 12 stating that "in the beginning Alexandre offered his investors 'guaranteed' high investment returns" and continuing to the end of the paragraph. Alexandre does not provide a specific basis for his objection, but instead asserts that he should be provided with the date, context, and format in which those statements were allegedly made. Ample evidence supports the factual assertions set forth in this paragraph and no revisions should be made. For example, during a weekly investor meeting on or about April 28, 2022, as well a weekly investor meeting that took place on or about May 5, 2022, Alexandre stated the following, in substance in part:

- The vision of EminiFX is to harness the power of technology. (*See* Exhibit A, USAO_SDNY_00000011656, at 44:20). EminiFX uses an automated trading strategy. The company's "core product" is a robo-assisted advisor account, which Alexandre referred to as "RA3." (*See* Exhibit B, part USAO_SDNY_00000001522).

- Alexandre stated that many EminiFX investors have asked Alexandre what automated technology EminiFX uses for its trading platform. Instead of telling investors what technology the company used, Alexandre claimed that the technology was highly secret, stating that it is "our trade secret," and "we keep it to ourselves." (*See* Exhibit B, part USAO_SDNY_00000017067).

- At several points during Alexandre's presentation, he represented that investors would earn at least 5% returns through EminiFX every week. (*See, e.g.*, Exhibit B, part USAO_SDNY_00000001521). Specifically, Alexandre stated that investors would earn 5% every week (each Friday), and that within five months they would double their investment. (*See* Exhibit B, part USAO_SDNY_00000001522). As an example, Alexandre said that if an investor were to invest $10,000 initially, within five months they would have $20,000. (*See* Exhibit B, part USAO_SDNY_00000001522). Alexandre also stated that if an investor were to invest $10,000 initially, within two years they would be a millionaire. (*See* Exhibit B, part USAO_SDNY_00000001521). Alexandre also stated that if an investor invested $1,000, they would be a millionaire within three years, as long as the investor did not make any withdrawals. (*See* Exhibit B, part USAO_SDNY_00000001521).

Copies of the recordings of these meetings have been provided to the Court as Exhibits A and B to this submission.[1]

**Page 7, paragraph 13**

First, Alexandre objects to the following phrase from paragraph 13: "EminiFX did not have or utilize a Robo-Advisor Assisted account." This sentence is supported by ample evidence and should not be revised. As noted above, Alexandre represented to investors that the Robo-Assisted Advisor Account ("RA3") was EminiFX's core product. The EminiFX website explained that each investor received a "fully serviced Robo-Advisor Assisted account Trading Account [sic]," and "AI Software" when they invested. The EminiFX website also explained that the Robo-Advisor Assisted account allowed for automated trading.

Based on the Government's investigation, the Government has not found any evidence that EminiFX utilized anything resembling the RA3 technology described above to conduct its minimal trades. While Alexandre asserts in his Objections that he used an API interface to link investors' accounts to EminiFX's account at CoinPayments, this in no way resembles a "Robo-Advisor" investment platform, which typically utilizes complex computer algorithms to administer investment portfolios and perform trades. Furthermore, this explanation is flatly inconsistent with Alexandre's representations to investors that this technology was the company's trade secret, and that the RA3 technology was what enabled the company to generate its outsized (and fictitious) profits.

Second, Alexandre objects to the following language from paragraph 13: "[EminiFX] did not earn 5% weekly returns for its investors. Instead, Alexandre fabricated the weekly return numbers." This sentence is supported by ample evidence. Alexandre's objection is based on his assertion that for 8 out of 32 weeks during which EminiFX was in operation, the value of BTC appreciated by more than 5%. The Government disagrees that this can accurately be characterized as a weekly return, when in fact, it was entirely based on Alexandre's failure to invest the deposits of his investors at all. Instead, he left a substantial portion of the deposits uninvested in the form of BTC and failed to invest them. Further, the appreciation of Bitcoin by 5% on any given week does not demonstrate that the total assets for all EminiFX investors earned 5% on any given week, given that there were substantial investor funds that were not held in the form of Bitcoin.

Third, Alexandre objects to the following language from paragraph 13: (1) "Alexandre did not even invest a substantial portion of the investor funds entrusted to him, and Alexandre sustained losses on the limited portion of funds that he did invest"; and (2) "Alexandre . . . failed

---

[1] The Government previously produced video clips from the April 28, 2022 meeting to defense counsel in discovery. However, the Government realized today that it inadvertently omitted one clip, which was approximately one minute and thirty seconds in length, from its prior production. The Government produced the clip to defense counsel today. This omission caused some confusion on behalf of the parties as to certain language that was contained in the PSR, and that defense counsel objected to (because it did not have this recording). In light of this discovery, the Government is reviewing its files to ensure that no other discovery was omitted from prior productions.

to invest the vast majority of the investors' funds, which exposed investors to significant losses that were eventually realized." Alexandre argues that this is inaccurate because, according to him, the funds that investors deposited in the form on Bitcoin were "investments." This sentence is supported by ample evidence and should not be revised.

As a threshold matter, contemporaneous evidence shows that employees of EminiFX, as well as investors, understood that the BTC sent by investors to EminiFX were in fact investor deposits. For example, in an email dated May 5, 2022, an investor wrote the following: "i submitted a deposit two days ago on Eminifx fx via BTC but for some reason it's not showing that on my Eminifx account." (Exhibit C). Separately, a customer service agent wrote to a customer that the customer should provide EminiFX with a receipt or email proof "with the confirmation number visible of your last BTC deposit (CoinPayments)." (Exhibit D). In addition, in an EminiFX customer service PowerPoint presentation, EminiFX listed instructions for "How to Deposit BTC with Cashapp," as well as how to deposit BTC through other platforms, such as Coinbase Pro and Gemini.com. (Exhibit E at 30). Further, during the April 28 meeting described above, Alexandre stated in sum and substance that the only way for investors to send their deposits was through BTC. (*See* Exhibit B, part USAO_SDNY_00000001522). Finally, the Government is not aware of any instances in which Alexandre communicated to investors that when they sent their deposits, the deposits themselves were actually the investment that EminiFX had promised to place on their behalf. Tellingly, the defendant has not cited any such communications in his submission.

While Alexandre argues in his Objections that in the abstract Bitcoin can be described as an investment, he ignores the facts and circumstances relevant to this case. While it true that in certain situations investors invest in cryptocurrency, just like certain investors invest in fiat currency, in this case, as explained above, investors were sending their deposits in the form of BTC with the expectation that Alexandre would then invest those deposits in a strategy that earned the investor at least 5% per week. Considering all this evidence, this paragraph is accurate as written.

**Page 8, paragraph 15**

For the reasons explained above regarding paragraph 13, this paragraph is accurate and should remain unchanged.

**Page 8, paragraph 19**

We have no objection to the defendant's following proposed additions to the PSR:

- Documents produced in discovery demonstrate that EminiFX used as many as 59 employees from the Robert Half staffing agency. In March 2022, for example, EminiFX had approximately 25 accounting employees.

- Robert Xiong was one of the employees referred by Robert Half. Xiong's resume stated that he had (1) "extensive financial modeling experience and solid quantitative skills on Credit/Equity Derivatives/Structured Product[s]"; and (2)

- "[d]eveloped proprietary equity trading models to systematically calculate intrinsic values using historic financial statements to identify investment opportunities."

- Mr. Alexandre also hired Jeffrey Perelman as "VP of FX Development and Member Education." On May 3, 2022, Perelman extended an offer to Matthew Barlow for a position as a "full time energy [c]ommodity trader beginning Monday 5/16/22." On May 6, 2022, Perelman notified Mr. Alexandre that he planned to extend an offer to a second trader, "Danny," who was a "seasoned Forex trader from BBVA bank."

Alexandre also seeks to insert a cherry-picked set of statements made by former employees of EminiFX to the Government. These statements are each addressed below:

- "Employee-4 thought [EminiFX] seemed to be a legitimate company, as they had traders, an accounting department, and a human resources department."

Employee-4's statement that EminiFX seemed to be a legitimate company is irrelevant. As the defendant concedes, EminiFX was not a legitimate company, but was a fraud scheme, premised on false statements and representations to investors.

- "Employee-5 works at EminiFX on coding models for stock valuations and forecasting stock prices."

The Government has no objection adding this statement to the PSR.

- "[Employee-6 stated that] [t]he CEO, EDDY Alexandre, had multiple traders."

This statement is inaccurate and misleading. The Government's investigation revealed Alexandre was the only individual at EminiFX who engaged in any trades on behalf of investors. While there may have been employees who had the title "trader," they did not conduct trades on behalf of EminiFX clients.

- "[Employee-7 stated that] [t]he full-time position would include the investment training as well as creating the new Forex division. Employee-7 didn't know the Forex division didn't exist yet. Employee-7 wanted to bring in the best traders, which was a large part of his duties early on."

This statement is taken out of context. As the Government disclosed to the defense, Employee-7 stated in substance and in part: "Alexandre asked if Employee-7 was interested in moving to New York to work full time for the company. Employee-7 was interested in moving closer to his family, so he agreed. The full-time position would include the investment training as well as creating the new Forex division. Employee-7 didn't know the Forex division didn't exist yet. Employee-7 wanted to bring in the best traders, which was a large part of his duties early on." Accordingly, the Government would have no objection to adding the following to the PSR: "Alexandre hired an employee whose purported role was to create a FOREX division."

**Page 9, paragraph 19(c)**

As described above, the language in this paragraph is contained on the audio recording attached as Exhibit C, USAO_SDNY_00000017067. It should not be removed.

**Page 9, paragraph 20**

The statements set forth in this paragraph are accurate and should remain unchanged. The statements are contained in Exhibit F, which is being filed under seal in order to protect the privacy of the victim who made the statements. This exhibit will be provided to defense counsel on an attorney's eyes only basis.

Moreover, the additional statements proposed by Alexandre primarily concern the lack of knowledge of other EminiFX employees regarding Alexandre's fraudulent conduct. For example, Employee-1's subjective opinion that "Alexandre cared about the Haitian community," when Employee-1 did not know and understand at the time that Alexandre was defrauding many members of that community, is irrelevant and misleading. The fact that these employees and investors had a favorable view of the defendant or his company is irrelevant to the offense conduct given that Alexandre himself hid the fraud from them.

**Page 10, paragraph 22**

This paragraph should remain unchanged for the same reasons addressed above regarding paragraph 13.

**Page 10, paragraph 24**

Alexandre appears to object to this paragraph on the basis that Alexandre made certain statements to EminiFX investors, after-the-fact, that he was using their money in ways that deviated from what he told them originally. Alexandre's objections are without merit. At the outset, Alexandre's business operated as a fraud scheme from day one. He falsely represented to investors that he had an automated trading technology that did not exist, and that he would earn them at least 5% returns each week by trading in the cryptocurrency and FOREX markets. This was entirely false. The trading technology and the returns were nonexistent.

It is against this backdrop that Alexandre's subsequent use of his investor funds is properly characterized as misappropriation. For example, Alexandre used investor funds to purchase a $4.8 million dollar home for himself and his family, which was never disclosed to investors.[2] Alexandre used investor funds to make real estate investments in foreclosure properties, which he described, in an abstract way, to investors after the fact. By failing to give investors notice before his abrupt change to the investment strategy, he did not give investors the chance to withdraw their

---

[2] Defense counsel suggests that this home was purchased on behalf of EminiFX. This is nothing but another attempt by Alexandre to minimize his criminal conduct. As demonstrated in the email attached as Exhibit G, and the FBI interview summary set forth in Exhibit H, this property was purchased for Alexandre and his family. These exhibits are being provided on an attorney's eyes only basis to defense counsel.

money before he purchased tens of millions of dollars in foreclosure properties. As to the luxury cars that Alexandre used investor money to purchase, Alexandre did not notify his investors beforehand that he planned to use their money in this way, thereby depriving them of the chance to withdraw their money. Instead, he purportedly referenced these cars on social media and during an investor meeting. At bottom, Alexandre argues that because he gave investors certain pieces of information about his misuse of their money after the fact, that he did not misappropriate their money. But these after-the-fact disclosures did nothing to erase the principle harm caused by Alexandre's scheme: he lost over $50 million of investor money by lying to investors and using their money in ways that were inconsistent with his prior representations. This paragraph is accurate as written and should not be changed.

**Page 11, paragraph 26**

This paragraph should not be changed, for the same reasons set forth above as to paragraph 13.

## Discussion

I. **Applicable Law**

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005). Thus, the applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States v. Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005). In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." *Booker*, 543 U.S. at 259-60 (citations omitted).

Along with the Guidelines, the other factors set forth in Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

## II. A Guidelines Sentence of 120 Months Is Warranted In This Case

A Guidelines sentence of 120 months would be fair and appropriate in this case, given the nature and circumstances of Alexandre's offense, the need to impose just punishment and promote respect for the law, and the need for adequate deterrence.

### A. The Need For The Sentence To Reflect The Nature and Seriousness Of the Offense

The impact of Alexandre's enormous fraud is made apparent in the victim impact statements submitted to the Court in this case. For example, ▮▮▮▮▮▮▮▮, described how her family was impacted by his fraud:

> It took me a little while to send this email, however, I felt compelled to do so after what this man Mr. Alexandre did to my family and myself. Your Honor, this man destroyed an entire community with his elaborated lies. He used the people's weakness such as God and the Bible to lure them in and ultimately rob us of our hard earn money. My family lost over a half of a million dollars in this Ponzi Scheme. Mr. Alexandre destroyed family. Broke marriages. separated children with parents. He caused people becoming homeless. We even heard people were trying to commit suicide due to this man elaborated lies. Calculated plan to defraud us. And well thought plan to fraudulently lure us in to bring money to him. Your Honor, 10 years prison sentence would not have been enough to compensate Mr. Alexandre harm to the community, however, it is a start…"

Exhibit I.

Another investor, ▮▮▮▮▮▮▮▮, explained the widespread and severe impact that Alexandre's fraud had on the Haitian community:

> One 68 years old woman invested her entire life saving and is now homeless. A 51 year old single mother of two teenagers mortgaged her home to invest in EminiFX because her pastor told her it was a good idea, and her house is now being foreclosed on because she is unable to pay her mortgage. There are thousands of similarly situated people who have been hurt by Eddy Alexandre. The community considers Eddy Alexandre a sociopath, a financial terrorist who used the Church and the bible to terrorize them.

On behalf of the victims, I am asking the court to sentence Eddy Alexandre to the maximum sentence possible. The court should set an example so others would learn that this kind of criminal behavior is unacceptable and will be severely punished. To sentence Mr. Alexandre to anything less than 10 years in prison would not only revictimized the victims, but it will send a terrible message to the community that it is acceptable to rob 62,000 people of their life savings and expect the court to show mercy with a light sentence.

Exhibit J.

Another investor, ▇▇▇▇▇▇▇▇, expressed his regret of initially supporting Alexandre after Alexandre was charged in this case:

> I respectfully request to withdraw my support to defendant Mr. Eddy Alexandre in the above listed case. Your Honor, I was completely blindsided by this man charisma and ruse when me, my family and friends threw our support behind him without knowing all the facts related to this case. Your Honor, I am now 100% convinced that everything Mr. Alexandre has said to us was all lies and the business was a complete and fabricated scheme. Due that effect your Honor, I am withdrawing my support to this man and asking the court to punish him to the fullest of the law for his crimes.

Exhibit K.

Another investor, ▇▇▇▇▇▇▇▇, also withdrew his previous support for Alexandre and expressed concern that Alexandre has continued to take money from investors after being charged in this case:

> My name is ▇▇▇▇, I'm an Eminifx investor, few months ago I was told by Mr. Bove Eddy Alexander's lawyer that I needed to write a letter on his behalf so he can get less time. Well after everything that happened to me and my family I would like to withdraw my support letter that they force me to submit to the court. Because I found out Mr. Eddy Alexandre is still taking/ stealing money from our poor community. Mr. Eddy is a scamer the government was right about everything.

Exhibit L.

Another investor, ▇▇▇▇▇▇▇▇, expressed similar concerns:

> Mr. Judge Cronan I would like to withdraw removed [sic] my support letter for Eddy Alexandre. He is a scamer and a liar. He recently took some money to invest from my cousin, that was march the 12th at his office, he stole the money and stated it was the market that stole it they go to the same church. I'm so tired of Mr. Eddy ponzi scam. Eddy Alexander makes sure to take cash money only. This man deserves 40 years in jail. The Haitian community is hurt badly because of Eddy Alexandre.

Case 1:22-cr-00326-JPC   Document 102   Filed 07/18/23   Page 13 of 18

Page 13 of 18

Exhibit M.

The most egregious aspects of Alexandre's offense are manifest in these letters. First, Alexandre defrauded *over thirty thousand victims*. The scope of the defendant's harm cannot be overstated. This was not a fraud that impacted the lives of an unlucky few, this was a fraud that damaged tens of thousands of lives. Although Alexandre's scheme was limited to September 2021 through May 2022, when he was arrested, Alexandre inflicted remarkable harm during those eight months, defrauding more than 30,000 investors of nearly $250 million. As a result of Alexandre's scheme, more than $50 million of those funds were lost and will not be recovered.

Second, Alexandre exploited his position of trust within his Church and the Haitian community to lure unsuspecting investors into his scheme. Investors trusted Alexandre because he was well known within the Church community and the Haitian community. And Alexandre exploited this trust, even going so far as to enlist members of the Church to help recruit EminiFX investors.

Third, as the Court can see, the victims of Alexandre's scheme were not wealthy, and, based on the victim statements, the harm that resulted from Alexandre's fraud was severe: families were destroyed; marriages were broken; children were separated from their parents; people became homeless; victims were unable to pay their mortgage; one investor even heard a report that someone became suicidal. These investors worked hard for the money they invested with Alexandre. And Alexandre worked hard at convincing his victims to turn over this money, falsely portraying himself as a talented investor who could be trusted. Alexandre used a fancy website (that posted fabricated investment returns each week), a flashy promotional video, face-to-face meetings at his large Midtown office, and weekly investor meetings, to create the appearance of legitimacy and to steal his victims' hard-earned savings. In reality, Alexandre's company was a total fraud: he never had the core investment product he promised investors, and he fabricated their earnings week after week. The seriousness of this conduct demands a Guidelines sentence of 120 months' imprisonment.

### B. Just Punishment

As noted above, Alexandre's fraud is aggravated by the fact that his victims were not wealthy investors or institutions; rather, he knowingly took advantage of victims in his own community, who were predisposed to trusting him. Just punishment for Alexandre's conduct, the need to account for the serious financial and emotional harm to his victims, and a sense of fairness of behalf of the victims are additional reasons that justify a Guidelines sentence of 120 months' imprisonment.

### C. General Deterrence

A substantial sentence is required not only to reflect the seriousness of the offense and to provide just punishment, it is also necessary to deter Alexandre and others from similar conduct. With respect to general deterrence, fraud schemes are difficult to detect and prosecute, especially where, as here, the defendant took steps to obscure and hide his conduct. For example, Alexandre not only deceived investors, he gave his Ponzi scheme the veneer of legitimacy by operating a

website, renting office space, and hiring dozens of employees. Once uncovered, a lucrative fraud scheme like this one should be sternly punished. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."). Conduct like Alexandre's also erodes the investing public's trust in financial advisors and investments in general. It is meaningful to the investing public at large that Alexandre's fraud is appropriately punished. Given the massive scale of the defendant's fraud scheme, the substantial variance requested by Alexandre would not achieve general deterrence; a Guidelines sentence of 120 months' imprisonment is necessary here.

### D. Specific Deterrence

With respect to specific deterrence, Alexandre's conduct cannot be explained away as an aberration. Alexandre's conduct was not a one-time occurrence occurring on a single day, such as a robbery. Rather, his fraud unfolded over a period of eight months. During that time, he committed countless individual acts of fraud and deceit: each time he gave a weekly investor meeting; each time he published false earnings statements to his investors; and each time he gave an investment pitch to a prospective investor. Moreover, his conduct was not driven by financial need or desperation, and he does not claim otherwise. He had a history of employment, and the ability to earn a lawful living. He was not forced into this conduct; he chose it, again and again. He chose to continue recruiting victims into the scheme when he knew his historical returns were fabricated, and when he knew his promised returns were impossible to achieve. Like many Ponzi schemes, he kept recruiting investors into the scheme when he knew that that was the only way to keep the scheme going and avoid getting caught. In the end, Alexandre was stopped only by his arrest.

Alexandre argues that his decision to keep the scheme going was because he "felt too embarrassed." (Br. at 28). This argument is not supported by the record. Alexandre ran EminiFX as a fraud from its inception. He never had the investment technology he touted to investors. But instead of delaying the launch of his company until he had the core product he was marketing, he went ahead and began taking in investor funds. Worse, Alexandre peddled EminiFX as an MLM, all but ensuring that the company would rapidly grow. This makes it clear that Alexandre had every intent from the beginning of the scheme to defraud as many investors as possible.

Alexandre also argues that "he was working to fix his errors at EminiFX at the time of his arrest." *Id*. at 29. This is supported by nothing but his say-so. Through the day of his arrest, Alexandre continued to falsify investor returns and lose enormous sums of investor money. There is no evidence that at any point in time Alexandre had an automated investment tool capable of earning the enormous returns that he claimed he was earning for investors. And there is no evidence that this tool was in the process of being developed. Furthermore, on April 8, 2022, at the very time that Alexandre claims he was working to fix his errors, Alexandre misappropriated investor funds to purchase a $4.8 million home for him and his family. Alexandre's actions from the start of the scheme through his arrest do not "reflect favorably on his true intent," rather they demonstrate that his consistent aim was to defraud his investors of their hard-earned money, and to line his pockets along the way.

Alexandre's brief also suggests that specific deterrence could be satisfied through the "collateral consequences" he has suffered, including "reputational consequences." (*Id.* at 29). But a sentence without a substantial prison term would send the wrong message to both the defendant and the public about the consequences for committing serious frauds. Individuals who commit fraud often do so on the basis of a cost-benefit analysis: a belief that the likelihood of financial gain outweighs the risk of being caught and punished. In this context, a deterrent message to the defendant and public is necessary to change behavior. If Alexandre and others who would follow in his footsteps believe that even when caught, they can rely on the support of their friends and family, their reputation in the community, their good works over the course of their lives, and talk their way out of a serious sentence, there will be little disincentive to lie to investors and steal their money. Such a sentence would impose a cost not just on victims of fraud offenses, but on society generally.

### E. The Guidelines Provide a Useful Framework in this Case

Contrary to the defendant's argument that the "loss-driven Guidelines range is unreasonable under § 3553(a)," Br. at 22, the Guidelines here provide a useful framework for fashioning an appropriate sentence. Economic loss serves as a suitable starting place for assessing culpability because it serves as a useful – though certainly not dispositive – proxy for viewing the magnitude of the crime. This is especially so in this case where the defendant personally extracted nearly $250 million from more than 30,000 investors. Given this – as well as the fact that Alexandre conducted a de minimis amount of actual investing – there can be no question about the scope of the harm that the defendant intended to, and did, inflict on his victims. Further, even based on the actual, as opposed to intended loss, the Guidelines would not change: because the actual loss was nearly $50 million, instead of an adjusted offense level of 37, the defendant would have an adjusted offense level of 33, with a Guidelines range of 135-168 months' imprisonment. Based on the Government's extension of a plea offer to Count One, the defendant received the benefit of capping the Guidelines range at 120 months' imprisonment, which would remain unchanged even if the Guidelines looked to actual loss to determine the offense level. As a result, the criticisms sometimes leveled at the loss Guidelines in the context of other types of fraud cases – namely that they purportedly overstate the true loss by including theoretical losses, or losses beyond the defendant's control – do not apply in this case.

### F. Alexandre's Personal Background and Character Do Not Justify A Substantial Variance

The Court should of course consider Alexandre's personal history and characteristics, but those factors cut in both directions here. The Government has no reason to doubt Alexandre's leadership in his church, his "commitment to faith and service" (Br. 25), or that he is a loving father, friend, and mentor (*Id.*). Similarly, Alexandre cites letters of support from his family and friends in seeking leniency. (*Id.*). But that is not unusual in fraud cases. And worse, here, Alexandre exploited these connections with his family, friends, Church, and community to commit the instant offense. Without his deeply rooted ties to the community Alexandre would not have been able to pull off this massive scheme. It was because of his involvement with his Church, as well as his relationships with his friends and community, that he was able to lull his victims into giving him

their life savings. Alexandre exploited those relationships, violating the trust and faith of countless victims. It is the same reason why his victims have been so scarred emotionally by his breach of trust, as described in the victim impact statements submitted to the Court.

Alexandre also cites his service working as a chaplain for people who were isolated and in need during the COVID-19 pandemic, *see id*. But this also cuts both ways. During the same period, Alexandre also used his position within his Church to inflict tremendous harm on tens of thousands of individuals through this scheme—harm that cannot be undone and has devasted the lives of many victims.

Alexandre cites his personal history, including immigrating from Haiti, enduring a difficult childhood, and overcoming these challenges to succeed in school and eventually become a computer technician in the United States. (Br. 3-8). No doubt that record is impressive. But despite all of that success, Alexandre still was motivated to commit the instant offense. Unlike a defendant who may feel he has no way out from poverty other than by committing crimes, Alexandre lived a successful life. He was simply greedy for more, such as the $4.8 million home that he used investor money to purchase, or the BMW that he also funded with investor funds for his personal use. For a defendant with so much support and success—unlike many disadvantaged defendants that come before the Court—to nevertheless choose to commit such an egregious scheme that defrauded the very community that supported him reflects an uncommon brazenness. In that way, Alexandre's successful background makes his crimes more deserving of punishment, not less.

Alexandre also notes he will likely be removed from the United States as a result of his conviction and will be permanently separated from his wife, children, family members, and community—factors that he argues favor a substantially lower sentence. (Br. 33). The Government is not unsympathetic to these potential consequences of his conviction. Nonetheless, this consideration is substantially outweighed by the significant aggravating sentencing factors present here.

Finally, Alexandre invites the Court to consider the eight months of conduct underlying his conviction against the balance of his law-abiding life. But eight months is a substantial amount of time, and during that time, he committed countless individual acts of fraud and deceit. In those eight months, Alexandre was a prolific criminal, defrauding tens of thousands of victims who continue to be affected by Alexandre's conduct more than a year after his crime ceased. Alexandre's fraud will touch the lives of those victims for years. Victims' children's lives will likely be affected; for example, those who cannot afford college or who have to drop out of a private school. The aftershocks of Alexandre's conduct will continue for decades. Viewed in that light, a sentence of at least 120 months' imprisonment is entirely proportional to Alexandre's conduct, despite the additional collateral consequences that may result as a result of Alexandre's conviction.

### G. The Lenient Sentence Alexandre Requests Would Result in an Unwarranted Disparity with Similarly Situated Defendants

A sentence substantially below 120 months, as requested by Alexandre, would create unwarranted disparities with similarly situated defendants. The defendant's brief cites sentencing

data showing that approximately 89% of fraud defendants in Criminal History Category I and Zone D of the sentencing table based on U.S.S.G. § 2B1.1 received sentences of less than 59 months' imprisonment. (Br. 38). But Alexandre's crime was not average. It was not an insider trading or accounting fraud case—serious crimes in their own right, but which often lack the personal impact on investors in a Ponzi-scheme case like Alexandre's.³ Alexandre perpetrated an egregious fraud that caused personal harm to more than 30,000 victims. The Government agrees with the defendant that the appropriate sentence should not be driven solely by the amount of loss Alexandre caused. But the Government is seeking a sentence of at least 120 months not because of the Guidelines loss table, but because such a sentence appropriately balances Alexandre's personal characteristics, the seriousness of his crimes, the impact of his crimes on his victims, and the need for specific and general deterrence to prevent similar Ponzi-like frauds in the future.

Such a sentence would be comparable to other similarly situated defendants in this District. For example, in *United States v. Jaramillo*, 754 F. App'x 61, 62 (2d Cir. 2019), the Second Circuit affirmed Judge Swain's 144-month, above-Guidelines sentence for a Ponzi-scheme defendant who defrauded unsophisticated investors, including immigrants, of $1.2 million by holding himself out as an investment professional. (*See also United States v. Jaramillo*, 17 Cr. 04 (LT), Dkt. 73, Sent. Tr. at 15-16, 18-19). Indeed, much of Judge Swain's explanation of her significant sentence in *Jaramillo* is equally applicable here:

> He stole the funds that were given to him for investment for his own use, for fancy vacations, and to enrich himself in other ways, and he used some of the money to pay other victims who he could not discourage from demanding redemption of their investments. Mr. Jaramillo preyed upon unsophisticated investors, targeting his own ethnic community. His crimes were serious, personal, carefully calculated, and utterly despicable.

*Id.* at 19. Like Alexandre, Jaramillo immigrated from another country and provided the Court with letters of support showing that he was well-regarded in the community. *Id.* at 20. *Jaramillo* appears to involve some facts remarkably similar to those here, namely, that the defendant set out to defraud investors from the start by renting a fancy office and soliciting investors online, just like Alexandre. In addition, Jaramillo spent a substantial sum of money on himself, as Alexandre did when he purchased a $4.8 million home for him and his family. *Id.* 18-19. On the other hand, the scale of Alexandre's fraud scheme dwarfs Jaramillo's scheme. For example, Jaramillo raised only $1.2 million during his scheme from a far smaller number of victims (26), while Alexandre raised $250 million from over 30,000 investors. The emotional devastation reported by victims from the defendants' own communities in both cases is remarkably similar, and a sentence of at least 120 months here would be entirely in proportion to that in *Jaramillo*.

In another case, *United States v. Cosme*, 13 Cr. 43, Judge Preska sentenced the defendant who misappropriated $5.5 million from an unsophisticated non-profit school victim to 111 months' imprisonment. (Dkt. 400, Sent. Tr.). Similar to this case, the defendant took money from a

---

³ For this reason, Alexandre's extensive reliance on the *Rogas* case is misplaced. There, the investors that the defendant defrauded involved sophisticated investment firms, such as AXA Venture Partners, a venture capital firm.

vulnerable victim through lies and spent the victim's money on luxury vehicles.[4] While the defendant went to trial in that case and testified falsely, *Cosme* only involved one, institutional victim, not tens of thousands of individuals, and a loss of approximately $5.5 million, as opposed to $250 million. A sentence of at least 120 months here would be comparable to the 111-month sentence in *Cosme*.

## Conclusion

For the reasons set forth above, the Government respectfully submits that a sentence of 120 months' imprisonment is necessary and appropriate in this case.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: s/_____
Nicholas Folly
Jared Lenow
Assistant United States Attorneys
(212) 637-1060

Cc:   Defendant (by ECF)

---

[4] *See* https://www.justice.gov/usao-sdny/pr/long-island-man-sentenced-over-9-years-prison-defrauding-south-korean-religious-school#:~:text=Joon%20H.,South%20Korea%20of%20%245.5%20million.