N7i5aleS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,                    New York, N.Y.

4              v.                                 22 Cr. 325 (JPC)

5    EDDY ALEXANDRE,

6                   Defendant.

7    ------------------------------x

8                                                 July  18, 2023
                                                  2:00 p.m.
9

10   Before:

11                        HON. JOHN P. CRONAN,

12                                         U.S. District Judge

13

14                         APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  NICHOLAS FOLLY
17        JARED P. LENOW
          Assistant United States Attorneys
18
     CHIESA SHAHINIAN & GIANTOMASI PC
19        Attorneys for Defendant
     BY:  EMIL J. BOVE, III
20        BRITTANY A. MANNA

21

22

23

24

25

N7i5aleS

1        (Case called)

2            THE DEPUTY CLERK:  Can counsel, starting with the

3    government, please state your name for the record.

4            MR. FOLLY:  Good afternoon, your Honor.  Nicholas

5    Folly and Jared Lenow for the government.

6            THE COURT:  Good afternoon, Mr. Folly, and Mr. Lenow.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N7i5aleS

| | |
|---|---|
| 1 | MR. BOVE:  Good afternoon, your Honor.  Emil Bove for |
| 2 | Mr. Alexandre, who is seated to my right, and I also have with |
| 3 | me Brittany Manna an associate at my firm, and Nicole Verdi who |
| 4 | is a summer associate, who will join us, with the Court's |
| 5 | permission. |
| 6 | THE COURT:  Verdi? |
| 7 | MR. BOVE:  Verdi. |
| 8 | THE COURT:  Good afternoon, Ms. Manna, Ms. Verdi, and |
| 9 | Mr. Alexandre. |
| 10 | Let me just make sure I am pronouncing it correctly, |
| 11 | it is Alexandre not Alexandre; is that right? |
| 12 | THE DEFENDANT:  Alexandre. |
| 13 | THE COURT:  Alexandre, great. |
| 14 | So, we are here this afternoon for Mr. Eddy |
| 15 | Alexandre's sentencing.  Mr. Alexandre pled guilty before me on |
| 16 | February 10, 2023, pursuant to a plea agreement with the United |
| 17 | States Attorney's office.  He pled guilty to Count One of the |
| 18 | indictment.  That count charged him, from the period of |
| 19 | September 2021 through May 2022, in engaging in commodities |
| 20 | fraud in violation of Title 7 U.S.C. Sections 91 and 13(a)(5), |
| 21 | Title 17, Code of Federal Regulations Section 180.1, and Title |
| 22 | 18 U.S.C. Section 2. |
| 23 | I will start by running through the materials I have |
| 24 | received and reviewed in preparation for today's sentencing.  I |
| 25 | will ask everyone's patience as there were quite a few |

N7i5aleS

1  materials.

2          First, I have reviewed the presentence investigation

3  report dated May 25, 2023.  Appendix A to the presentence

4  investigation report is a document with information, that

5  document contains data for the defendant's final offense level

6  of 37.  So, that document has data for defendants who had a

7  final offense level of 37 pursuant to Section 2B1.1 and

8  Criminal History Category I, which are the offense level and

9  Criminal History Category that probation arrives at for the

10 defendant.  I have also reviewed the addendum to the

11 presentence investigation report which addresses various

12 objections to the presentence report raised by the defense.  I

13 have reviewed Mr. Alexandre's lead sentencing submission dated

14 July 5, 2023, that is at Docket no. 86.  This includes a

15 45-page brief from Mr. Bove and approximately 1,100 pages of

16 attached documents.  Those attachments start with a letter from

17 Mr. Alexandre himself and is followed by many letters in his

18 support including from his wife, his mother, family members,

19 and about 500 other letters and e-mails from people who knew

20 the defendant in Haiti or met him in the United States

21 including members of his church, or as well as a large number

22 of EminiFX investors.  And I suspect a large number of the

23 authors of those letters may be in this courtroom and in the

24 overflow courtroom today and I do thank you for your letters, I

25 have read all of them in advance of today's proceeding.  I know

N7i5aleS

that two correspondences appear to be written in French; an

e-mail from Marie Thomas and an e-mail from Jemps Meigan.  I do

not have translations of those e-mails but if either of those

individuals wish to speak today, and ideally if necessary that

their statements be translated, I will be happy to hear from

them.  I will also address anyone else who wants to speak in a

few moments.

There were several other materials attached to the

defense submission.  There is an article on Haitian political

history in the 1980s, a March 2020 e-mail thread between

Mr. Alexandre and the CFTC regarding Mr. Alexandre's creation

of the CFTC portal account, an e-mail thread from May 2022

concerning defendant's employment of Robert Xiong and Robert

Perelman; July 28, 2022 and September 16, 2022; letters from

the government as well as summaries of witness interviews, a

fiscal year 2022 statistical information packet from the

Sentencing Commission, three status reports from the receiver

in the CFTC civil lawsuit against Mr. Alexandre pending before

Judge Caproni; those reports are dated May 15, 2023; February

15, 2023; and October 12, 2022; there is a May 2022 e-mail

thread between the defendant and a Jeffrey Perelman, and a

spreadsheet purporting to show EminiFX employees.

The publicly-filed version of the defense submission

contains redactions of certain personal information of the

authors of some of the letters and other limited redactions in

N7i5aleS

the attachments and I reviewed those.

I also have reviewed the government's lead sentencing submission of July 12, 2023, that is at Docket no. 88, that submission also includes several exhibits.  Attached are recordings of investor meetings on May 5, 2022 and April 2, 2022; exchanges between an investor and an EminiFX customer service agent regarding the affected investors' deposits, an EminiFX PowerPoint presentation, a sealed FBI report of a victim interview, a sealed e-mail exchange and FBI report regarding a house purchase and letters from victims.  I believe there were about five letters from victims attached.  Those victim letters were originally filed under seal but now have been filed on the public docket with the sender's personal information redacted.  And I have reviewed the redacted as well as unredacted or sealed versions of those materials as well.

I also have received a submission from the parties that follow the government's submission.  I received two letters on July 13, 2023 from Mr. Bove; the one at Docket 89 concerned the sealed and restricted treatment of certain attachments to the government's submission and the one at Docket 90 concerned the government's failure to previously produce, whether in discovery or otherwise, Exhibit B to the government's submission which was the recording of the April 28, 2022 investor meeting.  And I have reviewed the exhibits attached to that letter at Docket no. 90 as well which involve

N7i5aleS

1      the various exchanges between the government and Mr. Bove

2      regarding discovery.

3            I also reviewed the government's July 13th, 2023

4      response regarding his production of a video of the April 28,

5      2022 investor meeting which is at Docket no. 93.  I directed

6      the government to file a supplemental declaration on that issue

7      which the government submitted to me yesterday and filed

8      earlier today.

9            I have also reviewed the government's response

10     regarding the sealing of certain materials.  The government

11     submitted that response on July 14th, and this letter also

12     attached three more exhibits which I have reviewed.  Those

13     exhibits are notes from an interview of a purported victim, a

14     summary of a recording of the defendant speaking to various

15     victims, and a report of an FBI interview of the victim who

16     provided that recording.  And I have reviewed the defendant's

17     reply on July 15th.

18           As the docket reflects, after reviewing those

19     materials and the documents themselves, I found yesterday that

20     sealing of Exhibits N through P, and F through H, of the

21     government's submission, was appropriate.

22           Now, I have also reviewed a July 13 letter from

23     Mr. Bove filed under seal concerning a request to strike

24     Exhibit J to the government's sentencing submission.  That

25     letter attached one exhibit also filed under seal which was a

N7i5aleS

| | |
|---|---|
| 1 | May 26, 2023 e-mail.  Given my ruling that Exhibit J should be |
| 2 | unsealed, I will also order that Mr. Bove's letter of July 13 |
| 3 | on this issue to be unsealed and I will ask you, Mr. Bove, to |
| 4 | file that on the docket, because the letter discusses a |
| 5 | witness, I authorize redactions of any references to the |
| 6 | witness' name or other personally identifying information in |
| 7 | that letter and the e-mail.  Also, I have reviewed the |
| 8 | government's response to that letter which the government filed |
| 9 | on July 17. |
| 10 | Then, most recently last night, I received a sealed |
| 11 | letter from the government concerning information purportedly |
| 12 | from another investor including notes pertaining to that |
| 13 | person's information.  In addition, over the past few weeks I |
| 14 | have received in my chambers e-mail correspondences from a |
| 15 | number of purported victims of this offense.  I have provided |
| 16 | those to the parties and I have posted them on the docket with |
| 17 | redactions to the names of the senders and any other personally |
| 18 | identifying information and those are posted at Docket no. 98, |
| 19 | and just not too long before this proceeding started, |
| 20 | Docket no. 103, and in fact I received some of those e-mails |
| 21 | earlier today. |
| 22 | So I know that is a long list, let me just make sure |
| 23 | the parties have received and reviewed all of those |
| 24 | submissions. |
| 25 | MR. FOLLY:  Yes, your Honor; the government has. |

N7i5aleS

1          MR. BOVE:  Yes, Judge.

2          THE COURT:  Is there anything in connection with

3    today's sentencing that I did not mention but I should have

4    reviewed?

5          MR. FOLLY:  No, your Honor.

6          MR. BOVE:  No.

7          THE COURT:  And aside from issues that I have already

8    addressed, what are the parties' views as to whether the

9    redactions of the parties' submissions should remain in place?

10          MR. FOLLY:  Your Honor, for the reasons we have set

11    forth previously, the government's position is they should

12    remain in place.

13          THE COURT:  Mr. Bove?

14          MR. BOVE:  We agree, Judge.  Thank you.

15          THE COURT:  So I have also reviewed these redactions

16    and agreed that what remains are appropriate redactions that

17    are narrowly tailored and I will allow them to remain in place.

18          Mr. Folly, has the government complied with its

19    obligations to victims under federal law?

20          MR. FOLLY:  Yes, your Honor; we have.

21          THE COURT:  Do you expect any victims who wish to

22    speak in court today?

23          MR. FOLLY:  No victims have indicated that they intend

24    to speak today.

25          THE COURT:  At the appropriate time I will confirm

N7i5aleS

1    whether any victims wish to be heard today.  Given that we have

2    a few overflow courtrooms, there is a possibility that a victim

3    who wishes to speak is not in this courtroom, so any victims

4    who may be observing or listening in to the proceeding in

5    another courtroom and wishes to speak, I will invite you to

6    come to courtroom 12D where we are and let one of the security

7    officers in the courtroom know.  Tell the officer your name,

8    that you wish to be heard, and I will arrange for you to speak

9    at the appropriate time.  And also, as I mentioned earlier, I

10   received e-mails in the defense submission from two individuals

11   that appear to be written in French, Ms. Thomas and Jamps

12   Maigan.  If either of those individuals wish to speak they are

13   welcome to do so.  Since I am not fluent in French I do not

14   know what they wrote in those letters.

15        I want to go back to Mr. Bove.  As I mentioned when I

16   ran through the materials I reviewed, one of the issues you

17   raised was the government's failure to produce in discovery the

18   videos of the April 28, 2022 investor meeting.  Now this does

19   seem like a relatively significant piece of evidence, or at

20   least an important meeting that occurred given representations

21   that were made to investors at that meeting including as to the

22   robo-advisory assistant.  As I will address shortly, my

23   inclination is to consider Exhibit B today in arriving at

24   Mr. Alexandre's sentence.  I want to confirm that the defense

25   does not request any adjournment to further consider or

N7i5aleS

1    evaluate that video or the videos.

2              MR. BOVE:  That's right, Judge; we are not seeking an

3    adjournment.

4              THE COURT:  Mr. Folly, I believe I reviewed your

5    declaration.  Are you able to confirm that to the best of your

6    knowledge the government has otherwise complied with its

7    discovery obligations in this case?

8              MR. FOLLY:  Yes, your Honor; we confirm that.

9              THE COURT:  Now, I also mentioned when I ran through

10   everything that I received a letter last night from the

11   government which was submitted under seal.  And I know given

12   that it is under seal we need to be careful as to what we say

13   about it.  Mr. Bove, do you wish to be heard on whether that

14   letter should be considered today?

15             MR. BOVE:  We have no objection to it being

16   considered.  We do not dispute its contents and would

17   appreciate an opportunity, at the appropriate time, to be heard

18   at side bar in response.

19             THE COURT:  As to one other preliminary matter, I have

20   considered the defense's application that I strike Exhibit J of

21   the government's submission.  I will deny that application.

22   The information in that exhibit which comes from a lawyer seems

23   appropriate for me to at least consider.  The person, for

24   example, claims that a victim of the defendant's scheme is now

25   unable to pay the mortgage on her home which is in foreclosure

N7i5aleS

         1    and expresses the view of others as to the defendant's conduct.

         2    Now, with that said, the weight these statements should be

         3    afforded is a different matter.  The defense has provided

         4    evidence suggesting that this witness is a disbarred attorney

         5    who has engaged in recruiting victims of EminiFX to join in a

         6    class action lawsuit against the defendant which the defendant

         7    contends would be in violation of Judge Caproni's

         8    anti-litigation injunction in the CFTC civil action.  So while

         9    I will consider Exhibit J and not strike it, I will afford it

        10    weight as I see appropriate in light of the information

        11    provided by defense and arguments I hear today.

        12             Let me turn to the presentence investigation report.

        13    Mr. Bove, have you read the presentence investigation report?

        14             MR. BOVE:  Yes, Judge.

        15             THE COURT:  Have you discussed it with your client?

        16             MR. BOVE:  I have.

        17             THE COURT:  Mr. Alexandre, have you also read the

        18    presentence investigation report?

        19             THE DEFENDANT:  Yes, your Honor.

        20             THE COURT:  Have you discussed it with your attorney?

        21             THE DEFENDANT:  Yes.

        22             THE COURT:  Have you had enough time and opportunity

        23    to review the report?

        24             THE DEFENDANT:  Yes.

        25             THE COURT:  And discuss it with your attorney?

N7i5aleS

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  Have you been able to go over with

3    Mr. Bove any errors that you saw in the report?

4          THE DEFENDANT:  We went over it multiple times.

5          THE COURT:  Also, have you been able to have enough

6    time to discuss with Mr. Bove anything you would like him to

7    raise with me today at sentencing?

8          THE DEFENDANT:  Yes, your Honor.

9          THE COURT:  Mr. Folly, has the government also

10   reviewed the presentence investigation report?

11         MR. FOLLY:  Yes, your Honor.

12         THE COURT:  Let's turn to the objections.  Before I go

13   through particular objections that appear to remain, let me ask

14   counsel as a more global matter whether either party feels

15   there is a need for an evidentiary hearing on any of the

16   remaining objections.

17         Does the government have a view?

18         MR. FOLLY:  Your Honor, the government does not

19   believe an evidentiary hearing is necessary at this time.

20         THE COURT:  Mr. Bove?

21         MR. BOVE:  We don't think that one is necessary with

22   respect to the live issues in the PSR.  There are other issues

23   today that I think are going to come up where there will be

24   more of a discussion.

25         THE COURT:  With respect to the live issues in the

N7i5aleS

1    PSR, one that I wanted to ask about involves this

2    robo-assistant, this robo-advisor assistant.  I wanted to get a

3    sense of how big a disagreement there is in the parties' view

4    as to this technology.  It would seem to me that there is

5    significant difference between a defendant who may have just

6    completely made up the possibility and existence of this

7    technology versus someone who had it in development but it

8    wasn't quite ready and operational.

9             Is it the government's view that the entire concept of

10   the robo-advisor assistant was made up?

11            MR. FOLLY:  Your Honor, it is the government's view

12   that the robo-assisted trading technology did not exist.  We

13   have seen no evidence during the course of the investigation

14   that it existed in any form.  The defendant seems to

15   acknowledge that even himself, in his own letter; he says the

16   artificial intelligence part that would take over trading

17   functions on the Forex trading desk were "still missing."

18            That's the government's position.

19            THE COURT:  Mr. Bove?

20            MR. BOVE:  This is not a place where we want to get

21   bogged down in semantics, Judge, but I think our point here is

22   that Mr. Alexandre allocuted to the absence of a specific part

23   of the technology that was advertised to be associated with

24   these accounts.  We concede that, we accept responsibility for

25   it, he has expressed remorse for it already, and he will do

N7i5aleS

1     that again today.

2            What we are mainly trying to protect against in the

3     record is the suggestion just that there were no accounts or

4     that nothing went in to them.  There are other features of the

5     accounts in EminiFX that did exist.  There was briefing in the

6     pretrial motions about the API interface which made point

7     payments and the servers at EminiFX, so this is -- I think

8     realistically what the record supports is this is someplace in

9     the middle.  There are sentences that say categorically there

10    was no such account.  I don't think that is accurate and I

11    think your Honor appreciates the difference and modified the

12    PSR to reflect it.  There was plenty of things, features of

13    these accounts that did exist and there was also -- and I think

14    we will talk about this more based on the exhibits in the

15    submissions -- plenty of things in progress that reflects on

16    Eddy's intent moving forward with the accounts.

17           MR. FOLLY:  Your Honor, if I can be heard briefly in

18    response to that?

19           THE COURT:  Yes.

20           MR. FOLLY:  Your Honor, I'm not sure specifically what

21    accounts or features of the accounts are being referred to but

22    your Honor was inquiring specifically about what the defendant

23    advertised as his, quote unquote, core product, he called it a

24    robo-assisted advisory account, he referred to it as RA3 and,

25    your Honor, specifically investors asked him how he was able to

N7i5aleS

1    earn so much money for them and his response to that question

2    is that he had his secret technology that was enabling him to

3    earn those returns.  Your Honor, the government's position is

4    that that technology did not exist, there was no trading

5    technology that enabled the defendant to earn outsized returns.

6    He falsely represented that repeatedly to investors both that

7    he had the technology and that it was actually earning these

8    returns.

9              THE COURT:  So when we get to those parts of the

10   presentence report my inclination was to have language that

11   essentially said that robo-advisor assisted account, or RA3,

12   was not operational or functional at the time that the

13   representations were made to potential investors.

14             Mr. Bove, is there any disagreement with that

15   characterization?  Again it was not operational or functional

16   at the time.

17             MR. BOVE:  Judge, I think that a specific reference to

18   the absence of the AI technology would most likely track our

19   allocution in this case but, generally speaking, yes, we agree

20   that's accurate.

21             THE COURT:  Mr. Folly, what is the government's view

22   on that characterization in the presentence report?

23             MR. FOLLY:  Your Honor, can you read it back again?

24             THE COURT:  We can do it again when we get to the

25   specific paragraphs but I think it may come up a couple of

N7i5aleS

1    times but essentially would say something along the lines of,

2    in reality, EminiFX did not have an operational or fully

3    functioning robo-advisor assisted account at the time that the

4    representations were made to investors.

5              MR. FOLLY:  Your Honor, the only phrase we would take

6    issue with is the use of the phrase "fully functional" because

7    we have no evidence that it was functional in any way, shape or

8    form, insofar as he represented to investors that it was being

9    used to facilitate the trading and to achieve these outsized

10   returns.  There is no evidence that that was happening.

11             THE COURT:  OK.

12             MR. FOLLY:  So we would request that it be not fully

13   functional but that it was not functional; it was not in use

14   and it was not functional.

15             THE COURT:  Yes, don't we take it up when we get to

16   that paragraph.  I think the first objection that still remains

17   from the defense is paragraphs 8 and 9; is that right,

18   Mr. Bove?

19             MR. BOVE:  Yes, Judge.

20             THE COURT:  These paragraphs concerned the defendant's

21   adjustment and conduct while on pretrial supervision.  There

22   are reports that there were some instances of non-compliance

23   with home detention including some unauthorized stops in late

24   2022.  None of these issues were reported to me by pretrial

25   services either for me to consider as a basis for bail

N7i5aleS

1    modification or for bail revocation for that matter, or even

2    just brought to my awareness.  One of the points the defense

3    makes is that the defendant was never able to challenge these

4    accusations.  Mr. Bove, my question is regardless of whether

5    these purported violations were brought to my attention, your

6    response to probation says that the issues involved little more

7    than good faith misunderstanding between Mr. Alexandre,

8    counsel, and EDNY pretrial services.  Is there anything in

9    paragraphs 8 and 9 that is factually incorrect or are you

10   concerned with how it is characterized?

11          MR. BOVE:  I guess it is the latter, Judge.  I don't

12   think any of the things referenced in these paragraphs are

13   fairly characterized as non-compliance in the context of the

14   supervision relationship and our main point here is that my

15   presumption, personally from throughout the supervision period,

16   was that pretrial services was monitoring Mr. Alexandre by GPS

17   in real-time.  There were times when we made applications to

18   the Court to reduce restrictions on his travel including for

19   employment, and as Eddy started on that process he started with

20   a job, he did certain things that to my understanding,

21   including things, Judge, like stopping for lunch while working,

22   that to my understanding pretrial services was aware of in

23   real-time and had no issue with.  So, when they brought it --

24   they changed the technology around December of 2022 and when

25   they brought it to my attention that they viewed these things

N7i5aleS

1    as non-compliance I said that wasn't our understanding.  We

2    talked through some of the facts.  To your Honor's point, I

3    think there is -- these things weren't brought to the Court's

4    attention so that a hearing could be sought.  I also wasn't in

5    an adversarial posture with the officer at the time about these

6    things, I didn't ask for proof or evidence and he now views it

7    as significant problems in the PSR that are going to travel

8    with Mr. Alexandre in this document suggesting that he is not

9    compliant with supervision and I just don't think that is the

10   case and I don't think that when you look at the way

11   supervision played out that that is what happened here and that

12   is why we are asking that these be struck.

13          THE COURT:  Does the government have a view?

14          MR. FOLLY:  No, your Honor.  We don't have any

15   additional information other than what has been offered in

16   those paragraphs.

17          THE COURT:  I will make a couple of changes to

18   paragraphs 8 and 9.  For paragraph 8 -- and I will indicate

19   where the new language before the first and second sentence

20   is -- it will now read:  We communicated with the defendant's

21   supervising pretrial services officer in the Eastern District

22   of New York who related although no bail violations had been

23   submitted to the Court, that pretrial services believes that

24   the defendant had instances of non-compliance with regard to

25   his home detention condition.  It was reported that the -- this

N7i5aleS

```
1   is also new -- purported non-compliance began in August 2020

2   but became increasingly apparent in October 2022.  And then, at

3   the conclusion of paragraph 9, I will add the following

4   language so there is no possible confusion.  That language will

5   read:  Alexandre maintains that these instances of purported

6   non-compliance were the result of good faith misunderstandings

7   between him, his attorney, and the pretrial services officer,

8   and some of them occurred during a period when Alexandre and

9   the family were displaced from their rental home following a

10  fire.  None of these issues of non-compliance were brought to

11  the Court's attention, nor did the Court make any finding of

12  non-compliance.  The Court never held a hearing at which

13  Alexandre had the opportunity to contest them or otherwise

14  explain any misunderstanding.

15          Do you want to be heard any further on that?

16          MR. BOVE:  I would ask that we also add that

17  Mr. Alexandre disputes that they were in fact instances of

18  non-compliance.

19          THE COURT:  I think that's fair to add.

20          MR. BOVE:  I have not seen pretrial services behave

21  like this, Judge, and it will necessarily impact the way the

22  defense bar works with them going forward when you have

23  informal conversations like this that they don't feel rise to

24  the level of reporting to your Honor, and then you find them as

25  a surprise in the draft PSR that they basically transcribed
```

N7i5aleS

```
 1    their version of a conversation.  It just puts everyone in a

 2    difficult position.

 3              THE COURT:  Well, I will add the sentence that

 4    Alexandre does not view these instances as non-compliant.

 5              Now we go to paragraphs 12 and 13.  These paragraphs

 6    provide an overview of the criminal scheme.  Mr. Bove, it seems

 7    to me the primary objection here is to the supposed

 8    argumentative nature of these two paragraphs, and in particular

 9    language that the defendant did not invest a substantial

10    portion of the funds.  Is that accurate?

11              MR. BOVE:  So for paragraph 12, Judge, I think there

12    are four sentences that were at issue in our submission, the

13    last four beginning Alexandre offered his investors... through

14    the end of the paragraph.  We withdraw our objection to the

15    final two sentences, and in particular -- it is relatively

16    early in the proceeding -- I want to be clear that Eddy has

17    acknowledged in Exhibit A, his letter, that these ROI figures

18    that he provided to investors were not accurate reflections of

19    the investment performance of the funds.  I think that bears a

20    lot on this proceeding but we are not going to be disputing

21    things that relate to that 5 to 9 percent issue in the PSR.

22              With respect to the remaining two sentences, the two

23    above that, the issue is that I don't think that this PSR

24    requires a summary paragraph, I don't think it is necessary for

25    the probation officer to just copy the complaint in the PSR
```

N7i5aleS

1    and, in particular, in these two sentences I'm not sure where

2    the quotation "guaranteed" is used.  I'm not sure where that

3    came from.  I didn't have an opportunity to review that video

4    and it sort of parallels the situation that happened where we

5    got a video a little bit later.  We should have an opportunity,

6    I submit, to review the evidence that underlies these positions

7    in the PSR and contest them or not.  When it is this vague --

8    and this is going to come up in other of our objections -- it

9    makes that impossible and so the quote "guaranteed" is a

10   problem in that way.

11           I guess the next sentence also touches on this 5

12   percent issue that we are not contesting so it is really just

13   that.

14           THE COURT:  Mr. Folly, the word "guaranteed"

15   especially in quotes, where is that coming from?

16           MR. FOLLY:  Your Honor, I don't know if there is a

17   specific quote that is being referred to.  I think it is

18   accurate to say, to use the word "guaranteed."  I think it

19   would be equally accurate to use the word "promise," we have no

20   objection to modifying it or revising it to say that he

21   promised high investment returns, if that would solve the

22   dispute.

23           THE COURT:  Mr. Bove, it does seem accurate to me.

24           MR. BOVE:  That's fine.  Thank you.

25           THE COURT:  So that sentence will be changed to

N7i5aleS

1    Alexandre promised his investors high investment returns using

2    new technology, and it will continue as written.

3              Are there any other remaining objections to paragraph

4    12 and 13?

5              MR. BOVE:  No, Judge.  Thank you.

6              THE COURT:  With respect to the next possible

7    objection, I believe it will be paragraph 15 of their -- what I

8    had proposed earlier was that last sentence being changed to:

9    As noted, RA3 did not exist -- changed from:  As noted, RA3 did

10   not exist, to:  As noted, RA3 was not in fact operational or

11   functional at the time these representations were being made to

12   potential investors, although it may be fine just to leave it

13   as is.

14             Do the parties have a view on that?

15             MR. FOLLY:  Your Honor, we think it is accurate as it

16   is and that the revision that your Honor has proposed, we don't

17   have an objection to that.

18             THE COURT:  Mr. Bove?

19             MR. BOVE:  We prefer the revised version.

20             THE COURT:  I will make that revision to the last

21   sentence.

22             I believe next is paragraph 19, unless there is

23   objection before that, Mr. Bove.

24             MR. BOVE:  19 is next; yes, Judge.

25             THE COURT:  I mentioned this earlier but since

N7i5aleS

paragraph 19 discusses the April 28, 2022 investor meeting in a
bit of detail, I note that I will not strike the discussion of
the April 18, 2022 investor meeting as the government
represents in its declaration, the omission of the video clips
of that meeting appear to have been inadvertent and was
remedied as soon as the government became aware that it had
not, those clips had not been previously produced.  I also did
not think that there is prejudice here to the defense for the
late production given that the clip was not exculpatory, as the
defense acknowledged and of course Mr. Alexandre himself was
the one who made these statements who presumably would know
what he said at those meetings, particularly the meeting on
April 18, 2022.

          So, as to the changes in this paragraph let me just
first address some, because there appears to be agreement, the
government agrees in the sentencing submission on page 7 and
page 8 to certain changes, largely along the lines of the
defendant's request.  So I will add to paragraph 19
subparagraphs A through C that read as follows:

          Subparagraph A:  EminiFX used as many as 59 employees
from the Robert Haft Staffing in March 2022 EminiFX had
approximately 25 accounting employees.

          Subparagraph B:  Robert Xiong was one of the employees
referred by Robert Haft.  Xiong's résumé stated that he had (1)
extensive financial modeling experience and solid quantitative

N7i5aleS

skills on credit equity derivatives structured products; and

(2) developed propriety and equity trading models to

systematically calculate intrinsic value given historical

financial data to identify investment opportunities.

And then subparagraph C:  Alexandre also hired Jeffrey

Perelman as VP of FX development and member education.  On May

3, 2022, Perelman extended an offer to Matthew Barlow for a

position as a full-time energy commodity trader beginning

Monday, 5/16/22.  On May 6, 2022, Perelman notified Alexandre

that he planned to extend an offer to a second trader, Danny,

who was a seasoned Forex trader for BVVA Bank.

Now, as to the four statements from employees the

defense asked to include I will add what the defense proposes

to some extent, although there are certain changes proposed by

the government.  I am not sure they are all directly relevant

to the offense conduct but I will add them to the report

nonetheless.

Subparagraph D will read, as follows:  Various EminiFX

employees who were interviewed by the government provided their

observations as to the operations of the company including:

(i) Employee 4 thought EminiFX seemed to be a

legitimate company as they had traders, an accounting

department, and human resources department.

(ii) Employee 5 worked at EminiFX on coding models for

stock valuations and forecasting stock prices.

N7i5aleS

1        (iii) Employee 6 stated that as CEO of EminiFX,

2   Alexandre had multiple traders -- although the government

3   contends that Dan was the only individual at EminiFX who

4   engaged in any trades on behalf of investors.

5        (iv)  Alexandre hired an employee whose purported role

6   was to create a Forex division.

7        And that means then the original subparagraphs of 19

8   will we begin at that point starting at E.  Actually, let's

9   just say those subparagraphs I just mentioned, maybe I should

10  start after the current E since they all pertain to the April

11  28, 2022 investor meeting.

12       Are there any other issues with respect to paragraph

13  19 that we need to take up?

14       MR. FOLLY:  Not from the government, your Honor.

15       MR. BOVE:  No, Judge.  Thank you.

16       THE COURT:  Is there still an objection to paragraph

17  20, Mr. Bove?  This is the one that starts with the language

18  that the defendant made similar representations in other

19  settings.

20       MR. BOVE:  No, your Honor.

21       THE COURT:  And paragraph 22, is there an objection to

22  that one still?

23       MR. BOVE:  We maintain our objection to the "failed to

24  invest" language, Judge.  We are going to rest on our papers

25  for that.  I do think there is a difference between what the

N7i5aleS

| 1 | investors thought when initially engaging EminiFX and sent |

1    investors thought when initially engaging EminiFX and sent

2    money in, so like some of the exhibits attached to the

3    government's submission referring to BitCoin transfers as

4    deposits, that initial interaction as compared to long-term

5    holding by any EminiFX other than BitCoin.

6         THE COURT:  Would adding the language at the end of

7    the phrase in (1) saying:  In the manner he promised

8    investors... address that concern?  In other words, Alexandre

9    failed to invest a substantial amount of the investor funds he

10   received in the manner he promised investors.

11        MR. BOVE:  Can I have one moment, Judge?

12        THE COURT:  Yes.

13        (Defendant and counsel conferring)

14        MR. BOVE:  Yes, Judge.  We agree with that change.

15   Thank you.

16        THE COURT:  Mr. Folly?

17        MR. FOLLY:  Your Honor, we would still object to that

18   change.  We think the language, as written, is accurate and

19   that it is actually a central part of the offense conduct.  He

20   received well over a hundred million dollars in these investor

21   deposits and represented to investors that he was using AI

22   technology that was going to invest that money, and the money

23   sat there.  He didn't invest it.  These investors understood

24   they were funding deposits the same way if somebody was

25   transferring money into another currency, they would have the

N7i5aleS

1    expectation that that money would then get invested.

2    Cryptocurrency, it's a currency and here you can invest and

3    have an investment strategy with respect to currencies, but

4    here all of the surrounding facts and circumstances demonstrate

5    that the funding of the deposits was understood by nobody at

6    the time to be the actual investments that were supposed to get

7    implemented by the defendant.  So we think it is actually

8    important that this remains unchanged and that it accurately

9    reflect that the defendant let the money sit there, did not

10   invest it, and as a result of that he lost his investors tens

11   of millions of dollars that they will never get back.

12        THE COURT:  Is it your view that just putting the

13   money in Bitcoin and seeing what happened to the money would

14   not qualify as an investment?

15        MR. FOLLY:  Your Honor, under these facts and

16   circumstances it was not an investment.  Investors understood

17   they were funding their deposits into EminiFX by sending them

18   in the form of cryptocurrency, and here, after the defendant

19   received those deposits, he did not implement an investment

20   strategy, he didn't, in turn, invest them, and that's what he

21   represented he was going to do.  And it would be the equivalent

22   if they were using fiat currency and he said instead of sending

23   me dollars, send me pounds, and then received the pounds and

24   then claims later because he left them in pounds that that was

25   actually the investment and, look, you know, it either moved up

N7i5aleS

1  or it moved down and that was the investment itself.  But

2  nobody at the time had that understanding.  That is just an

3  argument that is being used after the fact to hide the fact

4  that there was no actual investing going on, or at least as it

5  says here, a substantial amount of the investor funds he

6  received, he failed to invest them.

7          THE COURT:  Is it your view that the money just was

8  never -- the funds were never moved from the Bitcoin, they were

9  converted into some other form of deposit or investment?

10         MR. FOLLY:  That's correct, your Honor, and that is

11  reflected in the reports that the defendant has attached as

12  exhibits to his submission from the receiver, they reached that

13  exact conclusion.  The money essentially sat there, a

14  substantial amount of it, and that was not an investment, it

15  was a deposit that was made by the investors for the purpose of

16  the defendant then investing the money and making the investors

17  money off of it.

18         THE COURT:  Part of your argument though, too, is that

19  by having the money in Bitcoin the investors were subject to

20  significant risk.  They also could have -- it also could have

21  gone up.  It didn't go up in the summer of 2022 but it could

22  have gone up.  Doesn't that make it an investment?  Just not in

23  the manner that he promised investors.

24         MR. FOLLY:  Your Honor, again, I think the fact and

25  circumstances matter a lot and here there are contemporaneous

N7i5aleS

e-mails and other communications, internal communications at

the company that demonstrate everyone's understanding that the

funding through cryptocurrency was the placement of a deposit,

it was not the implementation of an investment.  It would be a

very, very rare case where someone would hire an investment

company and transfer money and that, in and of itself, would

constitute the investment and then everybody would just say

hands off, we will let the money sit there, and your job is

done, you have now invested the money.  That was the deposit.

Everybody understood I am funding a deposit the same way I

would send someone U.S.D.  And sure, global market conditions

might change in favor or against the dollar and it might change

the value of that, quote unquote, investment, but nobody had

the understanding that that, in and of itself, was the

investment.  It was the funding of deposits, the defendant

promised that he was going to, in turn, use that money and

invest that money, and he did.

THE COURT:  Mr. Bove, how was that an investment?

MR. BOVE:  First of all, Judge, I find fascinating

Mr. Alexandre's assertion that Bitcoin is the same as any other

fiat and I look forward to discussing that with some of his

other colleagues in crypto cases that seem to take a different

view.

Your proposed modification is accurate; this was an

investment, it wasn't the one that Eddy advertised on the

N7i5aleS

1   website.  The most obvious evidence in the record to

2   demonstrate that is the fact that when we get to the discussion

3   of actual loss in this case, it's going to be about what

4   happened in that account.  We are not talking -- the comparison

5   between a transfer from dollars to some foreign currency,

6   that's also a type of investment because he wasn't just holding

7   these things.

8           The last point that I will make, Judge, is that what

9   Mr. Folly just did is a characteristic throughout their

10  advocacy, extrapolating from one or two discrete pieces of

11  evidence to just incredibly broad generalizations.  They

12  submitted two communications that refer to a deposit out of

13  what they say are 30,000 investors.  If they read the

14  receiver's documents they would understand that it's maybe 25.

15  But, those details don't matter to these guys.  So the idea

16  that you take two exhibits and you stand up in court and say

17  everyone understood this, is just not a sustainable position

18  and your Honor's proposed modification is accurate.

19          THE COURT:  I don't think the modification I proposed

20  impacts the ability of the government to make the arguments it

21  has been making and I am sure will make today so I will have

22  the modification as I mentioned.

23          Paragraph 24 is the paragraph that deals with the use

24  of investor funds that were inconsistent with representations

25  to investors mentioning the $4.8 million home, the foreclosure

N7i5aleS

1  properties, and the luxury vehicles.  Let me hear more from the

2  defense as to that objection.

3       MR. BOVE:  I think the main objection here, Judge, is

4  the idea that the website was the only way that Eddy

5  communicated with investors.  On the one hand there are

6  arguments being made that Eddy communicated with them every

7  week during Zoom meetings about certain things but then when we

8  bring up points about meetings that happened with investors

9  with disclosures that are mitigating, those are categorically

10 rejected because they weren't advertised on the website.  So,

11 our main points are these things were disclosed to investors

12 during those meetings.

13       THE COURT:  After the fact or before they were

14 referred to?

15       MR. BOVE:  While they were happening.  So the cars

16 were advertised in social media while those transactions were

17 going on and this is -- we have laid out the evidence that we

18 submit supports this.  So, that's the main part of this

19 objection.  We reviewed Exhibits G and H to the government's

20 submission and acknowledge that the Manhasset property was

21 intended for Eddy's personal use so we are withdrawing that

22 objection.

23       The last point here is that there were service fees

24 that were disclosed to these investors and so the fact that

25 Eddy used some of those funds to purchase some of these things

N7i5aleS

1    is consistent with the service fees that he said he was

2    charging.  We fully recognize the response to that, Judge,

3    which is that these people didn't get what they paid for.  We

4    wanted to make that point.

5             THE COURT:  Mr. Folly?

6             MR. FOLLY:  Your Honor, we maintain it is accurate as

7    written in the PSR.  The defendant advertised this company as

8    being a crypto and Forex trading platform.  The suggestion that

9    he was free to, after the fact, do whatever he wanted with the

10   money and make some sort of partial disclosures to the

11   investors as a remedy to that is just -- it's unlawful, your

12   Honor.  That's the bottom line here.  He represented he was

13   going to do certain things with the money, and to some extent

14   he made either contemporaneous, as in transactions were under

15   way kind of disclosures, or completely after-the-fact

16   disclosures, that the entire model for the company had

17   dramatically shifted, but in this context it is not meaningful

18   because he didn't have the right do that in the first place.

19   The whole company was premised, from day one, on a set of lies

20   about having a product that could be used to generate

21   investors' specific returns.  That product never existed, he

22   was never entitled to get that money, and he was certainly not

23   entitled to use it to spend millions of dollars on a home for

24   him and his family, to spend enormous sums of money on luxury

25   cars, to spend money on fancy office space.  All of that money

N7i5aleS

1   that got spent will never be returned to these investors.

2   Period.  And that is why it is accurate to characterize it as a

3   misappropriation as it is set forth in paragraph 24.

4           THE COURT:  Were there not times when he represented

5   to investors that the investments included real estate, besides

6   the $4.8 million Manhasset home?

7           MR. FOLLY:  Your Honor, he did make representations

8   during the meetings that he had ventured into the real estate

9   space and that he was going to be flipping foreclosure

10  properties but the fundamental problem with this, your Honor,

11  is these investors were never sent a notice that said in 30

12  days the company is going to shift its investment strategy, we

13  are now going into the real estate market, we are going to be

14  flipping foreclosure properties.  If you want to take out your

15  money now, if you think that is too risky, go right ahead.

16  Instead, they were notified of it as it was happening or after

17  it had already happened and it was completely inconsistent with

18  what he originally represented he was going to be doing with

19  their money.  So he deprived them of the choice to withdraw

20  their money and he just misused it.  He used it on things that

21  dissipated the money.  Spending money on a $5 million home for

22  himself and his family is a use of the money that will never

23  come back and it deprived these investors of their money and

24  these other purchases; cars, charity contributions, luxury

25  office space, all of these things had nothing to do with the

N7i5aleS

investments that he promised he was giving them.

THE COURT:  I'm definitely in agreement on the
$4.8 million home.  What I am more focused on are the
foreclosure properties and whether or not he represented that
their investments would include real estate and that might
include flipping these properties.

MR. FOLLY:  Your Honor, he did not represent that the
investments were going to include real estate from the start of
the scheme.  During the meetings, after people had invested, he
informed them that had he started using their money to invest
in real estate.  That's the difference.

THE COURT:  Mr. Bove?

MR. BOVE:  I don't want our disputes over the PSR to
distract from what I think is the most important thing from the
defense perspective which is remorse.  But it is my job to
fight to make sure this record is accurate and to hold the
government accountable when they misstep.  It is the
government's burden in a proceeding like this to establish
facts like the ones that they just argued and I don't really
get to ask questions in a proceeding like this but as I was
listening to Mr. Folly I had to wonder, what is the basis in
the record for the sequence of the disclosures in meetings that
he just described?  They submitted one recorded meeting.  It
doesn't back what he just said and it doesn't establish that
when Mr. Alexandre discussed these things on the meeting that

N7i5aleS

1     they did record that that was the first time.  He hasn't

2     pointed to the timing of any of these contracts to establish

3     that position.  And I would like to take this point one step

4     further because Mr. Folly used the phrase "since day one."  And

5     when he said that and when he wrote that or something similar

6     in his submission, I had to wonder what is the basis in the

7     record for what was on the EminiFX website on September 1,

8     2021?  I don't think there is anything.  I think that they took

9     some screen shots in late April and May and are telling your

10    Honor that that's how it existed the entire time but I don't

11    think there is any support in the record for that.

12            In addition to that, when they say every week

13    Mr. Alexandre said this and that and this and that, the

14    receiver has found that the representations that were made with

15    respect to ROI began in late October so it wasn't every week.

16    And this is an exercise, Judge.  This is an extremely

17    consequential day in this man's life and it requires a little

18    more precision than what you are getting from the front table

19    here.

20            THE COURT:  Mr. Folly, what is the evidence about the

21    sequence of disclosure regarding the forfeiture properties.

22            MR. FOLLY:  Your Honor, first of all, defense counsel

23    is ignoring that we actually submitted two recordings to the

24    Court.  But, putting that aside, the issue that's being

25    presented is if it is accurate to describe in paragraph 24 that

N7i5aleS

1    he used investor funds that were inconsistent with his

2    representations to investors.  That's the issue.  And the

3    descriptions that are set forward even on the recording make

4    reference to communications to investors about his use of the

5    funds to engage in these real estate transactions and the

6    recordings suggest that those transactions are in the process

7    of happening.  It's pretty remarkable, your Honor, the

8    defendant -- this is his own company, he ran the whole thing,

9    and he is objecting to representations that are set forth in

10   the PSR about his timing of communicating to investors.  He has

11   proffered absolutely nothing to the contrary.  Zero.  He has

12   made no representation or proffer that there is some factual

13   inaccuracy about the sequence and timing of these disclosures

14   and that they actually started on a different date and he ran

15   the company.  And, your Honor, we are here at sentencing, he

16   had every opportunity to do that, and instead he is pointing

17   the finger at the government and saying that we are somehow not

18   being precise in our characterization of the sequence of the

19   facts here but there is nothing inaccurate about saying that

20   somebody who uses investor funds to do things like purchase a

21   home for themselves, to do things like purchase foreclosure

22   properties, is using them in ways that are inconsistent, at a

23   minimum, with their prior representations that they would be

24   using the funds for a cryptocurrency and Forex trading platform

25   and they would be using RA3 technology that would generate

N7i5aleS

1    outsized returns.

2            THE COURT:  Mr. Bove, as to the luxury vehicles, what

3    is the explanation for that?  Wouldn't they be depreciating in

4    value?

5            MR. BOVE:  Yes, Judge, they would.

6            THE COURT:  Do they fall into the category of the

7    $4.8 million home where you agree that those should not have

8    been purchased?

9            MR. BOVE:  No, Judge.  I think there is a series of

10   vehicles -- I am going to go to the vehicle part of the PSR in

11   paragraph 86.  And so, there is seven here.  Number one, the

12   BMW Eddy used personally.  We acknowledge that for whatever

13   weight that deserves in his sentencing.  2 through 6 were not

14   used by Eddy, these were used by others at EminiFX, they were

15   disclosed in social media posts that we did provide to the

16   probation office in writing the PSR, and in connection with

17   Eddy's cooperation he went to great length to go to people who

18   possessed the vehicles and give them back so that whatever

19   value was on them could be recovered.

20           THE COURT:  For the first sentence of this paragraph I

21   will slightly modify it to read:  Alexandre used investor funds

22   for purposes that were, at times, inconsistent with his

23   representations to investors as to how he would use their

24   funds; and keep the remainder of the paragraph.  Certainly I

25   understand the parties' arguments from both sides as to this

N7i5aleS

1   but that language would be fair here.

2          I think the last objection may be paragraph 26, if

3   that still is an objection.  Mr. Bove, is there an objection to

4   26?

5          MR. BOVE:  I think it has been resolved based on your

6   Honor's modification.

7          I apologize for this.  In reviewing the PSR to prepare

8   for sentencing there are a few other issues that I need to

9   bring to the Court's attention.

10          THE COURT:  Go ahead.

11          MR. BOVE:  These relate to paragraphs 28, 31, and 38.

12   So, in paragraph 28 there is a reference to a range of between

13   30,000 to 40,000 investors and we would ask that that be struck

14   and corrected, based on the receiver's report, which is Exhibit

15   J, I think at footnote 2, that indicates it is 25,000.

16          THE COURT:  Mr. Folly?

17          MR. FOLLY:  Your Honor, we don't have any objection to

18   that.

19          THE COURT:  I will change, in paragraph 28, "30,000 to

20   40,000" to the number "25,000."

21          MR. BOVE:  In paragraph 31 there is a foreshadowing of

22   an updated financial analysis from the government that I don't

23   think we got.  There is another reference to the 30,000 to

24   40,000 number that should be corrected.  And then I think the

25   remainder is accurate, these are representations the government

N7i5aleS

1    made.

2              THE COURT:  So I guess I would start that paragraph:

3    At present, unless there was an updated analysis provided in

4    advance of sentencing...  Mr. Folly?

5              MR. FOLLY:  Your Honor, I didn't hear the paragraph

6    number.

7              THE COURT:  Sure; 31.  It starts with saying that the

8    government intends to provide an updated financial analysis in

9    advance of sentencing.

10             MR. FOLLY:  Yes, I think it is appropriate to start it

11   at present with the proposed modification as to the number of

12   investors that has been made by defense counsel.

13             MR. BOVE:  And then paragraph 38 has that, the range,

14   again, of the victims.

15             THE COURT:  I will make that change to paragraph 38 as

16   well to reflect 25,000 victims.

17             So, aside from those, are there any other objections

18   to the factual recitations in the presentence report?

19   Mr. Folly, anything from the government?

20             MR. FOLLY:  No, your Honor.

21             THE COURT:  Mr. Bove?

22             MR. BOVE:  No, Judge.

23             THE COURT:  Having resolved the objections that were

24   made and hearing no further objections, I will adopt the

25   factual recitations set forth in the presentence investigation

N7i5aleS

report with the many changes that we have noted over the past
hour.  The presentence investigation report will be made part
of the record in this matter and placed under seal.  If an
appeal is taken, counsel on appeal may have access to the
sealed report without further application to me.

        Let me turn to the sentencing guidelines now.
Although I am not required to follow the U.S. sentencing
guidelines, I still must consider the applicable guidelines
range when arriving at the sentence in this case.  To do that,
it is therefore necessary for me to accurately calculate the
guideline sentencing range.

        There was a plea agreement in this case.  It appears
to me that the presentence report contains the same guidelines
calculation as the plea agreement; is that right, Mr. Folly?
Mr. Bove?

        MR. FOLLY:  Yes, your Honor.

        THE COURT:  Does either party have any objection to
the guidelines calculation in the presentence investigation
report?

        MR. FOLLY:  The government does not.

        MR. BOVE:  No, Judge.

        THE COURT:  Mr. Folly, I assume the government moves
for the third acceptance point?

        MR. FOLLY:  Yes, your Honor, we do.

        THE COURT:  I will grant that motion pursuant to

N7i5aleS

1    Section 3E1.1(d).

2              So let me put on the record my calculation of the

3    application of the sentencing guidelines as to Mr. Alexandre.

4    The base offense level for Count One is six pursuant to U.S.

5    Sentencing Guidelines Section 2B1.1(a)(2), and that is because

6    the offense to which he has pled guilty, 26 levels are added

7    pursuant to Section 2B1.1(b)(1)(N).  That is because the loss

8    amount was greater than $150 million but not greater than

9    $250 million; two levels are added pursuant to

10   Section 2B1.1(b)(2)(A)(i) and that is because the offense

11   involved 10 or more victims; two levels are also added pursuant

12   to Section 2B1.1(b) and (c), and that is because the offense

13   involves sophisticated means and the defendant intentionally

14   engaged in or caused the conduct that constituted these

15   sophisticated means; four more levels are alleged because the

16   offense involved a violation of the commodities law and at the

17   time of the offense the defendant was a commodity pool

18   operator; and lastly the offense level is decreased by three

19   pursuant to Section 3E1.1 because of the defendant's timely

20   acceptance of responsibility.  The result is an offense level

21   of 37.  Because the defendant has no criminal history, he has

22   no criminal history points, that puts him in Criminal History

23   Category I.

24             Now, offense level 37 and Criminal History Category I,

25   the resulting guidelines range would normally be 210 to 262

N7i5aleS

months' imprisonment.  The maximum authorized sentence for

Count One, however, is 10 years in prison, so that means the

effective guidelines range in this case is 120 months in

prison.  And in addition, the guidelines fine range after

finding an ability to pay on the part of the defendant is

$40,000 to $1 million.

Now, I believe the plea agreement also provided that

neither party would be seeking a departure from the stipulated

guidelines range and of course I am referring to a departure,

not what is more commonly known as a variance.  I understand

that the defense is going to be advocating for a variance from

that range.

Is that right, Mr. Bove?  Does the defendant seek a

departure from the guidelines range?

MR. BOVE:  We are not seeking a departure; correct.

THE COURT:  What about the government?

MR. FOLLY:  No, your Honor.

THE COURT:  I, too, have considered whether there is

an appropriate basis to depart from the advisory guidelines

range and while I acknowledge that I have the authority to

depart, I do not find any grounds warranting an upward or

downward departure in this case and I therefore will decline to

depart from the guidelines range.

I will now hear from the parties as to sentencing.  I

propose I will hear first from the government, then I will hear

N7i5aleS

1    from Mr. Bove.  I then will ask whether there is anyone, any

2    victims who wish to be heard, and then lastly I will see if the

3    defendant wishes to make a statement.

4            Does anyone have any concerns with that schedule?

5            MR. FOLLY:  No, your Honor.

6            THE COURT:  Mr. Folly or Mr. Lenow?  Please.

7            MR. FOLLY:  Your Honor, the scale of this fraud scheme

8    and the damage inflicted by the defendant was enormous in this

9    case.  The brazen nature of his conduct, the exceptionally

10   large number of victims that he defrauded, the way that he

11   manipulated the members of his own community that trusted him.

12   He took that trust, he turned it around, and he used it as a

13   tool to recruit more and more victims into this fraud scheme;

14   victims who were not institutional investors, who were not high

15   net worth investment clients, victims who were ordinary,

16   everyday people who put their hard-earned money in his hands

17   for one reason, and that reason was because they trusted him

18   and they believed the things that he said about his company,

19   the lies that he told them about his company.  In light of all

20   of that, a guideline sentence of 120 months is fully warranted

21   in this case.

22           Your Honor, starting first with the offense conduct,

23   which we have already spent a considerable amount of time

24   discussing here today, the first point there is the scope of

25   this scheme and the number of lives that it touched cannot be

N7i5aleS

overstated.  It was a massive scheme.  It was an operation for

a period of eight months and only came to an end because the

defendant was arrested.  But during that eight-month period of

time, the defendant managed to solicit approximately 25,000

victims into his scheme, an enormous number.  Approximately

$250 million in investments poured into the defendant's

company.  He ran that company, it was his company, he was the

CEO, he was the spokesperson, it all revolved around him.  And

not only did he manage to dupe such a large number of victims,

he also caused tremendous financial harm to those victims.

It's not just that he took their money, it is that he also

erased an enormous portion of their money that they will never

get back because of his lies and because of his scheme.

        In addition, your Honor, one of the most deeply

troubling aspects of this scheme, and it is something that the

defense actually points to in favor of their request for a

below guideline sentence, I believe they phrased it as a

substantial variance; your Honor, he exploited his position in

the community.  He was a trusted pillar of his community, of

his church, of the Haitian community.  He was a pillar.  People

believed him when he said he had a company and he had an

investment product that was capable of transforming their

lives, that was capable -- and this is not a direct quote, your

Honor, I am capturing the sentiment -- he offered them 5 to

9.99 percent returns every week.  That is a transformational

N7i5aleS

amount of money.  And they believed him because they had every

reason to believe him because he presented himself to that

community, he was dedicated, he was known to give back to that

community, he served that community.  We are not here to

dispute that, your Honor, but what we are here to do is

carefully examine the way that he used that as a tool to get so

many victims into this scheme, victims that would not have

otherwise trusted him.  If he had been an unknown person, if he

did not have the reputation of trust and the reputation of

doing good deeds in his community that he did, he would never

have been able to successfully induce these victims to parting

with their hard-earned money and handing it over to him.  And

right alongside that, he also used the church.  He used the

church as an instrument to recruit, to get more victims into

this scheme.

          So, while we recognize that his good deeds in the

community are a mitigating factor, his betrayal of that trust

and his deliberate use of it as a tool to get more and more

investors and more and more money into this company is anything

but a mitigating factor, it is a factor that counsels in favor

of the 120-month sentence, the guideline sentence that should

be imposed here.

          In addition, your Honor, this was a scheme that was

entirely deliberate and calculated from inception.  Your Honor,

we read the defendant's letter in this case carefully, and

N7i5aleS

although the defendant said the theme for today at sentencing

is the defendant's remorse, what has been remarkable is that

since the day the defendant pled guilty, he has completely

failed to accept actual responsibility for his misconduct in

this case.

There was never a basis to start this company.  There

was never a basis.  The product never existed and the

defendant, nevertheless, launched the company, even though from

day one it was a fraud.  It was entirely smoke and mirrors.  He

had a fancy office in midtown, he hired multiple employees, he

had a website, he had a recruitment video on that website.  The

problem, your Honor, was he never had the product that he was

telling the investors was going to earn them the money.

And your Honor, it was clear that it was calculated

because the defendant acknowledges that he was faced with

questions along the way.  He said in that video that is

referenced in the PSR that he was getting questions about how

are you earning all this money for us?  And he said it was this

proprietary product, this RA3, this AI technology.  And your

Honor, it did not exist, that was a total fiction.  And it was

the whole premise of the company.  It wasn't a lie about do we

have 150 shoes on the shelf or do we have 130?  Your Honor, it

was a lie about the entire promise that he was making to the

investors that he had this technology that could earn them

these huge returns.  And it never existed.  He said it was a

N7i5aleS

1  trade secret, he said it was the core product.  He kept leading

2  investors to believe that not only did it exist but it was

3  responsible for generating these incredible returns.  He

4  peddled that from the beginning and that shows, your Honor, his

5  state of mind.  He says today is about remorse but his actions

6  throughout this case and throughout this scheme demonstrate he

7  fully intended to mislead these investors.

8          Your Honor, another fact that is relevant to

9  understanding the defendant's frame of mind is his actions

10  during the scheme and some of the ways he was using the money.

11  And there was the suggestion in the defense submission that he

12  actually made a decision that he was going to try to fix his

13  errors.  And that is completely contradicted by the record

14  because right during the same time in the lead-up to his arrest

15  that he claims he was trying to fix his errors, he was using

16  investor funds to purchase a $5 million home for him and his

17  family -- with investors investor funds.  So the idea that he

18  was trying to fix the company at the very same time that he was

19  using an enormous sum of investor funds to purchase himself a

20  $5 million home, it is completely inconsistent with his own

21  actions.

22          Your Honor, I spoke a moment ago about the scope of

23  this scheme and not only the way that it impacted such a large

24  number of victims but the way that it had a very profound

25  impact on those victims, the way that it damaged and hurt their

N7i5aleS

1    lives.  And your Honor, some of the victims' statements speak

2    to this.  On page 9 of our submission there is an excerpt from

3    a victim statement saying:  My family lost over a half

4    a million dollars in this Ponzi scheme.  Mr. Alexandre

5    destroyed my family –– I apologize –– destroyed family, broke

6    marriages, separated children with parents, caused people to

7    become homeless.

8         Your Honor, that's what happens when a defendant like

9    Alexandre targets everyday people and gets them to give them

10   massive amounts of money.  It completely damages their life,

11   particularly here where there is real money that was lost and

12   will never go back to those investors.  They have been without

13   that money for a year and they will never get that money, all

14   of it back; they will not because of the defendant's scheme.

15        This is not a scheme, your Honor, that hurt a small

16   handful of people or that hurt institutional investors or

17   anything of the sort.  It is a scheme that damaged everyday

18   people's lives and that damage will be felt for years to come

19   as these investors try to put their life back together and deal

20   with the loss of the money as a result of this defendant's

21   actions.

22        Your Honor, the other point, just focusing on this

23   scheme itself, is the defendant did this himself, he did it

24   alone, he wasn't acting at someone's direction.  This all came

25   from him.  He cannot blame anyone but himself.  He made every

N7i5aleS

decision, he made the misrepresentations.  It all falls on this defendant.

Your Honor, in addition, there is a need here for general deterrence.  This was a fraud that changed the defendants' lives overnight and there is the need to deter other like-minded individuals from engaging in this type of conduct.  The defendant was able to get access to a lifestyle that he never would have had absent this scheme.  He suddenly was the CEO overnight of a very, quote unquote, successful company with tens of thousands of investors, with millions under his management.  He was able to purchase himself a $5 million home.  Your Honor, general deterrence is important here so that others do not engage in a scheme like this.  It is also important, your Honor, because schemes like this erode the public's trust in the future for other investment opportunities.  They damage that trust and a substantial sentence here is required in order to defer others from inflicting similar damage on the community.

Your Honor, specific deterrence is also particularly important here and that's not always the case in some of these white collar sentencings, but here it is particularly important.  There is a few reasons for that, your Honor. First, the defendant, despite remorse being the focus of today, has just failed to accept responsibility.  At his plea he tried to minimize his conduct.  He described the trading functions as

N7i5aleS

1    not being, quote unquote, fully functional.  He said he did

2    this as part of his marketing.  He refused to say he intended

3    to mislead anyone, your Honor.  And that goes to the heart of

4    what he did here.  He deliberately, he intentionally, and in a

5    calculated fashion misled his entire community.  That's what he

6    did in this scheme.  There is no other explanation for his

7    conduct.

8             In his letter that he submitted he continues with this

9    theme of minimizing his conduct and placing blame on other

10   things besides himself.  He places blame on the rapid growth of

11   the company for what happened in this case.  He acts as though

12   he was just running a legitimate business and got in over his

13   head.  Your Honor, again, the problem with this is it is just

14   inconsistent with what actually happened here.  He wasn't just

15   running a legitimate company and got in over his head.  From

16   the inception of the company he marketed something that never

17   existed.  He marketed his core product that never existed.  He

18   marketed returns that he never achieved.  And he did that

19   throughout the scheme, all the way until his arrest.

20            So the notion that other circumstances were to blame

21   for what happened here, or the notion that he was just in over

22   his head, or the notion that he was actually going to fix it

23   and this was just the result of some technical failures or

24   anything of the sort -- that seems to be the suggestion

25   throughout his letter -- is completely inconsistent with his

N7i5aleS

1    actual actions with what he did from day one.

2          Your Honor, the other point here is the defendant's

3    willingness to do something like this again.  It is not just

4    hypothetical the way it is in some other cases.  Your Honor,

5    the government has put forward documentation to the Court

6    indicating that after the defendant was charged in this case,

7    he continued to engage in conduct he knew he was prohibited

8    from doing.  He continued to meet with victim investors, to

9    discuss additional investments, he attempted to dissipate

10   $100,000, a substantial sum of money, despite making

11   representations that all of the money that he had access to was

12   tied up in connection with the government's actions that were

13   taken at the time of his arrest.  Your Honor, that conduct,

14   since the case was charged, also speaks to specific deterrence.

15   It also speaks to the need for a substantial sentence, a

16   sentence of the guidelines of 120 months.

17         Your Honor, there is another point relevant to the

18   defendant's failure to accept responsibility.  That failure in

19   this case has had a corrosive impact and effect on the judicial

20   system, on the legitimacy of these proceedings, on the public's

21   perception of justice.  Many of the investors who wrote letters

22   of support that were attached to the defendant's submission do

23   not believe he did anything wrong.  To this day.  And your

24   Honor, one of the main, if not the main reason that they don't

25   believe he did anything wrong is because he has continued to

N7i5aleS

1   make those representations.  It's in his letter, the way he

2   writes his letter to the Court explaining what happened in this

3   case, it leaves the suggestion that this was not a fraud

4   scheme, that he didn't, at the inception of the company, launch

5   a company that didn't have the core product it was promising

6   his investors; it leaves the suggestion that what happened here

7   was a series of innocent mistakes and that is absolutely

8   inconsistent with what is in the PSR and the facts before this

9   Court.

10          There were statements in the letters that the

11   defendant kept his promises, that he never lied to anyone since

12   the launch of the platform, that he is innocent, that the

13   government shut down the club with a lot of accusations that

14   were not true.  Your Honor, part of what is so troubling here

15   is the defendant's willingness, up through sentencing, to

16   attempt to continue to mislead that community that he misled

17   during the course of this fraud scheme.

18          THE COURT:  Let me ask you, some of those individuals

19   who wrote, made reference to -- and I think the way you

20   described the letters is very, very fair, Mr. Folly, I will say

21   that, they almost all express frustration that this came to an

22   end because every Friday they were getting their 5 percent.

23   Were they actually pulling out 5 percent on every Friday or was

24   it a notification that your account went up 5 percent?

25          MR. FOLLY:  Your Honor, on Fridays they had the choice

N7i5aleS

1    as to whether they would withdraw or reinvest, and your Honor,

2    that goes to one of the core misrepresentations that the

3    defendant was making to these victims.  It was the false

4    representation that that money actually existed as to all of

5    these investors, that if they all chose to withdraw all of

6    their money, including the profit that he falsely represented

7    they had made, they could do so.  They never could.  If they

8    had done that, there would have been far more money requested

9    to be withdrawn than existed.  That was the core of this

10   scheme, it was a scheme that was operating in many ways as a

11   Ponzi scheme.  It required the in-flow of new money in order to

12   satisfy whatever withdrawal requests came in because the

13   company was not earning legitimate investment returns and

14   certainly was coming nowhere close to the representations that

15   were made to the investors.  And your Honor, that is detailed

16   in the attachment that the defendant attaches the report from

17   the receiver.  It lays it out, week by week, the total

18   discrepancy between the representations made to investors about

19   their ROI and about what actually existed for those investors

20   were they to choose to withdraw their money.

21          So, your Honor, those investors believed that they had

22   that money but it was a total fiction, it never existed, that

23   money never existed.  And your Honor, the defendant, the way

24   that he has presented himself in his letter to the Court, at

25   his plea allocution, it continues to mislead investors about

N7i5aleS

the true scope of his conduct and what he really did to the

community that supported him and still supports him.

Your Honor, the other point relevant to specific

deterrence, this defendant is smart, this defendant has a

community of supporters, this defendant has a supportive

family, this defendant has shown over time that he is capable

of earning a lawful living.  And while all of that is again

pointed to as mitigation, despite all of that, the defendant

engaged in this massive fraud scheme.  He was blinded by his

own ambition.  He continues to distort reality, that is clear

in his submission.  And he will continue to put people in

harm's way as he has done even since the case has been charged.

So, your Honor, while he points to his personal

background, he points to his character all as being a basis for

a substantial variance, those factors cut both ways in this

case.  He had opportunities many defendants don't.  He was not

desperate.  There is no suggestion that this was a crime

committed out of desperation.  What is clear is it was a crime

committed because of his own ambition.  He wanted what comes

with the success, he wanted to be the CEO of a big company.

And he has shown that he is willing to lie at every turn to get

and achieve that.

Your Honor, the last point, there was some argument

regarding unwarranted sentencing disparities.  Your Honor, we

have cited two cases with fair resemblance to this case in

N7i5aleS

which case the defendants received substantially similar

sentences.  In addition to that, your Honor, the bigger point

here is this defendant's crime was not average.  It wasn't an

average crime.  So the comparison to other crimes that had

similar Criminal History Category or were in Zone Z of the

sentencing table, as cited in the defendant's submission, is

not appropriate here.  This was a crime where the defendant

abused his position of trust in the community, he perpetrated

an egregious fraud that harmed 25,000 victims, that defrauded

them of $250 million, that caused economic harm of at least

$50 million that will never be returned to those investors.  So

while we agree the loss amount should not be the sole driver in

any way of this sentence, the sentence sought by the government

of 120 months is not solely based on the loss amount, it is

based on all of the various factors that I have addressed

during the course of this sentencing.

Your Honor, nothing less than 10 years is just

punishment for what the defendant has done.  Nothing less than

10 years is sufficient to deter others from get-rich schemes

just like this.  Nothing less than 10 years is sufficient to

deter this defendant from engaging in future crimes.  This

defendant, who despite his guilty plea, has failed to accept

responsibility in a meaningful way for his crimes and for the

enormous damage that he has inflicted on his community.  Your

Honor, in light of that, there is no basis for the substantial

N7i5aleS

1   variance requested by the defendant and every basis for a

2   guideline sentence of 10 years.

3        THE COURT:  So, if Count One didn't have a max of 10

4   years the guidelines would be far higher than that.  Count Two

5   had a max of 20 years.  What should I take from the fact that

6   the plea was to only Count One here?

7        MR. FOLLY:  Your Honor, in negotiating this plea the

8   government did take into account some of the mitigation that is

9   set forth in the defendant's sentencing submission.  Among that

10  mitigation is the fact that the defendant will likely be

11  removed, although I would note he has chosen not to consent to

12  his removal and sign the consent to his removal.  And your

13  Honor, he would be facing a far more significant sentencing

14  exposure had the government not offered him that lower cap of

15  10 years in this case.  Your Honor, the government has already

16  factored in to its plea offer the very things that the

17  defendant is now citing in his request for a substantial

18  variance below that 10-year cap.

19       THE COURT:  And presumably that will include accepting

20  responsibility.

21       MR. FOLLY:  Yes, your Honor.

22       THE COURT:  Where are things with restitution?

23       MR. FOLLY:  Your Honor, as to restitution, we spoke

24  briefly with defense counsel before today's proceeding.  Our

25  request would be that the Court today impose restitution in the

1  amount of $213,639,133.53, which is the maximum amount that is

2  set forth in the parties' plea agreement, with the

3  understanding that the parties will come back to the Court

4  within 90 days with a proposed restitution order for the Court

5  at that time that includes the table of victims and can take

6  into full consideration discussions with defense counsel as

7  well as the receiver on whether that number should be modified

8  to a different amount.

9          THE COURT:  I will hear, of course, from Mr. Bove, but

10 is it your understanding that the defense agrees with that

11 amount, with what you just proposed?

12         MR. FOLLY:  Your Honor, that is my understanding.  We

13 only discussed it very briefly so Mr. Bove may have further

14 comments on that.

15         Your Honor, on forfeiture, we would note that the

16 Court entered the consent preliminary order of forfeiture at

17 the time of the plea and we would of course request that that

18 be ordered in connection with sentencing.

19         THE COURT:  Obviously the point that you made

20 regarding conduct following his arrest, aside from that, do you

21 have any reason to dispute the claims that Mr. Alexandre

22 otherwise has been cooperative with the receiver?

23         MR. FOLLY:  No, your Honor.

24         THE COURT:  OK.  Thank you very much, Mr. Folly.

25         Mr. Bove?

N7i5aleS

1              MR. BOVE:  Thank you, Judge.

2              We are here today because Eddy accepted responsibility

3    for this.  He accepted it at his guilty plea, he accepted it in

4    a way that probation credited it, he accepted it in his letter

5    to the Court, and you will hear from him directly later on.  It

6    seems to be the government's position that if Eddy doesn't want

7    to use the words they use, if he wants to exercise rights like

8    objecting to facts in the PSR, or requiring the government to

9    establish a basis for his removal, that somehow that reflects

10   something less than a complete acceptance of responsibility or

11   it amounts to a failure to express sufficient remorse.  And

12   that is just not right, Judge, and it is just not right in a

13   case where the man has pleaded guilty in a setting that is

14   going to separate him from his family for the rest of his life.

15   And to the extent it is being suggested that there is a

16   difference between what Eddy said at his plea allocution and

17   what he is saying at sentencing in terms of acceptance, I

18   agree.  He went one step further and he acknowledges that the

19   ROI figures were not accurate.  I think that both of those

20   things together are the core of this offense, that is why we

21   are here, we acknowledge that, and that there is no dispute

22   from us about how gravely serious that offense is, about how it

23   has impacted the victims, about what's been said by those folks

24   that may be relevant to your Honor's consideration.  No dispute

25   from us on that.  We have endeavored to provide some context to

N7i5aleS

1  talk about facts to provide you with evidence about what

2  happened during these eight months so that you have a clear

3  picture because it is simply not right that this looked on day

4  one, in September of 2021, like it looked on May 12 of 2022.

5  And we are not blaming anybody.  Eddy said at his plea, I,

6  alone, am responsible for this.  But the context matters and

7  that's why we put it before you and I would like to walk

8  through a little bit of that and address any questions you have

9  about what was going on at EminiFX and what I think it shows

10  about Eddy's intent.

11        Eddy started this company in September of 2021.  They

12  didn't have a fancy office space at the time.  To the extent

13  the prosecutors just suggested otherwise that is false.  The

14  same thing, I will repeat a point I made earlier about evidence

15  of the website.  It wasn't how this started out.  The way this

16  started out was ambition, like Mr. Folly said, I agree, but it

17  was ambition that was not matched by sufficient experience in

18  this industry and technical capabilities to bring forward the

19  vision that Eddy had for EminiFX.  And that's not to minimize

20  the fact that he said there was going to be AI trading and

21  automated trading and there was not.  We have conceded that.

22  Whether we call it RA3 or not I don't think that is material.

23  We accept responsibility for that.  But what happened in late

24  2021 was that few members joined and the price of Bitcoin

25  skyrocketed, up until September, and it made Eddy, in addition

N7i5aleS

1    to the ambition, overly confident about his ability to deliver

2    on these things to the folks he was talking to at the time.

3    And I know your Honor has reviewed our submission and you can

4    see the way that the investor count changed over time, that the

5    receivers has described it as I think the vast, vast majority

6    of funds that came in the door happened in the last known weeks

7    of the company.  Early on it was slow and he was wrong.  He was

8    wrong throughout and he was wrong at the time about what he was

9    doing, but he thought that he could do better and as he tried

10   to get the company set up, as best he could with the limited

11   understanding that he had, things didn't fall into place for

12   him and part of that is the Bitcoin price decrease that your

13   Honor described, Eddy had trouble at banks because he wasn't

14   familiar with the commercial expectations of banks for accounts

15   like this for investor funds so funds got restrained and jammed

16   up from time to time and that happened beginning in December of

17   2021.

18          Then, in March of the following year, 2022, is where

19   you see the spike in investors.  And look, I have brought to

20   the Court's attention that we think the number based on the

21   receiver's report is 25,000 investors.  That is an

22   extraordinarily large number and I'm not suggesting otherwise.

23   But I think it is also important to keep in mind the structure

24   of the way this was set up.  Eddy didn't directly solicit

25   25,000 people, there was a multi-level marketing structure in

N7i5aleS

1   place that led this thing to explode in a way that maybe he

2   understood would happen but not at the level that it happened.

3   While that was going on, Eddy transferred funds to interactive

4   brokers, and your Honor referenced already today the evidence

5   that was provided about his communications with the CFTC.  And

6   my point here is his mindset was that he was trying to get

7   these things set up.  We are not saying he is not guilty.  This

8   isn't a failure to accept responsibility.  But you can see

9   steps beginning in March that show that the intention was to

10  get this going.  We appreciate that your Honor has added to the

11  PSR the facts about what staffing at EminiFX looked like and

12  the timing of that.  As of March there were 60 employees at

13  that office, 25 of them involved in accounting.  We have talked

14  about Mr. Perelman and Mr. Xiong who were there to help Eddy

15  set up the trading that he had advertised.  He was too little

16  too late.  But what Eddy said at his guilty plea, that it was

17  his intention to earn people's money back and get them their

18  money back, it was, and that's what he was doing in March and

19  April and May.

20          One thing that we haven't talked about today but we

21  mentioned in the sentencing submission is the establishment of

22  a StoneX account which is described in Exhibits F and G, and

23  that's another step he took, albeit too late, to get automated

24  trading in place, relying on true experts, Mr. Xiong and

25  Mr. Perelman, to deliver what he had been advertising for those

N7i5aleS

1    eight months.  This was wrong.  We are not suggesting

2    otherwise.  You will hear from them on that point.  But the

3    reason that we are bringing these things to your attention,

4    your Honor, is that this was a situation that -- it blew up.

5    He wasn't ready for it, he wasn't ready for what was going to

6    happen.  He wasn't qualified to handle the different features

7    of this that needed to be put in place.  And because of the

8    role that he had played in his community, which I understand

9    cuts both ways, because of that role he wasn't comfortable

10   telling people the truth.  That's another extraordinary failure

11   in this case that he is sorry for and he is going to tell you

12   that.  But it wasn't greed.  He did buy some things.  That

13   happened in late April and early May as these transitions were

14   put in place as he really thought things were trending in the

15   direction that he wanted them to be, but this was a crime that

16   was motivated -- I agree with what Mr. Folly said -- by

17   ambition and then really perpetrated in a period where he just

18   didn't have the tools to get it done right and he wasn't strong

19   enough to tell people that he had this problem.  And that, to

20   me, your Honor, is what this crime is really about.  And it is

21   not a lack of acceptance of responsibility.  We have

22   acknowledged, the AI wasn't there.  But he was taking steps to

23   make this right and I think that is relevant when you think

24   about risk of recidivism, specific deterrence, and some of the

25   other points that the prosecutors made.

N7i5aleS

1          In terms of general deterrence here and what is

2     necessary to send a message, Judge, we all understand the

3     general point that 3553 directs sentences to factor in general

4     deterrence and to have this messaging feature but there is not

5     a particular number of months or years that need to be put on

6     the sentence in this case under these circumstances where we

7     are breaking up a family and he is going to live in Haiti after

8     he is done completing it.  The message and the signaling here

9     was accomplished on the day he pled.  And to the extent Eddy

10     didn't sign a judicial order of removal, Judge, that was

11     proposed to him last week within a day of the first discovery

12     violation the government disclosed to us.  We hardly had time

13     to even consider it given the litigation that followed and all

14     the submissions that you described.  So, I really hope that

15     that is not something that is going to be held against him when

16     he was offered these documents at a very difficult time in his

17     life with a lot going on.

18          There were some other things said about specific

19     deterrence, Judge, that are focused on post-charge conduct and

20     I want to be clear about what we are accepting responsibility

21     for and what we contest.

22          So, as I said, last night's submission, that happened.

23     I think the intention behind that was to support someone that

24     Eddy knew he was not going to have an opportunity to support

25     going forward.  That doesn't make it right, far from it, but we

N7i5aleS

1    think about the parties that were involved there.  There was a

2    person involved in that situation who hadn't been fully

3    supported and that was Eddy's intent.

4           With respect to the idea that the government has

5    established a basis for the Court to find that Eddy solicited

6    investments after the charge in this case, we dispute that.  If

7    the Court or the government feels that that is a material and

8    necessary to impose sentence today, we request a hearing, and

9    in particular on, I am referring to the full contents of

10   Exhibit N.

11          We have your Honor's ruling on Exhibit J but those two

12   exhibits and the people that submitted them are related.  I'm

13   not here to attack anyone but this is another place where

14   context matters and there is a group within the victims who

15   decided to express their reaction to this by attacking Eddy

16   through falsehoods, and so because of that we have accepted

17   responsibility for the things that are true.  And I understand

18   how grave a situation it is to stand up and say that we accept

19   responsibility with the submission last night and so I hope it

20   is coming across how seriously we take objection to these

21   others.

22          I think the government is also relying on Exhibit O to

23   support the claim that Eddy solicited investments after the

24   charge in this case.  I don't think that that summary, one-page

25   summary of a, I think it is at least 50 minutes of a recording,

N7i5aleS

1   establishes that at all.  It doesn't establish who the parties

2   are.  I don't think there are references to investments.  There

3   is references to support and I think that what Eddy was talking

4   about at that time was support in connection with this process

5   because he had accepted responsibility publicly in February and

6   he was moving forward and he was talking to people who had

7   supported him emotionally before that plea and whether that

8   would continue after, but I submit that exhibit doesn't carry

9   the weight that the government has attributed to it.  They

10  haven't identified who is talking, there is not a discussion

11  mention of investments.

12        So, for those exhibits, N, O, and J, we dispute those

13  facts to the extent they are layered in hearsay which is

14  indicative of the motives that drove these people to report

15  those things.  I think a careful reading of J and O indicate

16  there is very little firsthand reporting in those letters,

17  particularly Exhibit N.

18        Having said all of that about what we dispute in the

19  record, with what is about to happen to Eddy, what more could

20  possibly be done to specifically deter him?  He is going to be

21  removed from the country.  You can consider what is happening

22  in the CFTC proceedings and what will ultimately happen in

23  those.  He will be financially in ruins and owe these people

24  money, as he should, for the rest of his life.  There are

25  obviously a lot of people in this world who believe that there

N7i5aleS

1    are many redeeming qualities that Eddy has, people who look

2    back on the life he has lived so far and thinks that there is

3    an opportunity here for redemption and people that know him

4    today and believe that this is the beginning of a second act.

5    That's why Eddy's wife is here, his sister, his oldest son, and

6    many, many others.  And I put myself in that group that

7    believes that this is a man who will contribute to society in a

8    very beneficial way going forward.  And that's not me or any of

9    these other people guessing, that's based on the record

10   including 500 letters that we put in front of your Honor

11   describing his history.  I hesitate to put a descriptor on the

12   challenges he faced growing up in Haiti; the poverty, the

13   violence, how he emerged as a leader to take care of his

14   siblings, take care of people around him, what that taught him.

15   That violence followed him into the United States.  When he was

16   here and his cousin was murdered in Haiti, he had to bring back

17   his remains and lead the family in a funeral for that event.

18   Eddy has showed his continued commitment to his church, his

19   faith, his community by supporting these people throughout the

20   pandemic.  Even before that you have letters from his pastor

21   and other people who have watched -- I recognize the point that

22   your Honor characterizes fair about some of these letters.  So

23   there are 500 letters and some of them certainly hit the themes

24   that have been discussed already but others are very specific

25   and very detailed about the positive contributions that Eddy

N7i5aleS

has made to society and that will continue while he is

incarcerated and when he gets out.

I do want to touch a little bit on the collateral

consequences of this because there is at least one that

certainly was not factored in by the government in plea

negotiations and I think collectively there is not very many

cases like this where a defendant with this type of conduct

faces removal, and so with the comparators we provided, there

is just not many non-citizen cases to abide by or to look at.

When I talked about reputational consequences in our

sentencing submission, what I was referring to was I think what

we generally regard as a branding of someone is going to be a

felon for the rest of their life and be known in that way and

there is public reporting about it and I have cited a case that

quotes that effect.  What we learned last night and I think

what your Honor learned is that the reputational impact of

Eddy's conviction is much more serious than that and that there

were safety concerns with him relating coming into the

sentencing, and that's today, let alone what is going to happen

going forward in his life when he is removed to Haiti with

violent, pre-existing violence, and this will follow him for

the remainder of his time.  The rest of the things we talked

about are very significant, Judge, and I think they take up

space on paper and it takes time for me to walk through them in

a courtroom.  It is really, really hard to give full

N7i5aleS

consideration to the idea that it is possible that even today

Eddy might not be at home with his wife and kids again.  It's

likely, it is inevitable, that I think Eddy will be removed

from the country at the end of this sentence at a place where

his family can't in any real way visit him, certainly not for

long periods of time.  And it is not every case where you have

a record like you do here of the closeness of these family

relationships and what is being broken up as a result of Eddy's

crime.  That's a consequence of his decision, we get it, it is

a feature of the system, we get that too, but these are -- this

is a close family, Judge.  And I understand that what was

submitted last night shed some light on a rough time in Eddy's

life and in that relationship I am talking about.  For sure.

We are not here to suggest that he is perfect.  But what came

out of that was very strong because you have read the letters

from the family directly.  It is real what happened but this

family will never be the same as a result of that.

        The last thing I want to touch on is the cooperation

with the receiver.  There are steps here that Eddy took to

facilitate this to make this case different than others that we

have cited and make him more deserving of leniency than many of

the other situations that I looked at.  We lay them out and

there is the vehicles, there is cancelling the real estate

contracts.  He wasn't obligated to do any of this.  Many people

in these situations fight.  And you know Mr. Folly went to

N7i5aleS

great lengths to talk about the corrosive nature and result of
the way Eddy approached this case on the judicial system.  What
Eddy did was facilitate what the receiver was doing with one
exception that I acknowledge, but overall, this is somebody who
cooperated with him and facilitated the receiver's efforts to
recover money so that we are in a situation where, yes, there
is a large number, over $200 million that EminiFX took in and
there is about $170 million of assets that's been recovered so
far.  And I think to me the most notable is the Bitcoin
payments account.  The government did not know about this
account when this case kicked off.  We laid out the things that
they said early in the case in our submission and haven't
suggested otherwise.  At that time the government's deposition
was that Eddy had all of this money abroad and he was a
tremendous flight risk and he might leave.  What Eddy in fact
did was tell me about the account so that we could get in touch
with Coinbase and start taking payments and start to take steps
to get that money back here, a hundred million dollars.  By
acknowledging that the account was his and he controlled it, he
waived his Fifth Amendment right and he helped confer a benefit
that the government was not in a position to get itself with
the same level of speed by signing those consents and making
direct requests that Bitcoin payments and Forex to get these
funds back.

          So when you look, Judge, at the whole record here, his

N7i5aleS

upbringing in Haiti, the way he overcame challenges there, what
he did before this crime, the fact that it was an eight-month
very serious mistake, but eight months.  The collateral
consequences that he faces and the steps that he took to
support what the receiver has done to help the members, we do
think that the parsimony clause requires a variance in this
case.  I think that's consistent with the cases we have cited.
Some of them involve sentencing and those are cases with large
loss amounts.  If the Court looks at what I consider to be the
actual loss amount in this case, which is about $49 million,
the Bitcoin payments -- the Bitcoin losses and the coin
payments account plus the operational expenses of EminiFX, the
guidelines, I believe, come down to about 135 to 168, which is
a range that starts to resemble the 121 to 157 in *Rojas* and is
a little bit higher than the 87 to 108-month range in *Levin*.
Those are cases that both involved at least guidelines loss
amounts in the three digits, hundreds of millions of dollars.
*Rojas* involved a crime that lasted years as opposed to Eddy's
eight months, and there was a finding in that case that he
violated -- I think it was Judge Crotty's freeze order.  There
is a basis now for a similar finding with respect to last
night's submission, I understand that, but I still submit that
the value of what is discussed in that submission is
dramatically outweighed by over a hundred million dollars of
recovery that Eddy facilitated.

N7i5aleS

| 1 | I also think that the *Abarbanel* case and the |
| 2 | sentencing by Judge Kaplan is another relevant comparator. |
| 3 | This is a case where the government, instead of extending the |
| 4 | 10-year cap, extended a five-year cap to a violation of |
| 5 | Section 371.  That crime, based on the record that I was able |
| 6 | to pick up from the docket, lasted for 2.5 years.  There was a |
| 7 | $106 million guidelines loss but he was only held accountable |
| 8 | for the actual loss, so there I think it was about $21 million |
| 9 | which is -- that one I argue about the $49 million, that's the |
| 10 | type of analogy that I am making, and there the government took |
| 11 | a similar position, we want the statutory maximum because we |
| 12 | have extended leniency and that leniency is the extent of what |
| 13 | is appropriate, and Judge Kaplan still imposed a 48-month |
| 14 | sentence. |
| 15 | I looked at *Jaramillo* and *Cosme* the two cases that the |
| 16 | government cited.  My sense of the record from *Jaramillo* is |
| 17 | that he stole a lot of money, it was about $1.2 million, and it |
| 18 | was all taken.  That's not what happened here.  We concede and |
| 19 | accept responsibility for the car, the Manhasset property. |
| 20 | There are things that Eddy spent on himself towards the end of |
| 21 | this crime.  I think it amounts to -- it is certainly under |
| 22 | a million, I think it is a little bit, $500,000 or $600,000. |
| 23 | *Jaramillo* took all the money and Judge Swain said this at his |
| 24 | sentencing:  I do not find him to be sincere except insofar as |
| 25 | I believe he is truly sorry that he had been caught. |

N7i5aleS

1          Eddy is going to talk to you in a minute, Judge, and

2     you will decide for yourself about whether the gravity of that

3     statement by Judge Swain applies here.  I don't think it will.

4     I think you can already see the sincerity at his plea in the

5     way that probation described and the way that you he interacted

6     with them and that will continue and that is why the 144-month

7     sentence in *Jaramillo* is not appropriate, it doesn't suggest

8     that maximum, the statutory maximum sentence is appropriate

9     here, and it is just not an accurate comparison.

10          *Cosme*, in front of Judge Preska, involved a guidelines

11     range of 111 to 132 months.  That was a combination of a fraud

12     charge plus a 1028A mandatory consecutive 24 months and so

13     there was a man min built into that sentence.  *Cosme* committed

14     perjury at trial.  It is all over the sentencing transcript

15     that the government cited to you.  And so, the idea that

16     because Eddy didn't use the words that the government would

17     have preferred in pleading guilty as being some kind of

18     corrosive effect on this process as compared to somebody --

19     they cite to you a case where somebody committed perjury at a

20     trial, it illustrates how far afield that that case is from

21     where we are today.  And so, the 111-month sentence there

22     doesn't support what the government is asking for here.

23          So what we are asking for, Judge, is leniency,

24     leniency that acknowledges the life Eddy lived before this

25     crime started, the family that he raised, the supporters that

N7i5aleS

he has whether you think that is 500 or it is 250, it is an

extraordinarily high number for a defendant coming forward in a

court to be sentenced here, as further reflected by the fact

that -- nobody has said to me what the overflow courtroom

situation is today but I know there is at least one because I

watched people get turned away at the front door.  And these

are people who have had the opportunity to read everything

that's been filed, to hear the government's allegations, and I

don't think they're here, Judge, to blindly support Eddy no

matter what.  I think the people in this room, especially his

family and friends, are here because they see some virtue in

him and a chance for redemption and they want to be together as

they get that started today, whatever is going to happen.

        We know part of what the going to happen is

extraordinarily severe no matter what sentence you impose.  We

have set out some options that are alternatives to

incarceration followed by Judge McMahon, Judge Garaufis, I

think Judge Rakoff, that I think -- I hope I am sure you would

consider it.  And they struck me, Judge, because there are

cases I have been involved in when somebody was going to be

removed supervised release, it was treated as academic, it was

treated as the idea that a Court should maintain jurisdiction

over somebody long enough to have some supervision while they

got put into ICE custody.  What we are asking for a more

thoughtful approach to supervised release that is, has a

N7i5aleS

1    punitive component because it has some restrictions on his

2    liberty.  It puts Eddy in a position to interact with the

3    community in Haiti and to start giving back and it would allow

4    him, I think, a more -- a sentence that is more consistent with

5    the full record of his life as opposed to what we agreed is a

6    very serious set of records, lapses in judgments, and criminal

7    conduct during the eight-month period at issue.

8          And so, for all of those reasons, Judge, we are asking

9    for a significant variance.  We leave it to your discretion in

10   its entirety.  I'm not going to name a number, but I don't

11   think that based upon this record with the collateral

12   consequences, the cooperation with the receiver, and what you

13   have seen in terms of his whole life's work and people who

14   still believe in him, that 10 years is necessary.

15         THE COURT:  Thank you, Mr. Bove.

16         Before I hear from Mr. Alexandre, if he still wishes

17   to speak, I will ask now, are there any victims of the offense

18   who wish to be heard?  I think two gentlemen in the back.  How

19   about the gentleman in the pink shirt come up first.  You may

20   go to the podium and I will ask you, sir, to identify yourself

21   and then speak into the microphone and speak as clearly and

22   slowly as you can since we have a court reporter here.

23         MR. GUILLIAUME:  My name is Binson Guilliaume.  I am a

24   victim of Eddy Alexandre.

25         THE COURT:  Before you tell us more, can you give us

N7i5aleS

1    the spelling of your name, please?

2            MR. GUILLIAUME:  My name is B-I-N-S-O-N

3    G-U-I-L-L-I-A-U-M-E.

4            THE COURT:  Binson Guilliaume.  Thank you.

5            MR. GUILLIAUME:  I am a victim of Eddy Alexandre.

6            THE COURT:  I apologize, but just go a little bit

7    slower so we are sure to understand and capture everything you

8    have to say to us.

9            MR. GUILLIAUME:  I am a victim of Eddy Alexandre.  I

10   am a truck driver, your Honor.  That man took my money by the

11   greed, he had promised to be -- make me a millionaire.  I take

12   money, all my life savings to invest, by his promise, to get me

13   money.  So, I lost $100,000 of my life saving, I have evidence

14   to show it.  Some people right here, your Honor, because of

15   what Eddy Alexandre did to the poor Haitian community some of

16   them -- I used to be sleep in my truck five days away, two days

17   home.  Until last month your Honor Mr. Eddy Alexandre, that man

18   right there, his party was paid with my own money.  Until now,

19   if you go less than 10 years, that man is nearly 50, he might

20   be going out doing the same thing over again.  You can look how

21   many people support him right here.  They wait for Eddy came

22   outside to do the same thing over again.  None of them may not

23   be investor or victim by Eddy, he paid some of them to come

24   right here.

25           Your Honor, I am really frustrated.  I am a poor man.

N7i5aleS

1    I left my country.  Eddy is coming from one of the biggest

2    school in Haiti.  He was a well-educated man.  At 14 I came

3    right here.  If I was Eddy I would be a doctor or lawyer,

4    something.  He is fortunate, he went to one of the best school

5    in Haiti by the Seventh-Day Adventist.  He got all the

6    opportunity.  That is what you did to the community.

7            I want you to stand up, Mr. Eddy Alexandre, to tell

8    all the people you sorry, because you lied to them.  Look at

9    them right now, show us what you did and to the government the

10   community.

11           Your Honor, based upon what Mr. Eddy did to me, I

12   recommend the best, the high amount, the maximum the law will

13   command for that man.  If you give him less than 10 years he

14   might come out there doing the same thing over and over again.

15           I got all the evidence right here, not no one paying

16   me to come right here because, you know, I am opponent.  I have

17   to work hard to try to face all my needs, all my bills.  That

18   means for the victim is it greed?  It is a manipulation.  He is

19   it sill going to be doing that because, you know, based off

20   what Eddy did to the community we never get back.

21           Thank you, your Honor, for the opportunity.

22           THE COURT:  Thank you, Mr. Guilliaume.

23           I believe there was also a gentleman in a suit who

24   would like to speak as well; is that right?

25           MR. BAPTISE:  Yes.

N7i5aleS

1          THE COURT:  You may come up as well, and also again,

2     please, identify yourself and please speak as slowly and

3     clearly as you can so we are able to capture in the transcript

4     anything you have to say to us.

5          MR. BAPTISE:  Good evening.  My name is Phucien

6     Baptiste.

7          THE COURT:  Can you spell your name for us?

8          MR. BAPTISE:  P-H-U-C-I-E-N B-A-P-T-I-S-T-E, like John

9     the Baptist, with E at the end.

10          Your Honor, I am here on behalf of all the victims who

11     are scared because some of them have been receiving threats if

12     they were to come to the court, something could happen to them

13     in the future.  And I heard it, I have a witness.  But me,

14     personally, as a victim, I worked hard, I suffered.  When I

15     came here as a former police inspector from Haiti, I had to

16     leave Haiti because I was arresting some corrupt politicians,

17     gang members, to put them in jails.  There are lawyers in Haiti

18     who would come and offer me money to free them.  I will arrest

19     those people who come and try to bribe me.  When I came here,

20     because my family didn't want me to stay in Haiti anymore

21     because they were scared that I might have got killed because

22     of the corruption running in this country.  So I came here.  I

23     worked in McDonald's mopping the floor to start.  I made my way

24     to the school.  I became a nurse after so many years of trying.

25     I failed nursing school because I was working full-time and

N7i5aleS

going to school full-time to try to make a living.  After I

failed nursing school, I went back again which I ended with my

nursing degree.

I invested in this Ponzi scheme that Mr. Eddy

Alexandre presented to the Haitian community.  Every Thursday

night he would hold the meeting to offer high interest and at

the moment Bitcoin, the cryptocurrencies were getting high,

people wanted to invest their money.  Mr. Eddy Alexandre took

this advantage, this opportunity to rob the Haitian community

of their life savings, people like Binson Guilliaume who worked

27 years as a truck driver.  His life savings, he showed me

close to $100,000 of his life savings that Mr. Eddy Alexandre

robbed.

Mr. Alexandre never took responsibility for his crime

and I do think the court system, the justice system, the

prosecutors, it is well like they had spoke to me but none of

them knew me, and everything they said is true and if the law

is supposed to be priority, if we, as the justice employees, we

are to keep this society safe from criminals like Eddy

Alexandre never to have an opportunity to come back and hurt

this society, I request that the law be applied in its full,

full strength.  Remember, the prosecutor has mentioned that

Mr. Alexandre has lied.  Yes, he has, so many times with his

accomplices.  He lied to the Court by saying he was acting

alone.  There was no way Mr. Alexandre could have acted alone.

N7i5aleS

He had accomplices like his sister, who is right here, who
would be in the meeting every Thursday night to present him.
Her husband is a lawyer.  You mean to tell me your husband
never told you that a Ponzi scheme is illegal in a society
that, as a wife of a lawyer, you should not be part of it and
you are presenting your brother every Thursday night to the
community?  And we have people like Jeffrey, who was doing the
stock trading and another guy name Bertrand Louis a/k/a Bert
Louis.  They all knew it was a Ponzi scheme.  We have another
prominent pastor by the name of John Maisonet.  Those guys used
their influence in the community to rob poor-minded, innocent
people of their life savings.  That's one lie that
Mr. Alexandre give by saying that he was acting alone.  And I'm
here to ask the prosecutors why these accomplices were not
arrested and be put behind bars too?  Because if they knew that
it was a Ponzi scheme, they were in the inner circle of the
club, why are they out there?  They are out there again and
they're going to do the same thing to hurt this society, and as
members of the justice system we represent the state, we should
step up to keep the society safe, to keep peaceful citizens
safe, when they work 25, 30 years, $9, $10 an hour, they hardly
had an education but they managed to save while they have
family in Haiti, they are taking out of that $9 an hour, $10 an
hour.  Some of them save $10,000, $15,000, $20,000 and now you
rob them?  Do you have a heart, Mr. Alexandre?

N7i5aleS

1          Yesterday I had an interview with a guy who knew

2     Mr. Alexandre from his church in Queens by the name of Beraca

3     Seventh-Day Adventist Church.  I have the whole interview

4     recorded with this guy of what Mr. Alexandre used to do at that

5     church.  OK?  And now again, prosecutors, why that arrest was

6     so precipitated that the accomplices were not part of this

7     arrest.

8          Another lie that Mr. Alexandre give, he broke the plea

9     deal that he had accepted, and if that plea deal was broken why

10    the justice system has to honor it when Mr. Alexandre himself

11    broke it after his release from jail, your Honor?  He went and

12    try again to start a new Ponzi scheme.  I have three witnesses.

13    I have three of them and they are scared.  Two of them can come

14    here but they were afraid if they come something would happen

15    to them.  One of them was his supporters.  His name is Ricardo.

16    OK?  After Ricardo followed him, your Honor, after Ricardo

17    followed him he opened that new Ponzi scheme again while the

18    process was going on.  Ricardo told me that he invested $100.

19    Mr. Alexandre called Ricardo and said why are you only invested

20    $100 --

21          THE COURT:  I'm going to ask you, please, to focus on

22    how you were a victim of the crime.

23          MR. BAPTISE:  Yes, your Honor.  OK.

24          I invested $25,000.  I would speak to Mr. Alexandre's

25    employees, one of them was Sophia, the wife of Pastor John

N7i5aleS

1   Maisonet.  She would tell me what to do and she would tell me

2   to not to invite people that I don't know.  Why?  If it is a

3   legal business anybody can come in and invest.  OK?  So the

4   reason why they were saying that, it is because they don't want

5   people to come and report them.  OK?  Now, when Mr. Alexandre

6   took my $25,000, this was money that I was planning to put down

7   on a house.  I have been in this country for about 20 years.

8   After all these hard life, hard working, honest-working, I save

9   to fulfill my American dream, Mr. Alexandre robbed me from

10  fulfilling my American dream and this is why I am here tonight,

11  to request that the Court does not honor the plea deal that was

12  made between Alexandre and the Court for the maximum 10 years

13  because he broke it so I request that the full prescription of

14  law be applied from 25 to 37 years.

15          Thank you.

16          THE COURT:  Thank you, Mr. Baptiste.  I did not see

17  anyone else, any other victims wishing to speak.  I will ask

18  again.  So hearing no one else, Mr. Bove, does your client

19  still wish to speak?

20          MR. BOVE:  Yes, Judge.  Thank you.

21          THE COURT:  Mr. Alexandre?

22          THE DEFENDANT:  Thank you, your Honor.

23          THE COURT:  Oh.  Hold on a second, Mr. Alexandre.

24          (Court and deputy confer)

25          THE COURT:  I am told that there are more victims who

N7i5aleS

1   now wish to speak before Mr. Alexandre speaks and I will hear

2   from them.  I ask the first victim to come in.

3              MR. L'ROVENTURE:  Good afternoon.

4              THE COURT:  Good afternoon.

5              MR. L'ROVENTURE:  Good afternoon.  My name is Dimy

6   L'Roventure.  D-I-M-Y, last name is L-'-R-O-V-E-N-T-U-R-E.

7              Thank you, your Honor, for giving me the privilege to

8   stand up here.  I want to say thank you to Mr. Alexandre.  The

9   reason I would like to say thank you to Mr. Alexandre, it

10  creates something, a dream, but sometime in life dreams is not

11  easy.  I understand Mr. Alexandre started business where he

12  made, you know, things happen.  He lost some money.  And let's

13  say the word is hard to come out but he was not strong enough

14  to come out to tell the people he was losing but he got the

15  courage to try to hire people.  He got the courage to try to

16  fix the problem but he did not have enough time.  When I got

17  into business, I start in March 27, 2022.  When I see what

18  happened, I couldn't be against him but I want to see more.  As

19  the thing goes, I see a man that want to help his people.  As

20  the day goes by, people was telling me how this man for the

21  COVID-19 would go out there helping people, people that he

22  doesn't know, people who need help.  Now I believe what I heard

23  from other people, he end up catching the COVID-19 by helping

24  people.  I am an investor like everybody.  I know this guy

25  lost, I feel sorry for them.  I lost too, but can I blame him?

N7i5aleS

 1    No.  I was thinking -- I was taking a chance on something, in a

 2    dream.  I pray to God every day for that dream to accomplish.

 3    Why do I have to pray to God if that dream was guaranteed?  It

 4    is because I know everything is not guaranteed.  It is a

 5    chance, you have to take it.  This man risked his life, he is

 6    taking blame.  People threaten him.  Those two gentlemen right

 7    here, I understand they are victim but while you are a victim

 8    you can't threaten this guy life.  You cannot.  You see all

 9    those people here?  Look at them.  Can they threaten people?

10    There is a lot of old people.  Look at them.  Can they threaten

11    those people, them right here?  No.  People that are against

12    Alexandre because they in the lawsuit, you see I speak today,

13    I'm going to be in that lawsuit to.  They are going to put me

14    in there because I stand for him.  That's what they're going to

15    do.  The man that started this lawsuit, why didn't this

16    gentleman come forward before that?  Why everybody stay away

17    when they needed witnesses?  Why?  Because there was no

18    lawsuit.  The lawsuit guarantee money if Eddy Alexandre get 20

19    or more.  That's why the lawsuit guaranteed.  That's why they

20    are going to see a lot of people walk away, because there is a

21    lawsuit out there, they tried to take those money.  After they

22    talk to, they say, oh, there is money, I'm going to go get that

23    money but you have to make sure this guy go away.  And the

24    money turned those people against each other.  All those

25    people, all those ladies from Canada, from Florida, from

N7i5aleS

1    California, you know he never threatened those guys.

2            Your Honor, I know you are doing your job but do it

3    from your heart, not what those people say.  This man is a man

4    that is trying to help, a good thing that turned bad.  That's

5    exactly what it is.  I'm not a victim.  I'm a man that tried to

6    take a chance on a dream and I know God have that dream for all

7    of us but please, your Honor, follow your heart.  Please.

8    That's what I have to say.  Thank you for the time.

9            THE COURT:  Thank you.

10           Let me just advise the parties, we are now at 4:42.

11   We are going to end this proceeding by 5:00 so we are going to

12   need to resume it on another day, probably tomorrow.  I will

13   hear from more people who wish to speak today.  Maybe,

14   Mr. Alexandre, if we get there, but given how long we have

15   gone, I just want to give everyone a heads up about that.

16   Also, maybe I should ask right now, Mr. Bove and Mr. Folly,

17   about schedule for tomorrow.  I am on trial at the moment, it

18   is a bench trial so I have some more flexibility in terms of

19   scheduling, but would resuming tomorrow at 4:00, for example,

20   be possible for everyone?

21           MR. FOLLY:  Your Honor, that is fine for the

22   government.  I just -- I understand that there were some very

23   specific travel arrangements that were made for people to be

24   here.  If there is any way to go longer, I would request that

25   we do.

N7i5aleS

1          THE COURT:  I was told there are no more people who

2     wished to speak and then now it looks like there are a number

3     more.  I don't know if the answer to that is no.  Frankly, we

4     are not going to go into the evening after going for three

5     hours already.  So I will hear as many as we can, but then we

6     are going to have to resume.  The other option would be

7     starting early tomorrow morning as well.  That might be

8     possible with travel arrangements as well.

9          Would 9:00 a.m. tomorrow morning be possible?  That

10    might be a little bit better?  I am talking to the attorneys.

11         MR. FOLLY:  Your Honor, I think the government can

12    make that work.  We do have some other things scheduled but we

13    think we can move them.

14         THE COURT:  Mr. Bove, in terms of tomorrow's schedule,

15    we will continue to go today for another 15, 20 minutes, but

16    resuming tomorrow at 9:00, would that be possible?

17         MR. BOVE:  Yes, Judge.  Thank you.

18         THE COURT:  So let me see if there is another, someone

19    else who wishes to speak, come on up.

20         MS. DEROE:  Good afternoon, everyone.  My name is

21    Magalie Deroe.  M-A-G-A-L-I-E D-E-R-O-E.

22         I am here because I'm one of the supporters of

23    Mr. Eddy Alexandre.  I am one of the investors.  When I got

24    included in the investment with Mr. Alexandre, I was so happy

25    because making $8 an hour, and able to investing in a business

N7i5aleS

where if you invest something you can get something at least
would help me with my income, I was so happy and feel blessed.

Mr. Alexandre is very transparency.  He would come out
on Thursday telling us everything that happened in the business
for the whole week.  He will tell us everything that he could.
We used to get paid every Friday.  It was our choice to either
we invest or cash out.  So when we cash, when I cashed my
money, I would get it right away.  And I was so happy with
that.  And it is not only me, it is my family, my friends, and
most of the people with the green colors.

This is not the first time we come here and then fill
up five rooms.  It has been since the beginning, as I am sure
you guys already know about it.  So we always come here to
supporting Mr. Alexandre because he has helping us out just to
change our life.  At this moment we come in a way where we used
to be one.  Now for some reason we are divided with certain
group and they have their own plan, like my brother just said,
because of the lawsuit.  So as of right now, we are talking me
as a woman, there is a lot of threat because we not with them,
we stick with Mr. Alexandre because we believe on what we heard
and we had before and with the business.  Mr. Alexandre never
talked to one of us.  If we come here from Florida, Canada, all
over, it is our choice because we would appreciate him with
what he used to do for us with EminiFX.  So we came here just
to supporting him, your Honor, just to let you know and insist

N7i5aleS

1    how appreciate, how we want him at least to have his life back,

2    and we just believed that he was out with EminiFX to help us

3    out with his heart.

4            He is a father.  He is an honest person.  He is a --

5    he has what they call human inside of him.  He is an open

6    person.  He loves people.  He will help you even you don't know

7    who you are.  That just happens.  So we are here to supporting

8    him and we will continue supporting him, your Honor, with all

9    heart.

10           I don't know, this is my first time been coming to

11   court and been coming from Florida, and I said I will consider

12   coming because I know when you are honest with yourself and you

13   know why you are out to help people, God will say something.

14   My honor, I know.  The decision, it is in your hands.  We are

15   here to supporting him and we hope you understand and you hear

16   our voice and make the decision.

17           Thank you.

18           THE COURT:  Thank you.

19           Before I hear from Mr. Alexandre, is there anyone else

20   in the courtroom who wishes to speak?  Go ahead.

21           And I do ask people, I remind you that comments should

22   be discussing the criminal activity here as this is a

23   sentencing proceeding.

24

25           MS. MOMPREMIER:  Hello, everyone.  Thank you for

N7i5aleS

giving me this opportunity to speak.  My name is Ermine,

E-R-M-I-N-E, last name M-O-M-P-R-E-M-I-E-R.

          I am here, your Honor.  I worked all night.  I have

not slept for over 22 hours.  I came from work, I drove to

Kentucky to take a flight to come here to support Eddy

Alexandre.  Why?  It is because when I left Haiti, I didn't

have anything.  I came here alone with the Lord and I manage to

become a nurse.  It was very hard and it was still hard because

I have a lot of siblings in Haiti.  I'm talking about 14 of

them.  And I had to do everything for everybody, including my

parents.

          When Eddy Alexandre came up with this idea and I

became aware of it and I invested, and it was the best thing

that could happen to me, my life, and my family in Haiti.  I

was able to help more and I was able to put them in a better

place that I have done before.  So, it is very hard to see the

good things that was making us happy, turning out that other

people sad.  He said he was going to give us 5 percent.  5

percent.  And if he gave us the 5 percent, but if the market is

good, and then he will give us more.  So, I, every Friday -- I

mean Thursday, after the meeting and I hear everything that he

is saying.  Everything, he put it out.  He said when the market

is red, when it is green.  You know certain things, you know

that maybe sometimes you don't understand but as a trader you

know and what he always tell us the truth and people us what is

N7i5aleS

1    going on.

2              We are human.  Things happen, we fall or whatever, but

3    my Honor, I am here, like I said, not sleeping.  I have to go

4    back to work tomorrow and I am asking you to please take into

5    consideration that we pouring our heart and soul to you because

6    we know that you -- God has the last say but you are here and

7    you are going to make that decision, and I am asking the Lord

8    to please help you to make the right decision, and I thank you.

9              THE COURT:  Thank you.

10             Is there anyone else who wishes to speak?  OK,

11   Mr. Alexandre, you may speak.

12             THE DEFENDANT:  Thank you, your Honor.

13             Since I am speaking after the victims, I would like to

14   take the opportunity to apologize to the victims and specially

15   mention them by name Mr. Guilliaume, the second victim

16   Mr. Baptiste, Mr. L'Roventure, Ms. Deroe, Ms. Mompremier, and

17   anyone who didn't have a chance to speak at this time.  I would

18   like to acknowledge them and I apologize deeply for their

19   losses.

20             Dear Honorable Judge, I wrote some notes because I did

21   not want to miss anyone --

22             THE COURT:  If it is easier since you are tall, for

23   you to be closer to the microphone, you can sit while you speak

24   to me, too, if that is more convenient.

25             THE DEFENDANT:  I will try.  I like to stand for your

N7i5aleS

Honor.

          THE COURT:  OK.

          THE DEFENDANT:  Dear Honorable Judge Cronan:  When I
embark on this journey, I left my career behind.  I was a very
happy man, like the prosecutor said.  I had a dream.  I never
imagined I would be here today in that situation and that
settings.  I am standing here today only to express my deepest
remorse and to humbly request leniency with regard to my
conviction.

          I fully acknowledge the gravity of my actions and take
full responsibility for the consequences they have brought upon
myself and those that I hold dear who entrusted me with these
decisions.

          First and foremost, I want to express my sincere
apologies to the Court and to all those who have been affected
by my actions.  I understand the pain that -- the
disappointment, and disruption that my behavior has caused,
especially to my family and friends.  My love for my family
runs deep and it pains me to see the hurt and the way my
actions have caused them -- the hurt my actions have caused
them.

          I assure you, your Honor, that this experience has
been a wake-up call for me.  It has allowed me to reflect on
the choices I have made and the impact they have had on the
EminiFX investors and my loved ones.  I am committed to making

N7i5aleS

amends, not only by accepting the consequences imposed by the Court today or tomorrow, but also by actively seeking to better myself and contribute positively to society.  I recognize the need for personal growth and rehabilitation and I am dedicated to continue to utilizing any resources or opportunities available to me for that purpose.

My family and friends have been my rock throughout this ordeal.  Their love, support, and forgiveness have been invaluable to me.  I realize the burden they have had to bear and the sacrifices they have made day after day for the past 14 months on my behalf.  I mean to repay their faith in me by working towards becoming all that they see in me, mending the bonds that have been strained and being a responsible and law-abiding member of society.

Your Honor, I humbly request your leniency not as an attempt to evade the consequences of my actions but as an effort to rebuild my life and continue the journey of redemption.  I understand the importance of accountability and rehabilitation.  I assure you that I will diligently comply with any terms and conditions set forth by the Court.  I am committed to making the most of this chance and proving myself deserving your trust.

Once again, I express my deepest remorse for the pain and disappointment I have caused.  I am sincerely sorry and I hope that my family and the Court can find it in their hearts

N7i5aleS

1      to forgive me.  I am ready to take responsibility for any

2      actions and strive towards a better future.

3              In closing, thank you for considering my request for

4      leniency.  I am grateful for the opportunity to express myself

5      to the Court and to the members, to the victims, and my loved

6      ones, and for the fair and just proceedings of this Court.

7              If given the chance, I am committed to making positive

8      changes and becoming a law-abiding citizen who can contribute

9      meaningfully to society.  Respectfully yours, your Honor.

10             THE COURT:  Thank you, Mr. Alexandre.

11             Since I thought speakers might have gone a little

12     longer and since it is 5:00 now, I assume the preference would

13     be to proceed to sentencing at this point, Mr. Folly?

14             MR. FOLLY:  Yes, your Honor.

15             THE COURT:  Mr. Bove?

16             MR. BOVE:  Yes, Judge.  Thank you.

17             Is there any reason from the parties that sentence

18     should not be imposed at this point?

19             MR. FOLLY:  No, your Honor.

20             MR. BOVE:  No, Judge.

21             THE COURT:  All right.  Well, I will ask everyone to

22     bear with me again, I want to step back to the robing room and

23     think about everything that's been said this afternoon and I

24     will be back out in a few minutes.

25             (Recess)

N7i5aleS

1          THE COURT:  I will start by explaining the factors I

2    have considered in arriving at Mr. Alexandre's sentence.

3          First, as required, I have considered the advisory

4    guidelines range which, if not for the statutory maximum, would

5    be 210 to 262 months' imprisonment, because of the 10-year

6    statutory maximum is effectively 100 months in prison, as I

7    mentioned earlier.

8          Under the Supreme Court's decision in *Booker* and the

9    cases that have followed it, that guidelines range is only one

10   factor that I must consider in arriving at the appropriate

11   sentence.  I also must require the factor set forth in United

12   States Section 3553(a)., those factors including the nature and

13   circumstances of the offense and the history and

14   characteristics of the defendant, the need for the sentence

15   imposed to reflect the seriousness of the offense, to promote

16   respect for the law, and to provide just punishment for the

17   offense, the need for the sentence to afford adequate

18   deterrence to criminal conduct, protect the public from further

19   crimes of the defendant, and to provide the defendant with

20   needed education or vocational training, medical care, or other

21   correctional treatment in the most effective manner.  I also

22   must consider the kinds of sentences available, the guidelines

23   range, any pertinent policy statement, the need to avoid

24   unwarranted sentencing disparities among defendants with

25   similar records who have been found guilty of similar crime and

N7i5aleS

conduct, and the need to provide restitution for victims of the

offense.  And also, under Section 3553(a) I must impose a

sentence that is sufficient but not greater than necessary to

comply with the purposes of sentencing.  I have given

substantial thought and consideration and attention to each of

these factors in arriving at Mr. Alexandre's sentence.

Eddy Alexandre orchestrated a massive investment fraud

that victimized thousands of individuals out of approximately

$50 million.  The tremendously serious nature of this offense

is the most important consideration in my mind today.  I will

therefore begin with Mr. Alexandre's offense conduct, and in

doing so consider nature and circumstances of his offense, as

well as the need for the sentence to reflect the seriousness of

that offense and to provide just punishment for it.

Mr. Alexandre founded EminiFX in September 2021.  In

the roughly eight months that followed until his arrest in May

2022, he defrauded tens of thousands of investors,

predominantly members of Haitian community and members of his

church, who invested over $248 million with EminiFX.  He

promised massive returns assuring investors returns of at least

5 percent each week and possibly up to 9.99 percent.  That

meant investors could see their money double within five

months.  The promise of such a return may seem unrealistic but

Mr. Alexandre's investors believed in him and trusted him.  He

was an admired member of the Haitian community, he was seen as

N7i5aleS

a man of integrity and faith, and investors trusted EminiFX

with their money.  But, in truth, EminiFX was a fraudulent

scheme.

         The primary way that Mr. Alexandre was able to

convince investors to put their hard-earned money into EminiFX

was by telling them that he had this amazing secret technology

called robo-advisor assisted account.  EminiFX advertised its

sophisticated trading functions on its website.  Each investor

supposedly would receive a fully-serviced robo-advisor assisted

account and AI software.  That technology, according to

Mr. Alexandre, would allow for investors to earn passive income

through automated investments in cryptocurrency and foreign

exchange trading.  That is how those outsized returns

supposedly would be generated, but in reality, Mr. Alexandre

never had that robo-advisor assisted account up and running.

This special secret technology did not exist.

         In addition, Mr. Alexandre reported false return on

investment figures to investors.  He would report to investors

that he had secured the promised returns but did not disclose

to investors that they in fact were suffering substantial

trading losses.  All of this was to bring more investments into

his company and keep investors with his company.  The fraud

extended over several months and it entailed Mr. Alexandre

employing sophisticated methods, it entailed him working to

enlist more and more investors.  It entailed weekly investor

N7i5aleS

calls, it entailed creating incentives for investors to bring
in more people.  Existing investors received commissions from
recruiting others to join in EminiFX.  This was not a one-time
transgression, it cannot be regarded as an isolated or rash
decision.  This was a calculated, planned, and ongoing fraud.
And the reach of the fraud was vast, it was approximately
25,000 victims.  Thousands of lives were damaged.  Many of
those victims cannot afford to lose their money they invested.
A lot of the investors, it is clear, invested much of their
life savings.  We heard that today.  In fact, one of the
investors who wrote a letter in support of Mr. Alexandre said
that she, quote, trusted Mr. Alexandre with all my life savings
knowing that he will invest it and give me a good return.
Another woman who met Mr. Alexandre at her church also wrote in
support of Mr. Alexandre and said that she had invested her
family's money in their 401-k with EminiFX.  It seems that this
person was perhaps receiving either weekly returns or
notification of weekly returns and it is not clear to me from
her letter that she even appreciated that the fraud -- she even
appreciates now that the fraud was taking place.  And I heard
from some supporters of Mr. Alexandre today who talked about
their weekly 5 percent or more returns.  But the money just
wasn't there and it wasn't there because this was, in essence,
a massive Ponzi scheme.

          The government also submitted various letters from

N7i5aleS

victims of this fraud discussing the significant harm they

suffered.  One victim wrote that Mr. Alexandre used people's

weaknesses such as God and the Bible to lure them in and

ultimately rob them of our hard-earned money.  He wrote:  My

family lost over a half million dollars in this Ponzi scheme.

Mr. Alexandre destroyed family.  Another wrote how he was

completely blindsided by Mr. Alexandre's charisma and ruse when

that individual, along with his family and friends, threw their

support behind him.

Two of his victims spoke today, at least two people

who appreciated they were victims spoke today.  Mr. Guilliaume

invested his hard-earned life savings.  Mr. Baptiste, another

hard-working man, invested $25,000 in the scheme.  He was

saving for a home.  These were real victims, about 25,000 of

them; families, hard-working families, people like

Mr. Guilliaume and Mr. Baptiste, people who lost, in total,

upwards of $50 million in their investments and they lost that

because they were deceived by Mr. Alexandre.  Maybe it is true

that Mr. Alexandre was hoping to make a profit for his

investors.  There is some indication that he was working to

make his company succeed by hiring an employee to work on a

coding model and another to help on foreign exchange and

investment training.  But Mr. Alexandre was over his head.  He

had no experience as an investment manager and regardless of

all of that, it does not change the simple fact that he was

N7i5aleS

1  lying to his investors about his company's technological

2  capabilities and the investment returns that were coming in and

3  that they should expect.  And these lies caused many people to

4  lose a lot of money.  I am also troubled because there was

5  every indication that this fraud would only have continued if

6  it were not disrupted by law enforcement and the CFTC action.

7  Mr. Alexandre was actively recruiting more investors, he was

8  receiving more and more funds.  The fraud only ended because it

9  was forced to end.  Maybe Mr. Alexandre would have tried to

10  continue to try to dig his way out but I have no reason to

11  believe that he would have stopped lying to his investors

12  unless law enforcement stepped in.

13        I also am not convinced that greed had nothing to do

14  with this crime.  Perhaps part of his motivation was to provide

15  this community with investment opportunities but I do believe

16  that avarice did come into play, as well as ambition.  Some of

17  the fraudulent proceeds went towards a multi-million dollar

18  home in Long Island for Mr. Alexandre's family.  While there is

19  an argument as to the status of the other foreclosure

20  properties in Long Island and whether those were investments

21  for EminiFX, that certainly cannot be said for the $4.8 million

22  home, nor can it be said for the BMW that he used for himself.

23        I have considered as well other sentences for

24  analogous conduct.  The defendants point to my prior sentence

25  of Adam Rojas for financial fraud and, without question,

N7i5aleS

Mr. Rojas committed a very serious fraud but very different from here.

       Here we have a massive number of individual victims. We have sophisticated means employed by Mr. Alexandre.  We have Mr. Alexandre taking advantage of the trust that his community placed in him and I do find this conduct considerably more egregious that Mr. Rojas'.  At the same time, while the *Jaramillo* case may be more analogous to Mr. Alexandre's conduct in that the defendant there targeted a sophisticated investors in the community, it does seem to that the defendant or that Mr. Jaramillo used considerably more of the defrauded funds for his own personal benefit and that defendant received a 144-month sentence which, obviously, is higher than the maximum here.

       Now, I do find the guidelines range helpful here in arriving at the appropriate sentence.  The U.S. Sentencing Commission has set a guidelines range for this conduct that would be 210 to 252 months.  The effective range in this case, of course, is much lower, it is 120 months.  But the statutory maximum for Count One, that maximum is 7.5 years below the bottom of the range the commission established for this conduct if it were not for a statutory maximum.

       I also find the loss amount that gave rise to that offense level to be appropriate.  It is a value of funds that investors were defrauded into investing.  Even if I were to

N7i5aleS

just look at the amount of funds investors in fact lost, which
to be clear I don't think is the appropriate consideration,
even that figure would trigger a guidelines range above the
statutory maximum here, it would be a range of 135 to 168
months.  On top of that, I think it is worth noting that the
offense level here includes a two-level enhancement for 10 or
more victims under Section 2B1.1(b)(2)(A)(i).  There are
250,000 victims here.  Without question, this was an
exceedingly serious offense.  At the same time, I note that for
the offense Mr. Alexandre pled guilty to, Congress has set a
statutory maximum of 120 months' imprisonment.

I will also discuss some of the other Section 3553(a)
factors.  In particular, let me address the need for deterrence
for Mr. Alexandre and others and for the sentence to promote
respect for the law and to protect the public from future
crimes for the defendant.

As for individual deterrence and the need to protect
society from future crimes by the defendant, I note that
Mr. Alexandre does not have a criminal history.  There is no
information suggesting that he violated the law in the past or
that he posed a danger to society prior to committing this
offense, and as I will discuss more in a moment, very much the
opposite seems to be the case.  There is considerable
information before me including from the many letters submitted
on Mr. Alexandre's behalf that he has been someone who helps

N7i5aleS

1    others, who has had a positive impact in his community, this

2    fraud notwithstanding, and that he is someone who is supportive

3    of his family and friends.  But, as I mentioned before, at the

4    same time this was not a one-time transgression.  Mr. Alexandre

5    only stopped committing the fraud because he was arrested and

6    that the parties acknowledge the defendant attempted to

7    dissipate $100,000 that should have gone to victims after he

8    was arrested in this case.  There is some degree of need for

9    specific deterrence here.

10            There also is considerable need for general

11   deterrence.  People in society must realize that the commission

12   of such massive investment schemes have real victims, and when

13   that happens there will be real consequences.  There is a value

14   for would-be fraudsters to note that if they choose to engage

15   in fraud, they may be caught and face serious consequences.

16   And economic-based fraud that requires sophistication, planning

17   and deliberation, such as the crime here, is the sort of more

18   rational and calculated crime for which general deterrence is

19   likely to have a stronger impact?

20            I touched on Mr. Alexandre's history and

21   characteristics a bit earlier but let me say some more about

22   that.  Mr. Alexandre was raised in challenging conditions in

23   Haiti.  He grew up in a neighborhood impacted by poverty and

24   violence.  He had a loving upbringing with his family but they

25   did struggle for food.  As a child and a young man he witnessed

crime and violence in Haiti, and then he emigrated to the

United States in 1998 and became a legal permanent resident.

By all accounts, he has been a productive member of society in

our country and in Haiti until his commission of this crime.

He secured an excellent education in Haiti.  I understand that

he received a bachelors degree in computer programming and

accounting from the University of Adventist in Haiti, and that

he further pursued college studies in economics at another

University in Haiti.  He has held excellent jobs in information

technology and computer software both here in the U.S. and in

Haiti.  He operated two different companies focused on

mortgage, real estate, and information technology services.  He

worked for a security protection company in Long Island, he was

a senior network engineer and senior architect for HBO, and

even as this case has been pending, he secured a very good job

as director of operations for an irrigation company in Long

Island.  Yet, as with several of the considerations in this

case, this cuts both ways.

          Mr. Alexandre is different than any of the criminal

defendants who appear before me.  While he grew up in difficult

and challenging conditions in Haiti, he has a loving family.

He was fortunate to receive a very good education.  He held

excellent jobs.  He was taking advantage of the many

opportunities that our country gave him.  He was successful.

He did not have to resort to this criminal activity.  He was

N7i5aleS

not desperate to put food on the table.  His motivation was not

financial desperation.  It may have been, in part, to help his

community invest, but also it was for him to make more money.

            Now, on the topic of his community, I have received a

massive number of letters in support of Mr. Alexandre.  They

come from family members, from members of the community, from

members of his church, from many EminiFX investors.  As I

alluded to earlier, it seems like that from these letters, many

of those investors believe they were making money thanks to

Mr. Alexandre reflecting the returns or notification of their

return.  These letters -- and I believe the defense has

submitted roughly 500, totaling over 750 pages -- over and over

again discuss, speak of Mr. Alexandre in very high terms.

There are some common themes in those letters:

            He is a devoted husband and loving father.

            He is a leader in the Haitian community.

            He is a leader and guiding member of his church, a man

of faith.

            He is committed to service.

            He volunteers and delivers food at food drives.

            He tries to help others.

            He is viewed as an honest and trustworthy man and a

man of integrity and dignity.

            He is a skilled musician who will play for free at

weddings and church functions.

N7i5aleS

1          He is a reliable friend and a mentor to the young.

2          And today, I believe we have three overflow courtrooms

3     from what I am told, and each of them are full.

4          there are some specific concrete examples of his

5     charitable efforts in the community:

6          He formed a non-profit Reform-Haiti in 2012 to improve

7     Haitian access to healthcare.

8          In 2013 he visited Haiti with medical supplies to be

9     distributed.

10         In 2014 he started a youth mentorship program in

11    Queens.

12         According to Mr. Alexandre's brother-in-law, in 2000

13    he implemented a program in the Flatbush community to encourage

14    young people to stay in school and he has mentored young people

15    in the community.

16         He is a chaplain in his church.

17         He works with church attendees in need including their

18    physical, mental, and social needs

19         He has done various work at North Shore hospital with

20    ill patients and their families.  He facilitated the pickup and

21    delivery of groceries and prescription medication for elderly

22    or sick members of the community.  He helped people who were

23    suffering from COVID 19 during the pandemic.

24         But this all also cuts in another direction, too.  It

25    seems to me that the overwhelming majority of Mr. Alexandre's

N7i5aleS

1    victims were members of the Haitian community and/or his

2    church.  Many of those victims, including I am sure many of the

3    people in the court house today, looked up to him and placed

4    their trust in him when they invested their hard-earned money

5    with EminiFX.  They did that because they trusted him and they

6    trusted his promises of huge investment returns.  One of the

7    investors who wrote in support of Mr. Alexandre wrote that

8    EminiFX created hope in the hearts of Haitian families.  This

9    was a close-knit and trusting community.  Mr. Alexandre was

10   strongly admired.  That resonated in the letters I received and

11   in some of the people who spoke today.

12          The owner of what I believe is the company that the

13   defendant now works at described Mr. Alexandre as a man of God,

14   a man of his word, a great leader.  Mr. Alexandre is a hero in

15   our community.

16          Another letter written by a minister who invested in

17   EminiFX wrote, When I have heard about EminiFX and the Haitian

18   community, my first question was who is the CEO?  And when I

19   knew it was Mr. Eddy Alexandre, I did not ask a second question

20   because I knew that Mr. Alexandre was a man of integrity and

21   vision.

22          Another investor said he invested with confidence

23   knowing that Eddy is a trustworthy person who always kept his

24   word.  Yet another investor wrote when I told my husband about

25   EminiFX, he shared with me that since Eddy is the leader, he

N7i5aleS

1     would be on board.  We trust him and know he would never steer

2     us wrong.

3          That was a trust that Mr. Alexandre had in the

4     community.  Those are words coming from his supporters but he

5     did steer them wrong.  He betrayed that trust and that trust

6     only contributed to the huge magnitude of this fraud.  The

7     investment on returns that the defendant promised seemed absurd

8     and unrealistic, between 5 and 9.9 percent week, but these

9     investors believed in him.  They believed in him as a trusted

10     member of the church and as a respected person in the Haitian

11     community and they trusted him with their hard-earned money.

12          Another investor, for instance, wrote to me also in

13     support of Mr. Alexandre, but what he said showed how so many

14     people were deceived.  He wrote:  We live in a world where

15     dishonesty is in full swing, we can trust nobody.  However,

16     among the rules there is an exception.  Eddy Alexandre, our

17     CEO, is an exception.  He is a man of integrity, a man of

18     character, a man of God.  That investor was receiving the

19     promised returns on Friday, but in actuality, investors were

20     suffering massive losses and I suspect many of the victims

21     likewise thought that Mr. Alexandre was someone they could

22     trust.

23          Now, with all of that said, Mr. Alexandre has accepted

24     responsibility for his crime.  He entered a guilty plea at a

25     relatively early stage of this case, especially for a case of

N7i5aleS

```
1    this size and magnitude.  It appears that, for the most part,

2    he has been cooperative with the receiver in a civil case

3    helping the receiver to recover funds from the victim of the

4    offense.  I mention, of course, in this instance where he tried

5    to dissipate funds.  But putting that instance aside, the

6    receiver has reported favorably on Mr. Alexandre's cooperation

7    to secure assets including stipulating to turn over certain

8    assets and providing a list of accounts, and the receiver noted

9    that this helped reduce recovery costs.  That included access

10   to his Coinbase account.  But notwithstanding these efforts, it

11   is clear that victims of this offense are not likely to be made

12   whole.

13          I have also considered the impact of the sentence on

14   Mr. Alexandre's immigration status and his family including the

15   possibility of separation from his family after he completes

16   his sentence.  I have considered these mitigating circumstances

17   but I also must consider the extremely serious nature of this

18   crime, I must consider the nearly 25,000 victims who were

19   defrauded out of nearly $50 million of their hard-earned money.

20   I must consider the massive nature of this fraud.

21          I will now state the sentence I intend to impose.

22   Mr. Alexandre, will you please rise.  Mr. Alexandre, it is the

23   judgment of this Court that you are remanded to the custody of

24   the Bureau of Prisons for 108 months.  That federal term of

25   imprisonment is to be followed by a period of three years of
```

N7i5aleS

1  supervised release.  I conclude that the sentence is sufficient

2  but not greater than necessary to achieve the purposes of

3  sentencing for the reasons I just went through and if you like,

4  you may be seated while I read the conditions of supervised

5  release that you must comply with.

6          The standard conditions of supervised release shall

7  apply.  Those are on pages 51 and 52 of the presentence report.

8  Mr. Bove and Mr. Alexandre, would you like me to read those out

9  loud?

10          MR. BOVE:  That's not necessary, your Honor.

11          THE COURT:  If anyone would like me to read them out

12  loud, I will, but otherwise I assume that Mr. Alexandre and the

13  attorneys have read them, given that everyone has stated that

14  they read the presentence report.

15          In addition, you will be subject to the following

16  mandatory conditions:

17          You must not commit another federal, state, or local

18  crime.

19          You must not illegally possess a controlled substance.

20          I will suspend the drug testing condition based on my

21  determination that you pose a low risk of future substance

22  abuse.

23          You must cooperate in the collection of DNA as

24  directed by the probation officer

25          You also must make restitution, which I will address

N7i5aleS

1    shortly.

2         You also must meet certain special conditions of

3    supervised release and I will explain the special conditions

4    that I will impose.  You must provide the probation officer

5    with access to any requested financial information.  You must

6    not incur any new credit card charges or open additional lines

7    of credit without the approval of the probation officer unless

8    you are in compliance with the installment payment schedule.

9    You must submit your person and any property, residence,

10   vehicle, papers, computer, other electronic communications,

11   data storage devices, cloud storage or media and effects to a

12   search by any U.S. probation officer and, if needed, with the

13   assistance of any law enforcement.  The search will be

14   conducted when there is a reasonable suspicion concerning the

15   violation of condition of supervision or unlawful conduct by

16   you.

17        Failure to submit to a search may be grounds for

18   revocation of release and you shall warrant any other residents

19   of the premises that the premises may be subject to search

20   pursuant to that condition, and any search shall be conducted

21   at a reasonable time and in a reasonable manner.

22        You also shall be supervised in the district of your

23   residence during a term of supervised release.

24        Restitution is mandatory in this case.  In addition,

25   in your plea agreement you agreed to make restitution in an

N7i5aleS

1    amount to be specified by me and that it will be a condition of

2    your supervised release.

3           As discussed earlier, I will order restitution in the

4    amount of $213,829,276.73 today, with the understanding that

5    the parties may come back within 90 days, which I believe would

6    be October 16th, 2023, with the proposed restitution order and

7    table of victims.  At that point they also should advise

8    whether the restitution figure I have just said should be

9    adjusted.

10          You shall make restitution payments by certified

11   check, bank check, money order, wire transfer, credit card, or

12   cash.  The check and money order shall be made payable to SDNY

13   Clerk of Court and mailed or hand-delivered to the U.S. Court

14   House, 500 Pearl Street, New York, New York, attention:

15   Cashier.  You shall write your name and docket number of this

16   case on each check or money order.  Credit card payments must

17   be made in person at the Clerk's office.  Any cash payments to

18   be hand-delivered to the clerk's office with exact change,

19   cannot be mailed.  For payments by wire you shall contact the

20   Clerk's office for wire any instructions.

21          The Clerk of the Court will forward any restitution

22   payments made by Mr. Alexandre to the victims.  Pursuant to

23   Section 3664(f)(2) of Title 18 in consideration of your

24   financial resources and other assets, including whether any of

25   those assets are jointly owned, the projected earnings and

N7i5aleS

other income, and any financial obligations you have including

obligations to dependents, you shall pay restitution in the

manner and according to the following schedule:

        In the interest of justice, restitution shall be

payable in installments pursuant to 18 U.S.C.

Section 3572(d)(1) and (2).  While serving your term of

imprisonment, you shall make installment payments towards your

restitution obligation and you may do so to the Bureau of

Prisons Inmate Financial Responsibility Plan.

        Pursuant to Bureau of Prisons policy, the Bureau of

Prisons may establish a payment plan by evaluating your

six-month deposit history and subtracting any amount determined

by the Bureau of Prisons to be used to maintain contact with

family and friends.  The remaining balance may be used to

determine your payment schedule.  Bureau of Prisons staff shall

help you develop a financial plan and monitor your progress in

meeting your restitution obligation.  Upon your release from

prison, any unpaid restitution will be paid in monthly

installments of at least 15 percent of your gross income but

not less than $300 per month and payable on the 7th of the

month.

        I have considered the factors in Section 3664(f)(2) in

formulating that payment schedule.  You shall notify, within 30

days, the Clerk of the Court, U.S. Probation Office during

supervised release, and U.S. Attorney's office at 86 Chambers

N7i5aleS

Street, New York, New York, of any change of your name,
residence, or mailing address, and any material change in your
financial resources that affect your ability to pay
restitution.  If you disclose or the government otherwise
learns of additional assets not known to the government at the
time of my restitution order, the government may seek an order
modifying the payment schedule consistent with discovery or
additional assets.  Your liability to pay restitution shall
terminate on the day no later than 20 years from the entry of
judgment or 20 years from your release from prison.  Subject to
those limitations, in the event of your death, your estate will
be responsible for any unpaid bail and the restitution amount
and any lien filed pursuant to Section 3613(c) shall continue
until the estate receives a written release of that liability.

        You also shall pay interest on any restitution amount
of more than 2,500 unless restitution is paid in full before
the 15th day after this judgment.

        In your plea agreement you also admitted the
forfeiture allegation in the indictment as to Count One and I
entered the content preliminary order of forfeiture.  So that
the record is clear you are ordered to forfeit to the United
States, pursuant to 18 U.S.C. Section 981(a)(1)(C) and 28
U.S.C. Section 2461(c), a sum of money equal to $ -- a sum of
money equal to $248,829,276.73 in U.S. currency which
represents the proceeds traceable to the commission of this

N7i5aleS

1    offense as well as all right, title, and interest you have in

2    the following specific property:

3            A BMW vehicle with VIN WBAGX0C17NCH48894.

4            A Mercedes Benz GLS 450 vehicle with VIN

5    4JGFF5KE4NA710045.

6            TD Bank accounts held in the name of EminiFX with

7    account numbers ending in 0637, 2914, 2922, 8473, 8598, 8697,

8    and 9920.

9            TD Bank accounts held in the name of the defendant

10   with account numbers ending in 5365 and 2539.

11           Bank of America accounts held in the name of EminiFX

12   with account numbers ending in 3746 and 3742.

13           A Genisys Credit Union account held in the name of the

14   defendant with account number ending in 9223.

15           Interactive Brokers accounts held in the name of the

16   defendant with account numbers ending in 1114 and 1937.

17           Square accounts in the name of EminiFX and/or the

18   defendant with account numbers ending in py1s, pykp, 8y62,

19   3VA3, and CXPF.

20           A Coinbase account held in the name of the defendant

21   with account number ending in -0f09.

22           A Gemini account held in the name of the defendant

23   with account number ending in -2849.

24           I am not going to impose a fine because I find that it

25   would interfere with your ability to pay restitution and

forfeiture.  I do impose a mandatory special assessment of $100

which shall be due immediately.

        Mr. Bove, is there a designation request from the

defense?

        MR. BOVE:  Yes, Judge.  We would ask for designation

as close as possible to the northeast so that Mr. Alexandre can

visit his family.

        THE COURT:  I will make that recommendation.  Of

course, it will be at the determination of the Bureau of

Prisons but I will recommend that he be designated to a

facility in the northeast as close as possible to the New York

City area.

        Aside from all the issues raised today, does either

counsel know of any legal reason why the sentence shall not be

imposed, as stated?

        MR. FOLLY:  No, your Honor.  No legal reason.  We

would just note, I believe your Honor in describing the offense

conduct at one point, you referenced there being 250,000

victims.  I understand you meant 25,000 victims, but just for

purposes of clarity on the record.

        THE COURT:  Thank you.  I very well may have misspoke.

If I did, I certainly meant 25,000 and not 250,000.  Thank you

for pointing that out, Mr. Folly.  As discussed throughout

today's proceeding, the number of victims was approximately

25,000.

N7i5aleS

1          And Mr. Bove, other than the issues you have raised

2    already, is there any legal reason why the sentence should not

3    be imposed, as stated?

4          MR. BOVE:  No, Judge.  Thank you.

5          THE COURT:  I order the sentence I have described to

6    be imposed, as stated.  I find that the sentence is sufficient

7    but not greater than necessary to satisfy the sentencing

8    purposes of 18 U.S.C. Section 3553(a)(2), including the need to

9    promote respect for the law, provide just punishment for the

10   offense, and to afford adequate deterrence to the defendant and

11   to others, and to protect the public from further crimes of the

12   defendant.

13          There was a second count in the indictment, does the

14   government move to dismiss that count?

15          MR. FOLLY:  Yes, your Honor.  We so move at this time.

16          THE COURT:  I will dismiss any open counts, including

17   but not limited to the second count of the indictment.

18          Have the parties discussed a voluntary surrender date?

19          MR. FOLLY:  Your Honor, the government is seeking

20   remand and would ask to be heard at this time.

21          THE COURT:  OK.  Mr. Bove, are you prepared to address

22   that at this time?

23          MR. BOVE:  Yes, your Honor.

24          THE COURT:  Mr. Folly.

25          MR. FOLLY:  Your Honor, there is two primary reasons

that remand is appropriate here.  The first is in light of the

substantial sentence that your Honor just imposed of 108

months, there is a substantial risk of flight for this

defendant.

Throughout these proceedings, your Honor, there has

been a number of references to the defendant's likely or near

certain removal to Haiti, a country he has indicated he clearly

does not wish to return to.  The defendant, in light of the

sentence imposed by your Honor here today, has every incentive

to flee at this juncture as opposed to waiting to serve out a

sentence -- a substantial sentence of 108 months, and then

being removed.

Your Honor, in addition to that, the second

significant reason that favors remand here, and of course as

your Honor knows at this juncture there is a presumption, but

the second reason is that the defendant's conduct while on bail

in this case, much of which has only surfaced in the last

several days, demonstrates his willingness to disregard Court

orders and to take actions that are contrary to the law.  For

example, as your Honor cited during your sentencing remarks,

the defendant dissipated $100,000 in assets of investors.  What

is particularly troubling about that $100,000 is that that

happened after the defendant made representations at various

bail proceedings that there were no assets, that all the assets

had been subsumed within the various actions on behalf of the

N7i5aleS

government, and the CFTC, and we now know that was not true, he
did have access to a substantial sum of money, and that's the
kind of money that could easily get used to assist the
defendant in fleeing.

Your Honor, putting those two facts together, there is
a significant risk of flight in this case.  There is not
sufficient evidence that this defendant is not going to flee
and for that reason we seek remand.

THE COURT:  Mr. Bove.

MR. BOVE:  Judge, this man has no ability to flee.  He
doesn't have the funds to do it, he doesn't have a passport.
It is inconceivable on this record.  I said it in my submission
and I will say it out loud, the only place on earth that Eddy
wants to be is in his home for as long as you let him, until he
is designated.

I talked to Eddy this morning at about 12:30 a.m. when
I saw the government's submission last night, and we talked
about what was in it and we talked about the truth and we
agreed that we would come here and accept responsibility for
that, knowing the consequences that would follow from that
acknowledgment.

He showed up, Judge.  And he will continue to show up
as he has throughout this case.  He is going to serve his
sentence.  And we would ask that he be permitted to surrender
once he is designated.

N7i5aleS

 1        THE COURT:  Are there additional conditions that you

 2   would propose given the additional risk of flight that there is

 3   now given that he has been sentenced?

 4        MR. BOVE:  Whatever the Court thinks is necessary,

 5   obviously.  What is paramount to him is his ability to spend

 6   meaningful time with his family, ideally not under a home

 7   incarceration or home detention condition that limits him to

 8   his house.  Judge, these are his final experiences with these

 9   kids.  He came here today knowing that.  He said good-bye to

10   them when he left.  He is going to serve his sentence.  He just

11   wants a chance to surrender.

12        THE COURT:  Given that there has not been issues

13   brought to my attention during his pretrial release and to the

14   extent that any were raised in the presentence report we

15   addressed them today, and there at least seemed to be a

16   misunderstanding to some extent, I am not going to order

17   Mr. Alexandre remanded today.  I will set a voluntary surrender

18   date.  With that said, though, if there are any issues during

19   his supervision pending that voluntary surrender date, I would

20   want to know about that immediately.

21        In terms of voluntary surrender date, how much time

22   would the parties propose, Mr. Folly?

23        MR. FOLLY:  Your Honor, again, I think considering

24   there is no change in his bail conditions being imposed and the

25   significant risk of flight we just outlined, we would propose

N7i5aleS

1    that it is the earliest practicable date.

2              THE COURT:  Mr. Bove, 30 days?

3              MR. BOVE:  Yes, Judge.  Thank you.

4              THE COURT:  I will set a voluntary surrender date in

5    30 days.  I believe if he is not designated by the Bureau of

6    Prisons to an institution by then he would report to the

7    marshals in this building but I'm not entirely sure as to how

8    that would work.  So Mr. Bove, please look into that.  30 days

9    would bring us to August 17th, so why don't we do it that

10   Friday, August 18, 2023.

11             Mr. Alexandre, I also advise you that you have the

12   right to appeal from the judgment imposing a sentence to

13   whatever extent you haven't waived it.  If you are unable to

14   pay for the cost of appeal, you may apply for leave to appeal

15   in forma pauperis.  If that application were granted, you would

16   be permitted to appeal without payment of fees.  Any notice of

17   appeal must be filed within 14 days of the judgment of

18   conviction.

19             I know that this is a long sentence.  I do hope when

20   you are released from prison and while you are in prison you

21   are able to live a productive life going forward.  It is

22   certainly evident that you have many people who care about you,

23   Mr. Alexandre, very, very much, and I do hope you are able to

24   have a positive impact on society.

25             Please bear in mind that when you are released from

N7i5aleS

```
1    prison, I don't know what is going to happen in terms of your

2    immigration situation, that is something outside of my control,

3    but if you are on supervised release you must take those

4    conditions of supervised release seriously.  If you violate

5    supervised release you most likely will be before me again, in

6    which case if there is a violation I may send you back to

7    prison which is certainly not what I would want to happen.

8            Mr. Folly, is there anything further from the

9    government?

10           MR. FOLLY:  No, your Honor.

11           THE COURT:  Mr. Bove?

12           MR. BOVE:  No, Judge.  And we appreciate the time.

13           THE COURT:  Thank you.

14           I hope everyone has a good evening.

15                           o0o

16

17

18

19

20

21

22

23

24

25
```