UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

UNITED STATES OF AMERICA,

-v-

EDDY ALEXANDRE,

Defendant.

---------------------------------------------------------------------X

22 Cr. 326 (JPC)
24 Civ. 5767 (JPC)

OPINION AND ORDER

JOHN P. CRONAN, United States District Judge:

On February 10, 2023, Eddy Alexandre pleaded guilty, pursuant to a plea agreement, to one count of commodities fraud arising from his operation of EminiFX, a purported cryptocurrency and foreign-exchange investment platform through which he raised nearly $250 million from tens of thousands of investors. In that plea agreement, Alexandre waived his right to appeal or collaterally attack any sentence at or below the statutory maximum of ten years' imprisonment. After the Court sentenced Alexandre to 108 months' imprisonment, he did not appeal.

Now proceeding *pro se*, Alexandre moves pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. He makes myriad arguments, including that his counsel disregarded his instruction to file a notice of appeal, labored under conflicts of interest, and induced him into entering an unknowing and involuntary guilty plea; that he is actually innocent; and that his prosecution violated due process. Alexandre also requests his release on bail while his Section 2255 motion is pending and the unsealing of the grand jury proceedings that led to his Indictment. For the reasons that follow, Alexandre's motions are denied.

## I. Background

### A. Facts

On September 20, 2021, Alexandre founded EminiFX, and for the next eight months he served as the company's President, Chief Executive Officer, and sole owner. Dkt. 112 ("PSR") ¶¶ 12, 14.[1] During that period, EminiFX held itself out as an investment platform through which investors could earn passive returns via automated trading in cryptocurrency and foreign exchange ("FOREX"). *Id.* ¶¶ 12, 15. EminiFX charged its users a monthly service fee of $49.99, as well as additional processing fees, transaction fees, and "performance" fees. *Id.* ¶ 17. Depending on how much they invested, users were assigned to one of twelve "membership levels"; investors of $500 to $2,499, for example, received a Bronze Package, while investors of $2,500 to $4,999 received a Silver Package. *Id.* ¶ 16. Regardless of membership level, each user was promised a "fully serviced Robo-Advisor Assisted account" and "AI Software" that would trade cryptocurrency and FOREX on the user's behalf. *Id.* ¶¶ 12, 15-16. Alexandre described this technology, which EminiFX called the "Robo-Assisted Advisor Account" or "RA3," as his "trade secret" and refused to tell investors how it worked. *Id.* ¶¶ 12, 15. Although investors were required to sign an "earnings disclaimer" acknowledging that there were "no guarantees" about earnings, Alexandre frequently told investors that their money would double within five months of joining by earning at least a 5% weekly return. *Id.* ¶¶ 12, 19.

To attract new users, Alexandre employed a multi-level marketing structure that paid existing users a commission for recruiting new members. *Id.* ¶ 18. And to retain existing users, EminiFX posted weekly earnings statements on each user's account page reporting that their

---

[1] Unless otherwise noted, all docket citations are to the docket in *United States v. Alexandre*, No. 22 Cr. 326 (JPC) (S.D.N.Y.).

balance had grown by between 5% and 9.99% in that week. *Id.* ¶ 21. These tactics worked. Within eight months of its founding, EminiFX had attracted more than 30,000 users, who invested approximately $248.8 million. *Id.* ¶¶ 12, 18, 23.

But EminiFX was a fraud. RA3 was not operational or functional, and the weekly returns that EminiFX had reported to its users were fabricated. *Id.* ¶¶ 13, 15, 22. Alexandre also failed to invest a substantial portion of investor funds in a manner consistent with what he had promised. *Id.* ¶ 22. Roughly $9 million was routed through Alexandre's personal bank account into a brokerage account in his name, where he traded individual equities and single-equity options rather than cryptocurrency or FOREX. *Id.* ¶ 25. In the course of such trading, Alexandre lost approximately $6.3 million—losses he never disclosed to his investors. *Id.* Additionally, tens of millions of dollars were simply held in Bitcoin, which declined in value over the relevant period. *Id.* ¶ 26. Alexandre even spent investor funds on purposes that had nothing to do with trading, including buying a $4.8 million home for himself and his family, purchasing six luxury vehicles, and making deposits on dozens of foreclosure properties in Long Island. *Id.* ¶ 24. In total, EminiFX lost its users tens of millions of dollars. *Id.* ¶¶ 13, 28, 31; Dkt. 107 ("Sent'g Tr.") at 95:7-9, 108:17-19.

**B. Procedural History**

**1. Initial Proceedings**

On May 12, 2022, Alexandre was arrested on a criminal complaint charging him with commodities fraud, in violation of 7 U.S.C. §§ 9(1) and 13(a)(5), 17 C.F.R. § 180.1, and 18 U.S.C. § 2, and wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. Dkt. 1; PSR ¶ 27. That same day, the Honorable Valerie E. Caproni unsealed a civil enforcement action brought by the Commodity Futures Trading Commission ("CFTC") against Alexandre and EminiFX. *CFTC v. Alexandre*,

No. 22 Civ. 3822 (VEC) (S.D.N.Y.), Dkt. 5 (Complaint); *see id.*, Dkts. 6-8 (CFTC's motion for an *ex parte* restraining order and a preliminary injunction). Also that day, Judge Caproni unsealed an order appointing a receiver to take control of EminiFX's assets. *Id.*, Dkt. 9 ¶ 30. About one month later, on June 9, 2022, a grand jury returned an indictment charging Alexandre with one count of commodities fraud ("Count One") and one count of wire fraud ("Count Two"). Dkt. 15 ("Indictment").

Aside from his initial appearance before the Honorable Katharine H. Parker on the day of his arrest, Alexandre was represented by retained counsel Emil Bove, who appeared in this action on May 19, 2022, Dkt. 6, and at the time worked at the law firm Chiesa Shahinian & Giantomasi PC.[2] Alexandre was released on bail conditions at his initial appearance, *see* Minute Entry, May 12, 2022, and those conditions were later modified following Bove's application, Dkts. 7, 11, 12. Bove later also moved to compel discovery from the Government, including materials concerning the CFTC's and the receiver's roles in the investigation of Alexandre, and to take depositions of overseas witnesses pursuant to Federal Rule of Criminal Procedure 15. Dkts. 39-41.

**2. The Guilty Plea**

On February 10, 2023, Alexandre pleaded guilty to Count One of the Indictment pursuant to a written plea agreement with the Government. Dkt. 78 ("Plea Tr."); PSR ¶ 5. In the agreement, the parties stipulated that Alexandre's offense level was 37 and his Criminal History Category was I, which normally would yield an advisory range under the U.S. Sentencing Guidelines of 210 to 262 months' imprisonment, but resulted in a "Stipulated Guidelines Sentence" of 120 months' imprisonment given the ten-year statutory maximum for commodities fraud under 7 U.S.C.

[2] Bove is currently a federal judge on the U.S. Court of Appeals for the Third Circuit. *See* https://www.fjc.gov/history/judges/bove-emil-joseph-iii (last visited Oct. 11, 2026).

§ 13(a)(5). Court Exh. 1 ("Plea Agreement") at 3-4.[3] Alexandre also agreed that he would "not file a direct appeal; nor bring a collateral challenge, including but not limited to an application under Title 28, United States Code, Section 2255 and/or Section 2241, of any sentence of or below the Stipulated Guidelines Sentence of 10 years' imprisonment," and similarly would not appeal or collaterally challenge any term of supervised release at or below the statutory maximum, any fine of $1,000,000 or less, any forfeiture of $248,829,276.73 or less, or any restitution of $213,639,133.53 or less. *Id.* at 5. The plea agreement noted, however, that none of the aforementioned provisions "shall be construed to be a waiver of whatever rights [Alexandre] may have to assert claims of ineffective assistance of counsel, whether on direct appeal, collateral review, or otherwise," rights which the parties "expressly agreed that [Alexandre] reserve[d]." *Id.*

Alexandre further waived "any and all right to withdraw [his] plea or to attack [his] conviction or sentence, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material (other than information establishing the factual innocence of the defendant)," including material under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). Plea Agreement at 6. And he "acknowledge[d] that [he] ha[d] accepted this Agreement and decided to plead guilty because [he] is in fact guilty." *Id.* at 5.

At the commencement of his change-of-plea hearing on February 10, 2023, Alexandre advised that he wished to enter a guilty plea to Count One. Plea Tr. at 2:14-21. The Court then placed Alexandre under oath and advised him of the consequences of making a false statement while under oath. *Id.* at 3:12-22. Following Alexandre's assurances that, among other things, his

[3] The plea agreement, which is dated February 7, 2023, was marked as Court Exhibit 1 at Alexandre's change-of-plea hearing. Plea Tr. at 11:5-9.

mind was "fully clear" and he understood the nature of the proceeding, the Court found him fully competent to plead guilty. *Id.* at 3:24-6:23. The Court then advised Alexandre of the rights he would forgo by pleading guilty, including his right to continue to plead not guilty, his right to a speedy and public jury trial at which he would be presumed innocent and the Government would be required to prove his guilt beyond a reasonable doubt, and his right to have witnesses testify in his defense. *Id.* at 7:12-8:25. The Court further advised Alexandre of his right to counsel "at every stage of [his] case," with the Court assuring Alexandre that "if you cannot afford an attorney, one would be appointed at public expense, meaning free of cost to you, to represent you." *Id.* at 8:9-14. The Court specifically confirmed that Alexandre had discussed with his lawyers whether there was a basis to seek suppression of the Government's evidence and that he understood that he would forgo that right were he to plead guilty. *Id.* at 9:10-18.

Alexandre then confirmed that he had read the plea agreement, had discussed it with Bove, and fully understood the agreement before signing it. *Id.* at 11:5-23. The Government then recited the elements of Count One, including that "the defendant acted knowingly, willfully and with the intent to defraud," and Alexandre acknowledged that the Government would have to prove each element beyond a reasonable doubt at trial. *Id.* at 12:7-13:2. The Court then described the maximum penalties and the Stipulated Guidelines Sentence of ten years under the plea agreement. *Id.* at 13:14-22:24. The Court also explained the agreement's appellate and collateral-attack waivers, telling Alexandre that "if I sentence you to ten years in prison or anything less than ten years in prison, you would have no right to appeal or otherwise try to challenge that sentence," which Alexandre confirmed he understood. *Id.* at 22:25-24:5. Alexandre further affirmed that he had discussed "all of these issues" with his lawyers, that he was "[c]ompletely" satisfied with their representation, that no one had made him any promise or offered him any inducement not

contained in the plea agreement, and that no one had threatened or forced him to plead guilty. *Id.* at 24:6-25:3. Alexandre then allocuted in his own words:

> Your Honor, between approximately September 2021 and approximately May 2022, I failed to inform members and potential members of the EminiFX that some of the trading functions advertised on the EminiFX website related to cryptocurrency and foreign currency (FOREX) were not fully functional. I understand the information I omitted about the status of EminiFX trading functions would have been important to the decisions that the investors were making about whether or not to invest in the EminiFX. I knew this was misleading and wrong. I alone was responsible for making decisions about EminiFX trading functions. . . . Although I fully believed that I would ultimately be able to work things out so that no one suffered a loss and all of the EminiFX members made money, I understand that belief is not a defense to the charge I'm pleading guilty to.

*Id.* at 25:8-26:1.

The Government requested that the Court ask Alexandre whether he "acted with the intent to defraud the investors." *Id.* at 26:5-6. Bove objected to that request, contending that Alexandre's allocution already established the requisite intent under 17 C.F.R. § 180.1(a)(2), which reaches one who "make[s] . . . any untrue or misleading statement of a material fact." *Id.* at 26:7-28:20. After a recess, the Government proposed instead that Alexandre be asked whether he made the misstatements "for the purpose of deceiving the investors in order to get them to invest." *Id.* at 28:22-29:18.

The Court then asked Alexandre a series of questions, and in response, Alexandre confirmed that the statements he had described were ones that he "knew investors would be relying on in making their decision whether or not to invest," explaining that "[t]elling the members that we have the AI software was part of my marketing strategy to attract investors to join me in EminiFX to invest with us." *Id.* at 29:19-30:5. Alexandre also stated that he had made the misstatements "intentionally and willfully to get them to invest with EminiFX," *id.* at 30:9-11, and, when asked whether the "false statements [were] intended to convince the investors, the potential investors to invest," Alexandre answered, "Yes, your Honor," *id.* at 31:11-15. Alexandre

also reiterated that he "knew this was misleading and wrong" and confirmed that he "kn[e]w [he was] breaking the law." *Id.* at 33:1-8. The Court found this allocution sufficient under Rule 11 of the Federal Rules of Criminal Procedure, *id.* at 31:19-32:11, and, after Alexandre stated, "I plead guilty, your Honor," the Court found that Alexandre was "knowingly and voluntarily pleading guilty" and accepted his guilty plea to Count One, *id.* at 34:10-24.

**3. Sentencing**

In advance of sentencing, Bove submitted a forty-five-page sentencing memorandum with nearly 1,100 pages of exhibits, including a letter from Alexandre himself and roughly 500 other letters of support. Dkt. 86 ("Defense Sent'g Submission"); *see* Sent'g Tr. at 4:13-22. In his letter, Alexandre acknowledged that "[s]ome of the trading functions advertised on the EminiFX website, specifically those related to cryptocurrency and foreign currency (FOREX), were not fully functional"; that the "Artificial Intelligence (AI) part that would take over trading functions and the FOREX trading desk were still missing"; and that the weekly "ROI" figures he had provided to investors "were not based on investment returns." Dkt. 86-1 ("Alexandre Sent'g Ltr.") at 3-4. Then, days before sentencing, Bove objected that the Government had only recently produced video clips of an April 28, 2022 investor meeting that it intended to rely on at sentencing. Dkt. 90; *see* Dkt. 93 (Government's response).

The Court held a sentencing hearing on July 18, 2023. At the start of the hearing, Alexandre stated that he had read and discussed the Presentence Investigation Report ("PSR") with Bove "multiple times" and had enough time to raise with Bove anything he wished to be addressed at sentencing. Sent'g Tr. at 12:12-13:8. Bove then stated that the defense did not seek an adjournment to evaluate the April 28 video, after which the Court concluded that the late production of the video had been inadvertent and caused no prejudice. *Id.* at 10:15-11:3, 13:12-

24, 24:1-13. The Court did sustain several objections to the PSR, however, revising the PSR's statement that RA3 "did not exist" to state that RA3 "was not in fact operational or functional at the time these representations were being made to potential investors," and adding several paragraphs concerning EminiFX's employees and hiring that the defense requested. *Id.* at 14:1-17:14, 23:6-26:11. After these changes were made, the Court heard from the prosecutor and Bove as to the appropriate sentence. *Id.* at 44:7-75:14. The Court also heard from multiple individuals who asked to speak. *Id.* at 75:23-90:8. Alexandre then addressed the Court, stating, among other things: "I fully acknowledge the gravity of my actions and take full responsibility for the consequences they have brought upon myself and those that I hold dear who entrusted me with these decisions." *Id.* at 90:12-93:9.

The Court adopted the Guidelines calculation stipulated in the plea agreement, which resulted in an effective Guidelines sentence of 120 months' imprisonment. *Id.* at 41:6-43:6, 94:3-7. After considering the factors set forth in 18 U.S.C. § 3553(a), the Court sentenced Alexandre to 108 months' imprisonment, to be followed by three years of supervised release, and ordered forfeiture and restitution. *Id.* at 94:1-109:5, 110:24-111:9, 113:18-114:23. On the motion of the Government, the Court dismissed any open counts, *i.e.*, Count Two. *Id.* at 116:13-17. The Court also granted the defense's request for a voluntary surrender, which the Court set for August 18, 2023. *Id.* at 116:18-120:10. Before adjourning, the Court advised Alexandre that he had "the right to appeal from the judgment imposing a sentence to whatever extent you haven't waived it" and that "[a]ny notice of appeal must be filed within 14 days of the judgment of conviction." *Id.* at 120:11-18.

Two days after the sentencing hearing, the Court gave notice under Federal Rule of Criminal Procedure 36 that it had misstated the restitution figure at sentencing and would enter

judgment in the amount requested by the Government and set forth in the plea agreement. Dkt. 105. Judgment was then entered on July 25, 2023. Dkt. 106.

**4. Post-Judgment Proceedings**

Alexandre did not appeal his conviction. In 2024, Alexandre, now proceeding *pro se*, filed several post-judgment motions, including a motion for a sentence reduction under Amendment 821 to the U.S. Sentencing Guidelines, which the Court denied. Dkts. 117-118; *see also* Dkts. 119 (requesting a fixed restitution payment schedule), 121-122 (seeking to relieve Bove as counsel and compel the surrender of his case file). Most important for present purposes, on July 22, 2024, Alexandre filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. Dkt. 127 ("Motion"). Then, a few months later, on October 24, 2024, Alexandre filed an amended Section 2255 motion. Dkt. 131 ("Amended Motion"). The Amended Motion consists of a two-page sworn affidavit, *id.* at 1-2 ("Alexandre Aff."), a twenty-five-page document titled "Amendment to 28 U.S.C. Section 2255 Motion to Vacate, Set Aside or Correct Sentence," *id.* at 3-27, a twenty-page memorandum of law, *id.* at 28-47, and several exhibits, *id.* at 48-64.[4]

Liberally construed, the Amended Motion asserts that (1) Bove failed to adequately consult with Alexandre about an appeal and then failed to file a notice of appeal despite Alexandre's request to do so, Amended Motion at 29-33; (2) Alexandre's guilty plea was not knowing, voluntary, and intelligent because Bove gave him erroneous advice about the elements of commodities fraud, ignored his claims of innocence, and pressured him to plead guilty when funds for trial ran out, *id.* at 33-38; (3) Bove labored under conflicts of interest due to the undersigned's prior professional relationships with Bove and Bove's financial interest in avoiding trial, *id.* at 46;

[4] Citations to the Amended Motion and to Alexandre's other submissions refer to the page numbers generated by the Court's electronic case filing system.

(4) Bove provided ineffective assistance by, among other things, failing to investigate, file a motion to dismiss and a suppression motion, subpoena witnesses, and advocate effectively at sentencing, *id.* at 42-45; (5) Alexandre is actually innocent, *id.* at 38-40; (6) Alexandre's prosecution violated due process because the CFTC lacked authority to regulate cryptocurrency, the Government withheld exculpatory evidence, and the Court failed to order restitution within ninety days of sentencing, *id.* at 43-44, 46-47; and (7) the Court should grant Alexandre bail pending resolution of his Section 2255 motion, *id.* at 41.

On December 30, 2024, after reviewing the motion, the Court concluded that testimony from Bove would be needed to allow the Government to respond, and ordered that Alexandre must sign and return a waiver of attorney-client privilege to avoid denial of his motion. Dkt. 136 at 1-2. The Court further directed Bove to then provide sworn testimony in the form of an affidavit addressing Alexandre's allegations of ineffective assistance. *Id.* at 2. Alexandre returned the executed waiver on February 25, 2025, Dkt. 137, and Bove submitted his affidavit on April 18, 2025, Dkt. 139 ("Bove Aff."). The Government filed an opposition to Alexandre's Amended Motion on May 9, 2025. Dkt. 142 ("Opposition"). Then, on July 24, 2025, Alexandre filed a cover letter, Dkt. 149, a motion to unseal the grand jury proceedings, Dkt. 150 ("Unsealing Motion"), a reply memorandum of law, Dkt. 151 ("Reply Mem."), a separate document titled "Reply to Government's Answer Pursuant to 28 U.S.C. § 2255," Dkt. 152 ("Reply"), a statement of facts, Dkt. 153, and a sworn affidavit, Dkt. 154 ("Reply Aff."), which the Court construes collectively as Alexandre's reply in further support of his Amended Motion. Between August 2025 and April 2026, Alexandre also submitted several requests for the Court to take judicial notice of judicial decisions, agency statements, and congressional activity concerning the regulation of digital assets. Dkts. 155-157, 161.

## II. Legal Standard

A federal prisoner may move the sentencing court to "vacate, set aside or correct" his sentence on the ground that it "was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). Because collateral relief is an extraordinary remedy, a movant must show "a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (citation modified).

Section 2255 further directs that, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon." 28 U.S.C. § 2255(b). A court resolving a Section 2255 motion therefore must decide two questions: first, whether any hearing is required; and second, if so, what form the hearing should take.

As to the first question, a movant is not entitled to a hearing simply by asking for one. "To warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief." *Gonzalez v. United States*, 722 F.3d 118, 131 (2d Cir. 2013). Put differently, Section 2255 "does not imply that there must be a hearing where the allegations are vague, conclusory, or palpably incredible." *Id.* at 130-31 (quoting *Machibroda v. United States*, 368 U.S. 487, 495 (1962)) (internal quotation marks omitted). The inquiry is therefore "analogous to . . . a summary judgment proceeding": the movant's papers set forth his claims and supporting evidence, and "[i]f material facts are in dispute, a hearing should usually be held." *Puglisi v. United States*, 586 F.3d

209, 213 (2d Cir. 2009). But unlike in the summary-judgment context, on a Section 2255 motion, "a district court need not assume the credibility of factual assertions . . . where the assertions are contradicted by the record in the underlying proceeding." *Id.* at 214. In particular, a defendant's sworn statements at a plea proceeding "carry a strong presumption of verity," so subsequent "conclusory allegations unsupported by specifics" or "contentions that in the face of the record are wholly incredible" should be "subject to summary dismissal." *Gonzalez*, 722 F.3d at 131 (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)).

Even in those cases where a movant's allegations cannot be rejected on the existing record, a full testimonial hearing is not necessarily required. Indeed, the Second Circuit has recognized "a permissible intermediate step that may avoid the necessity of an expensive and time consuming evidentiary hearing in every Section 2255 case." *Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001) (citation modified). The district court may expand the record "to include letters, documentary evidence, and, in an appropriate case, even affidavits," and then decide the motion on that expanded record. *Id.* (citation modified). Such a course is especially appropriate for claims of ineffective assistance in a Section 2255 motion that is before the same judge who presided over the underlying criminal proceeding. Such a judge is "in a position, based on the knowledge gained in the underlying criminal proceeding and on his or her role as a trier of fact in the habeas proceeding," to conclude that a "particular petitioner had no chance of overcoming counsel's detailed explanation" in an affidavit, such that a full testimonial hearing would entail a "needless expenditure of judicial resources." *Puglisi*, 586 F.3d at 215; *see Chang*, 250 F.3d at 86 (affirming denial of a Section 2255 motion on the basis of counsel's detailed affidavit where the petitioner offered only a "generic claim" and the district court reasonably concluded that live testimony "would not offer any reasonable chance of altering its view of the facts").

## III. Discussion

### A. Failure to File a Notice of Appeal

Alexandre first argues that Bove rendered ineffective assistance by failing to adequately consult with him about an appeal and failing to file a notice of appeal after he directed Bove to do so. Amended Motion at 29-33; Reply Mem. at 7-11. As a general matter, any defense counsel has an obligation to advise their client "about the advantages and disadvantages of taking an appeal" and "mak[e] a reasonable effort to discover the defendant's wishes." *Roe v. Flores-Ortega*, 528 U.S. 470, 478 (2000). "If counsel has consulted with the defendant, . . . [c]ounsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal." *Id.*; *accord Sarroca v. United States*, 250 F.3d 785, 787 (2d Cir. 2001). When such express instructions have been disregarded, a defendant need not "demonstrate that his hypothetical appeal might have had merit" in order to establish a constitutional violation. *Flores-Ortega*, 528 U.S. at 477, 484, 486. And this is true "regardless of whether the defendant has signed an appeal waiver." *Garza v. Idaho*, 586 U.S. 232, 235, 237, 242-46 (2019); *accord Campusano v. United States*, 442 F.3d 770, 771-72, 775-77 (2d Cir. 2006).

Here, Alexandre has not shown that he instructed Bove to file a notice of appeal. To be sure, Alexandre avers that, after sentencing, he "advised defense counsel Bove . . . that [Alexandre] wanted to talk to him concerning the appeal," and that "[d]efense counsel advised [Alexandre] that he would set[]up a time to discuss the appeal." Alexandre Aff. ¶ 2. Alexandre also avers that he "contacted defense counsel multiple times concerning [his] appeal" and that Bove "advised that there was still time left to file but there is nothing, nor rights to appeal." *Id.* ¶ 3. Alexandre even states that he "reached out to counsel to see if there were any options to file a notice [of] appeal . . .

and expressed that [he] wanted to appeal." *Id.* ¶ 4. But Alexandre does not actually aver that he directed Bove to file a notice of appeal, or that Bove agreed to file one and then failed to do so.[5]

Instead, Alexandre's submissions explain that, after speaking with Bove, he "firmly believed that he did not have a right to appeal and could not appeal," and therefore did not "pursue[] a more aggressive stance to appeal." Amended Motion at 31. This version of events is consistent with the account offered by Bove. Bove avers that, after the sentencing hearing, he "discussed the right to appeal with Mr. Alexandre in the courthouse" and "explained to [Alexandre] that [Bove] did not think there was a colorable basis for an appeal because of, among other things, the waiver in his plea agreement and the below-Guidelines sentence issued by the Court." Bove Aff. ¶ 12. Bove further avers that "Mr. Alexandre did not direct [Bove] to file a notice of appeal." *Id.* He adds that he and Alexandre "communicated regularly between July 2023 and February 2024," while continuing to litigate the CFTC action, and that at no point in that period did Alexandre direct him to file an appeal or claim that he was innocent. *Id.* ¶ 13.

Because Alexandre's and Bove's accounts do not actually diverge on whether Alexandre directed Bove to file a notice of appeal, there are no "detailed and controverted issues of fact that, if proved at a hearing, would entitle [Alexandre] to relief." *Gonzalez*, 722 F.3d at 131. But even if Alexandre's submissions could be read to raise a genuine factual dispute requiring some form of hearing, the Court has already afforded Alexandre the "intermediate step" contemplated by *Chang*, 250 F.3d at 86. As set forth above, the Court obtained a detailed affidavit from Bove addressing each of Alexandre's allegations, and then received Alexandre's reply in support of the

[5]Alexandre's unsworn reply memorandum asserts for the first time "that the evidence in this case indicates that [Alexandre] expressly communicated his desire to appeal during sentencing." Reply Mem. at 10. It is unclear if Alexandre is referring to a statement on the record in court or a private communication to Bove, but the transcript reflects no such statement, *see* Sent'g Tr. at 91:3-93:25, 120:11-121:14, nor does any other "evidence in this case."

Amended Motion, which itself included a further sworn affidavit and a statement of facts. Dkts. 136-139, 149-154. This is precisely the type of expanded record on which the Second Circuit has approved of resolving ineffective-assistance claims without live testimony. *See Chang*, 250 F.3d at 86 (affirming denial of a Section 2255 motion without a testimonial hearing where live testimony "would not offer any reasonable chance of altering [the court's] view of the facts"); *Castillo v. United States*, No. 19 Cr. 428 (JGK), 2023 WL 6622071, at *6 (S.D.N.Y. Oct. 11, 2023) (denying a failure-to-appeal claim without a hearing where the movant alleged that his counsel "discouraged" him from appealing but did "not allege that any of his lawyers refused to file a notice of appeal that he asked them to file").

Alexandre also has not shown that Bove failed to adequately advise him "about the advantages and disadvantages of taking an appeal." *Flores-Ortega*, 528 U.S. at 478. Bove attests that he discussed the possibility of an appeal with Alexandre immediately after sentencing and gave him a candid assessment of its prospects. Bove Aff. ¶ 12. Alexandre's own affidavit confirms that these discussions occurred. Alexandre Aff. ¶¶ 2-4. To the extent Alexandre contests the quality of Bove's advice that an appeal would be unlikely to prevail, that challenge easily fails. Alexandre had waived his right to appeal (other than a claim of ineffective assistance of counsel) a sentence of 120 months or less in prison, he received a sentence of 108 months' imprisonment which also was below the Guidelines range, and his plea agreement foreclosed the *Brady* and *Giglio* theories that he now says he wanted to press on appeal. *See* Plea Agreement at 5-6. Counsel does not perform unreasonably by accurately advising a client that an appeal would be futile. *Flores-Ortega*, 528 U.S. at 478.[6]

[6] Alexandre's related contention that he was misled by the Court's advisement that he could appeal "to whatever extent [he] ha[dn't] waived it," Amended Motion at 31, is similarly meritless.

**B. Validity of the Guilty Plea**

Alexandre next contends that his guilty plea was not knowing, voluntary, and intelligent. He principally alleges that Bove "induced" the plea through "faulty and erroneous[] legal advice," and pressured Alexandre to plead guilty because Alexandre lacked funds to pay for representation through a trial. Amended Motion at 6-7, 33-38; Reply at 23-25. Read liberally, his submissions also suggest that the Court did not explain to him the "legal difference between [m]ateriality and intent to defraud." Amended Motion at 6. Both theories fail for the same reason: the record of Alexandre's guilty plea proceeding on February 10, 2023 establishes that he pleaded guilty with a full understanding of the commodities-fraud charge, the consequences of his guilty plea, and the rights he was surrendering.

A guilty plea "is constitutionally valid only to the extent it is 'voluntary' and 'intelligent.'" *Bousley v. United States*, 523 U.S. 614, 618 (1998) (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)). A plea is voluntary when it is not "induced by threats . . . , misrepresentation . . . , or perhaps by promises that are by their nature improper," *Brady*, 397 U.S. at 755 (citation modified), and it is intelligent when the defendant "receives real notice of the true nature of the charge against him," *Bousley*, 523 U.S. at 618 (citation modified). Federal Rule of Criminal Procedure 11 implements these requirements by directing the court to address the defendant personally, to confirm his understanding of the charge and the consequences of the plea, to determine that the plea is voluntary, and to determine that there is a factual basis for it. Fed. R. Crim. P. 11(b).

As relevant here, when a defendant attacks his guilty plea on the basis of counsel's ineffective assistance, he must show, among other things, "that there is a reasonable probability

---

The Court's statement was accurate, it tracked the language of Federal Rule of Criminal Procedure 32(j)(1)(B), and Alexandre's own affidavit shows that he understood that a right to appeal existed and that he had fourteen days from the judgment of conviction to exercise it, Alexandre Aff. ¶ 1.

that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 56, 59 (1985) (citation modified). Courts "should not upset a plea solely because of post hoc assertions from a defendant about how he would have pleaded but for his attorney's deficiencies," but "should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Lee v. United States*, 582 U.S. 357, 369 (2017). Regardless of the theory by which a defendant attacks his plea, a defendant's sworn statements at the plea proceeding "carry a strong presumption of verity," *Gonzalez*, 722 F.3d at 131 (quoting *Blackledge*, 431 U.S. at 74), and a district court is "entitled to rely upon the defendant's sworn statements, made in open court," in rejecting a claim that his plea was unknowing or coerced, *United States v. Hernandez*, 242 F.3d 110, 112-13 (2d Cir. 2001).

The plea colloquy alone forecloses Alexandre's claims. The Government recited the elements of commodities fraud, and Alexandre acknowledged that he understood the Government would have to prove each element beyond a reasonable doubt if the case proceeded to trial. Plea Tr. at 12:7-13:2. The Court then reviewed the plea agreement, the maximum penalties, the Stipulated Guidelines Sentence, and various waivers in the agreement, and Alexandre confirmed his understanding of those terms. *Id.* at 11:5-24:5. Alexandre swore that no one had promised him anything outside the plea agreement, that no one had threatened or forced him to plead guilty, and that he was "[c]ompletely" satisfied with Bove's representation. *Id.* at 24:9-25:3. Alexandre also admitted to his criminal conduct. He allocuted that he told investors that EminiFX had "AI software" it did not have, that he did so "intentionally and willfully to get them to invest," that his false statements were "intended to convince . . . potential investors to invest," and that he "knew this was misleading and wrong" and that he was "breaking the law." *Id.* at 25:8-26:1, 29:19-31:15, 33:1-8. In light of these admissions, Alexandre's present assertions that he was misadvised,

uninformed, and coerced are the kind of "post hoc assertions," *Lee*, 582 U.S. at 369, that cannot overcome the "strong presumption of verity" that attaches to his previous sworn statements, *Gonzalez*, 722 F.3d at 131 (citation omitted).[7]

**C. Conflicts of Interest**

Alexandre next contends that Bove labored under two conflicts of interest that adversely affected his representation. First, he points to the Court's disclosure, at the outset of the case, that the undersigned had previously worked at the United States Attorney's Office with Bove. Amended Motion at 46; Reply at 23-24; *see* Dkt. 21 (transcript of arraignment and pretrial conference on June 14, 2022) at 3:11-4:3. Second, he contends that Bove's interest in being paid gave him a financial incentive not to proceed to trial. Amended Motion at 46; Reply at 24-25.

When defense counsel labors under an "actual conflict," meaning one that "affected [his] performance" rather than "a mere theoretical division of loyalties," *Mickens v. Taylor*, 535 U.S. 162, 171 (2002), prejudice is presumed and a defendant need only show that such conflict "adversely affected his lawyer's performance," *Cuyler v. Sullivan*, 446 U.S. 335, 348-50 (1980). By contrast, if there is a merely "potential" conflict, in which "the interests of the defendant may place the attorney under inconsistent duties at some time in the future," a defendant must demonstrate deficient performance under the standard of *Strickland v. Washington*, 466 U.S. 668, 688-89, 693-94 (1984). *United States v. Williams*, 372 F.3d 96, 102-03 (2d Cir. 2004) (citation modified).

[7] Alexandre's specific assertion that Bove induced his plea by demanding $750,000 for trial, Reply Aff. ¶ 17, is contradicted by Bove's averment that "[n]o one in the meeting Mr. Alexandre referenced in his § 2255 motion asserted that we would withdraw if he chose to proceed to trial," Bove Aff. ¶ 14. Nor does Alexandre aver that Bove threatened to withdraw should the case go to trial. In any event, the Court advised Alexandre at the change-of-plea hearing that "if you cannot afford an attorney, one would be appointed at public expense, meaning free of cost to you," which Alexandre confirmed he understood. Plea Tr. at 8:9-14.

Neither of Alexandre's theories describes an actual conflict, nor does Alexandre show any deficient performance under *Strickland* in connection with a potential conflict. A judge's prior professional acquaintance with the lawyers appearing before him places no divided loyalty on defense counsel, and it says nothing about whether counsel's interests diverged from his client's. And to the extent that Alexandre suggests that the undersigned should have recused, that argument fails too. The undersigned's prior service at the U.S. Department of Justice did not involve "participat[ion] as counsel, adviser or material witness concerning [this] proceeding," 28 U.S.C. § 455(b)(3), and prior professional relationships do not, on their own, provide reason that a judge's "impartiality might reasonably be questioned," *id.* § 455(a). *See United States v. Bayless*, 201 F.3d 116, 126-27 (2d Cir. 2000) (recusal under Section 455(a) turns on whether "an objective, disinterested observer fully informed of the underlying facts" would "entertain significant doubt that justice would be done absent recusal").

Alexandre's second theory fares no better. A retained lawyer's interest in being paid is a feature of every retained representation, and the Second Circuit has held that a fee dispute between a defendant and his lawyer does not, without more, create an actual conflict of interest. *United States v. O'Neil*, 118 F.3d 65, 71-72 (2d Cir. 1997). Moreover, Bove avers, and Alexandre does not contest, that even after Bove and Alexandre met to discuss legal fees, Bove "spent a significant amount of time on Mr. Alexandre's guilty plea and sentencing despite [Bove's] understanding that [Alexandre] would not be able to pay the associated fees." Bove Aff. ¶ 14. Indeed, Bove's thorough and extensive sentencing submissions and his effective advocacy at Alexandre's sentencing leave little doubt that Bove devoted significant time to sentencing. *See infra* III.D.2.

**D. Remaining Ineffective-Assistance Claims**

Alexandre's remaining ineffective-assistance claims, which are based on Bove's pretrial decisions and his performance at sentencing, require Alexandre to "show: (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *United States v. Brown*, 623 F.3d 104, 112 (2d Cir. 2010) (internal quotation marks omitted). On the performance prong, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," since "[t]here are countless ways to provide effective assistance in any given case." *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 689). On the prejudice prong, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome," but it is not enough to show that counsel's error had "some conceivable effect" on the proceeding. *Strickland*, 466 U.S. at 693-94.

**1. Pretrial Investigation and Motions**

Alexandre first faults Bove for failing to investigate "the general aspect of the digital asset offering," failing to investigate or to subpoena unnamed witnesses, and failing to move to dismiss the Indictment or to suppress unspecified evidence. Amended Motion at 42-43. None of these contentions are persuasive.

As to Bove's alleged failure to investigate, Alexandre does not identify a single witness counsel should have interviewed or subpoenaed, what that witness would have said, or how such testimony would have affected Alexandre's decision to plead guilty. *See Gonzalez*, 722 F.3d at 131-32 (holding that a habeas movant's lengthy affidavit, which did not describe what a further investigation would have revealed, did not warrant granting a hearing); *United States v. Patasnik*,

89 F.3d 63, 68 (2d Cir. 1996) (rejecting as "conclusory" claims that counsel failed to investigate where the defendant "point[ed] to nothing" that "would have made a lawyer optimistic about taking the case to trial"). In fact, the record shows that Bove actively investigated the case, filing a motion to compel that resulted in the Government's disclosure of witness identities and a successful Rule 15 motion to depose overseas custodians of the very account records Alexandre says would have supported his defense. Dkts. 39-41, 53, 72; Bove Aff. ¶ 3.

Additionally, the motions that Alexandre says Bove should have filed likely would have been futile. A motion to dismiss likely would have failed because the Indictment tracked the language of the statutes charged and alleged the time and place of the offense, as required. *See United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013); Indictment ¶¶ 1-2. And a suppression motion also likely would have failed, particularly given the Court's rejection of the defense's argument for additional discovery based on purported misstatements in the law enforcement agent's affidavit in support of warrants to search EminiFX's office and a phone seized incident to Alexandre's arrest. *See United States v. Alexandre*, No. 22 Cr. 326 (JPC), 2023 WL 416405, at *14 (S.D.N.Y. Jan. 26, 2023) (concluding that Alexandre "has not made a preliminary showing that the challenged statements in [the affiant's] affidavits—that [Alexandre] failed to invest the vast majority of the investors' funds—were deliberate falsehood[s] or reckless disregard for the truth" (internal quotation marks omitted)).

**2. Sentencing**

Alexandre also argues that at sentencing, Bove failed to investigate mitigating evidence, failed to object to the Government's characterizations of EminiFX's operations and of Alexandre's personal spending, failed to "correct the record" concerning RA3, and improperly declined the Court's offer of an evidentiary hearing on the late-produced video. Amended Motion at 43-45.

The record refutes these claims. Bove submitted a lengthy sentencing memorandum with more than a thousand pages of exhibits, gathered hundreds of letters in support of Alexandre, pressed numerous objections to the PSR, and obtained several favorable revisions, including the very change to the PSR's description of RA3 that Alexandre now says Bove failed to secure. *See* Defense Sent'g Submission; Sent'g Tr. at 4:13-22, 14:1-17:14, 19:17-26:11. Additionally, Bove's decision not to contest that RA3 was non-functional was a sound choice in light of Alexandre's admissions at the change-of-plea hearing that EminiFX's trading functions were "not fully functional" and that he falsely told investors that EminiFX had "AI software." Plea Tr. at 25:8-13, 30:3-5, 31:11-15. Indeed, Alexandre again acknowledged as much in his letter to the Court prior to sentencing. *See* Alexandre Sent'g Ltr. at 3-4 (acknowledging that "[s]ome of the trading functions advertised on the EminiFX website, specifically those related to cryptocurrency and foreign currency (FOREX), were not fully functional" and that the "Artificial Intelligence (AI) part that would take over trading functions and the FOREX trading desk were still missing"). Finally, Bove's decision to forgo an evidentiary hearing concerning the April 28 video was reasonable given that that video was not exculpatory. Dkt. 90 (pre-sentencing letter from Bove) at 1; Sent'g Tr. at 24:7-13. Ultimately, despite Alexandre's *post hoc* protestations, Bove vigorously and effectively advocated on his behalf at sentencing, and the Court imposed a sentence below the Stipulated Guidelines Sentence. Thus, there was no deficiency in Bove's performance at sentencing, nor a reasonable probability that a different approach would have yielded a more favorable result for Alexandre.

### E. Actual Innocence

Alexandre next asserts that he is actually innocent of commodities fraud. Amended Motion at 14-27, 38-40; Reply Mem. at 26-30. Neither the Supreme Court nor the Second Circuit has

recognized a freestanding claim of actual innocence under Section 2255, but those courts have also "never ruled that possibility out." *Fernandez v. United States*, 146 S. Ct. 1292, 1306 (2026). If such a claim exists, however, the standard "would necessarily be extraordinarily high." *Herrera v. Collins*, 506 U.S. 390, 417 (1993). For comparison, a claim of actual innocence can in some contexts act as a "gateway" for asserting otherwise procedurally-barred claims, and in that context, a petitioner must present "new reliable evidence . . . that was not presented at trial," and show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995). A freestanding claim of actual innocence, such as the one that Alexandre asserts here, would in theory require even "more convincing proof of innocence than" the gateway standard. *House v. Bell*, 547 U.S. 518, 555 (2006).

Alexandre does not come close to clearing this demanding bar. He offers no new evidence of innocence. Rather, the facts he emphasizes, including EminiFX's Bitcoin holdings, its real estate contracts, its employees, and his Form 40 filing with the CFTC, were known to him before he pleaded guilty and were the subject of extensive pretrial litigation. *See* Dkts. 39-41, 72; Amended Motion at 11-17. And more fundamentally, Alexandre's claim of innocence is contradicted by his own sworn admissions. He admitted under oath that he told potential investors that EminiFX had AI trading software that it did not have, that he did so intentionally to induce them to invest, and that he knew this was misleading, wrong, and illegal. Plea Tr. at 25:8-26:1, 29:19-31:15, 33:1-8. He repeated those admissions in writing before sentencing. Alexandre Sent'g Ltr. at 3-4. If a defendant's "bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea," *United States v. Torres*, 129

F.3d 710, 715 (2d Cir. 1997), they certainly are not sufficient to establish, years later, that no reasonable juror could have convicted him.

### F. Remaining Challenges

Alexandre's remaining contentions are that the Government violated *Brady* and *Giglio* by withholding the April 28, 2022 video and other information, Amended Motion at 7, 26-27; that his prosecution violated due process because the CFTC acted outside its statutory authority and because the regulatory landscape governing digital assets was too unsettled to give him fair notice that his conduct was unlawful, *id.* at 46-47; and that the Court failed to determine restitution within ninety days of sentencing, *id.* at 43-44. Each of these challenges is barred by Alexandre's plea agreement. *See Sanford v. United States*, 841 F.3d 578, 580 (2d Cir. 2016) ("A defendant's knowing and voluntary waiver of the right to appeal or collaterally attack his conviction and/or sentence [pursuant to Section 2255] is enforceable."). Alexandre explicitly waived the right to attack his conviction or sentence "on the ground that the Government has failed to produce any discovery material," including *Brady* and *Giglio* material, other than "information establishing the factual innocence of the defendant." Plea Agreement at 6. He also waived his right to bring a Section 2255 motion challenging "any sentence of or below the Stipulated Guidelines Sentence of 10 years' imprisonment," aside from "claims of ineffective assistance of counsel." *Id.* at 5. And in any event, as just noted, Alexandre fully allocuted to committing the offense in Count One, admitting that he told potential investors that EminiFX had AI trading software that it did not have, that he did so intentionally to induce them to invest, and that he knew this was misleading, wrong, and illegal. Plea Tr. at 25:8-26:1, 29:19-31:15, 33:1-8. Alexandre also waived any challenge to a restitution amount of $213,639,133.53 or less. Plea Agreement at 5. And, as also discussed above,

Alexandre's plea was knowing and voluntary, so those waivers are enforceable. *See Frederick v. Warden, Lewisburg Corr. Facility*, 308 F.3d 192, 195-96 (2d Cir. 2002).

Beyond the arguments relating to his Section 2255 motion, Alexandre makes two additional requests, both of which the Court denies. First, Alexandre asks to be released on bail pending resolution of his Section 2255 motion. Amended Motion at 41. Because this Opinion and Order denies Alexandre's motion, the request for bail is denied as moot. Second, Alexandre moves under Federal Rule of Criminal Procedure 6(e) to unseal the grand jury proceedings in this case. Unsealing Motion at 1-5. Because Alexandre's guilty plea waived any non-jurisdictional challenge to the manner in which the Indictment was obtained, *Hayle v. United States*, 815 F.2d 879, 881 (2d Cir. 1987), and, in any event, establishes the very probable cause that he now contends the grand jury lacked, the unsealing motion is denied.

**IV. Conclusion**

For the foregoing reasons, Alexandre's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255, his request for bail, and his motion to unseal the grand jury proceedings are denied. Because the record before the Court conclusively shows that Alexandre is entitled to no relief, no evidentiary hearing is required. *See* 28 U.S.C. § 2255(b). Alexandre also has not made a substantial showing of the denial of a constitutional right, so a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); *Tankleff v. Senkowski*, 135 F.3d 235, 241 (2d Cir. 1998). The Court further certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Opinion and Order would not be taken in good faith, so *in forma pauperis* status is denied. *See Coppedge v. United States*, 369 U.S. 438, 445 (1962). The Clerk of Court is respectfully directed to close *Alexandre v. United States*, No. 24 Civ. 5767 (JPC) (S.D.N.Y.), to terminate the motions pending

at Docket Numbers 127, 131, and 150 in *United States v. Alexandre*, No. 22 Cr. 326 (JPC) (S.D.N.Y.), and to mail a copy of this Opinion and Order to Eddy Alexandre.

SO ORDERED.

Dated: October 19, 2026
New York, New York

JOHN P. CRONAN
United States District Judge